# Exhibit A

**FOX ROTHSCHILD LLP**
CHRISTINE F. MARKS (024631990)
JOSEPH J. DIPASQUALE (016191994)
KIERAN T. ENSOR (305662019)
49 Market Street
Morristown, New Jersey 07960-5122
Telephone:    973.992.4800
Facsimile:    973.992.9125
CMarks@FoxRothschild.com
JDipasquale@FoxRothschild.com
KEnsor@FoxRothschild.com

**LAW OFFICES OF TIMOTHY KEBBE**
TIMOTHY P. KEBBE (Pro Hac Vice Pending)
245 Saw Mill River Road, Suite 106
Hawthorne, New York 10532
Phone 914.733.7745
tkebbe@kebbelaw.com

*Attorneys for Plaintiff, Legal Bay LLC*

| | |
|---|---|
| LEGAL BAY LLC,<br><br>Plaintiff,<br><br>vs.<br><br>MUSTANG FUNDING, LLC, MUSTANG SPECIALTY FUNDING I, LLC, MUSTANG SPECIALTY FUNDING II, LLC, JAMES BELTZ and KEVIN CAVANAUGH,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>ESSEX COUNTY – CHANCERY DIVISION<br><br>*Civil Action*<br><br>Docket No.: ESX-C-<br><br>**COMPLAINT** |

Plaintiff, Legal Bay Funding LLC, by its attorneys, Fox Rothschild, LLP, through its

Complaint against defendants Mustang Funding, LLC, Mustang Specialty Funding I, LLC,

Mustang Specialty Funding II, LLC, James Beltz and Kevin Cavanaugh, alleges as follows:

## INTRODUCTION

1.      Plaintiff Legal Bay LLC ("LB") brings this action for, among other things, (a) a declaration that LB, Mustang Funding, LLC ("Mustang"), Mustang Specialty Funding I, LLC ("Mustang Funding I"), and Mustang Specialty Funding II, LLC ("Mustang Funding II"); Mustang, Mustang Funding I, and Mustang Funding II are sometimes referred to collectively as the "Mustang Entities") formed a joint venture for the purpose of providing financing for litigation funding matters originated by LB in October 2018 (the "Joint Venture"); (b) dissolution and winding up of the Joint Venture; (c) the appointment of a special fiscal agent to dissolve and wind up the Joint Venture's business; (d) an accounting with respect to the Joint Venture; (e) declaring that the Mustang Entities breached fiduciary duties owed LB in connection with the Joint Venture; (f); that the Mustang Entities breached the Joint Venture agreement with LB; (g) declaring that Mustang Funding I breached an Agreement to Provide a Line of Credit to Legal Bay (the "LOCA") (Exhibit A), and (h) entering an injunction barring Mustang Funding I from soliciting, employing, hiring, retaining or engaging certain individuals and entities set forth in the LOCA for a period of one (1) year following the date that the LOCA terminates.

2.      Plaintiff also brings this action against James Beltz and Kevin Cavanaugh for fraudulently inducing LB to form the Joint Venture.

**PARTIES**

3.      Plaintiff Legal Bay LLC is a New Jersey limited liability company with its principal place of business located at 60 Roseland Avenue, Caldwell, New Jersey. Christopher Janish is LB's sole member and chief executive officer. Dr. Pete Caravella ("Dr. Caravella") is an active investor in Legal Bay LLC.

4.      Defendant Mustang Funding, LLC is a Delaware limited liability company with offices located in Hennepin County, Minnesota, Plymouth Meeting, Pennsylvania, and Caldwell, New Jersey.

5.      Defendant Mustang Specialty Funding I, LLC is a Delaware limited liability company with offices located in Hennepin County, Minnesota, Plymouth Meeting, Pennsylvania, and Caldwell, New Jersey. Mustang Funding I is registered to do business in New Jersey.

6.      Defendant Mustang Specialty Funding II, LLC is a is a Delaware limited liability company with offices located in Hennepin County, Minnesota, Plymouth Meeting, Pennsylvania, and Caldwell, New Jersey. Mustang Funding II is registered to do business in New Jersey.

7.      Defendant James Beltz is a resident of Minnesota and a managing member and co-founder of the Mustang Entities.

8.      Defendant Kevin Cavanaugh is a resident of Minnesota and a managing member and co-founder of the Mustang Entities. (Mr. Beltz and Mr. Cavanaugh are collectively, the "Individual Defendants").

## JURISDICTION AND VENUE

9.      This Court has general jurisdiction over Mustang, Mustang Funding I and Mustang Funding II. Each of the Mustang Entities has an office to conduct business in Caldwell, New Jersey.

10.      This Court also has general jurisdiction over the Mustang Entities because each is a member of the Joint Venture with LB, the purpose of which is to conduct a litigation funding business in New Jersey and other states. LB, Mustang and Mustang Funding I formed the Joint Venture in October 2018. When Mustang Funding II was formed in December 2019, it became a member of the Joint Venture and was subject to the same terms and conditions of the oral Joint Venture agreement, set forth below, as the other members of the Joint Venture.

11.      In furtherance of their Joint Venture, the Mustang Entities and LB have entered into ninety-seven (97) funding contracts to provide financing for plaintiffs and attorneys in connection with litigation funding matters in New Jersey state and federal courts. As of March 31, 2022, the Mustang Entities and LB have entered into 1,680 funding contracts with plaintiffs and attorneys to provide litigation funding in connection with lawsuits pending in various states (including the 97 in New Jersey).

12.      In connection with Mustang's due diligence concerning LB immediately prior to formation of the Joint Venture, Messrs. Beltz and Cavanaugh sent Frank LaRosa, an employee of Kevin Cavanaugh to visit and inspect LB's office and meet LB's employees in New Jersey.

13.      The Mustang Entities solicit business from New Jersey plaintiffs, attorneys, and surgical centers though internet advertising targeted at New Jersey residents. Through their misappropriation and unlawful diversion of LB's business relationships with New Jersey attorneys

and brokers sourcing plaintiffs' cases pending in New Jersey courts, the Mustang Entities regularly

do business with and provide litigation financing to individuals and entities located in New Jersey.

14.     The Mustang Entities and the Individual Defendants have systematic and regular

contacts with New Jersey that subject them to general jurisdiction in this State.

15.     For the same reasons, and as set forth below, the Mustang Entities' and the

Individual Defendants' contacts with New Jersey and their relationship with LB, the Joint Venture

and the subject matter of this litigation - all of which arise directly out of the Mustang Entities and

Individual Defendants sustained and regular contacts with LB in New Jersey - subject each of them

to specific jurisdiction in this State.

16.     This Court holds specific personal jurisdiction over Mr. Beltz and Mr. Cavanaugh

because they have made material misrepresentations to Mr. Janish, who received them in New

Jersey, to induce LB to become a member of the Joint Venture and execute the LOCA.

17.     The Individual Defendants' intentional dissemination of false information to Mr.

Janish and Dr. Caravella, designed to deceive and damage LB in New Jersey, provides this Court

with specific jurisdiction over Mr. Beltz and Mr. Cavanaugh in this State.

## FACTS COMMON TO ALL COUNTS

18.     LB is an originator of non-recourse pre-settlement and litigation funding for plaintiffs involved in lawsuits (for example, motor vehicle accidents, products liability, employment discrimination and wrongful termination, commercial contracts, medical and legal malpractice, premises liability, sexual assault, and adversary proceedings in bankruptcy) in various jurisdictions throughout the United States.

19.     Litigation funding provides money to individuals for (a) life's necessities (e.g., rent, food, mortgage payments) during the pendency of a litigation, and (b) to pay for costs connected to the events that caused the underlying lawsuit—i.e., medical procedures.

20.     LB also originates financing for attorneys. LB's attorney financing provides financial support for an attorney or law firm to cover expenses necessary to litigate a case taken on contingency to its conclusion. Like litigation funding for individuals, if the attorney obtains monetary recovery for a plaintiff, LB is reimbursed the initial sum provided, and related usage fees, both of which are outlined in the funding contract.

21.     The reimbursement comes from the legal fees and expenses collected by the attorney. If an attorney does not obtain a recovery for its client or does not receive or recover legal fees or expenses in a litigation, LB (and, under the joint venture agreement, the Mustang Entities) loses amounts initially provided to the attorney and is not reimbursed.

22.      LB additionally provides pre-settlement, litigation, attorney and surgical funding (collectively, "litigation funding") in various states throughout the United States.

23.     Under the Joint Venture between the parties, LB services litigation funding contracts and monitors the Joint Venture's funding portfolio; Mustang collects the sums due under the Joint Venture's funding contracts with plaintiffs and attorneys when there is a monetary

recovery litigation funding matter. A copy of LB's website describing its litigation funding business (https://lawsuitssettlementfunding.com) is attached as Exhibit B.

24.     The Mustang Entity Defendants are now engaged in the same litigation funding business as LB. A copy of the Mustang Entities' website (https://www.mustangfunding.com) describing their litigation funding business is attached as Exhibit C. The Mustang Entities now provide litigation funding in the same jurisdictions as LB and competes with LB for litigation funding business in those jurisdictions. The Mustang Entities proclaim on their website to have funded $75 million; however only $31 million of that was credited to the Joint Venture.  The Mustang Entities conduct violates their Joint Venture agreement with LB, unlawfully diverts business opportunities from the Joint Venture, and breaches their fiduciary duty and duty of loyalty to LB.

### A. Negotiations for the Joint Venture

25.     Mr. Janish and Dr. Caravella first met Mr. Beltz while he was a director of Gavel Funding, LLC ("Gavel") in or about 2016. Gavel, a hedge fund, provided financing for LB's litigation funding business for a period of time in 2017 before exiting that business altogether, also in 2017. LBV Funding, LLC, a non-party affiliate of LB,[1] was an investor in and member of Gavel from its inception until Gavel stopped providing financing for litigation funding matters.

26.     In the spring of 2018, Dr. Caravella contacted Mr. Beltz—at the time, a portfolio manager for a hedge fund in Boston—to determine if he had an interest in returning to the litigation funding industry as a financer for LB's originations. Mr. Beltz was immediately enthusiastic about the idea. Mr. Beltz informed Dr. Caravella that his colleague, Kevin Cavanaugh, would also be

---

[1] LB Capital, LLC is a Delaware limited liability company registered to do business in New Jersey ("LBC"). LBC is the successor-in-interest to LBV Funding, LLC, which was a Nevada limited liability company ("LBV"). LB and LBC are collectively referred to as "LB," LBV was not a member of LB, and did not have ownership, management, or voting rights in LB.

interested in providing financing for LB's litigation funding business. Mr. Cavanaugh, at that time, was the president and chief investment officer of a hedge fund focused on high yield and distressed debt.

27.     None of the Mustang Entities had been formed when Dr. Caravella and Mr. Beltz first spoke about the Individual Defendants providing financing for LB's litigation funding in the spring of 2018.

28.     Throughout the summer of 2018, Messrs. Beltz and Cavanaugh had numerous conference calls, and engaged in frequent email and text communications, with Mr. Janish and Dr. Caravella about a proposed litigation funding joint venture between LB and any entity or entities to be formed by the Individual Defendants ("Newco.").

29.     Mr. Beltz and Mr. Cavanaugh each told Mr. Janish and Dr. Caravella that Newco. would provide financing for LB's litigation funding business. The Individual Defendants informed Mr. Janish and Dr. Caravella that Newco. — which, when formed, became the three Mustang Entity defendants—would: (a) provide financing for the LB's litigation funding business; (b) not enter the litigation funding business as a broker or originator of litigation funding matters; and (c) not do business with LB's broker, attorney, and surgical provider relationships, either existing in the summer and fall of 2018, or to be developed after Newco. began providing financing for LB's litigation funding business, other than through LB.

30.     The Individual Defendants stated to Mr. Janish and Dr. Caravella that as experienced hedge fund managers, they had contacts with investors which would enable Newco. to raise far more money than LBV – funded solely by Dr. Caravella – to invest in litigation funding matters originated by LB though LB's network of brokers, attorneys, and surgical providers.

31.     In this regard, LB had established financing relationships with US Claims OPCO, LLC ("US Claims"), one of the largest and best-capitalized financers of litigation funding matters in the United States. Continuing to work with US Claims as its primary funding source, however, did not provide LB with the opportunity that Messrs. Beltz and Cavanaugh proposed: an exclusive origination hub and larger profit share.

32.     Mr. Beltz and Mr. Cavanaugh stated that the amount of capital raised by Newco., now the Mustang Entities, to fund LB's originations would enable LB to: (a) rapidly expand its network of brokers, attorneys and surgery providers; (b) provide financing for additional plaintiffs' cases (pre-settlement and litigation), attorneys representing plaintiffs, and plaintiffs in need of surgery due to the event giving rise to their claims; and (c) substantially increase LB's revenues and profitability within a year or two.

33.     The Individual Defendants represented to Mr. Janish and Dr. Caravella that LB would have the capacity to finance many additional litigation funding matters of every size and encouraged LB to expand and grow its base of brokers, attorneys, and surgical providers.

34.     During the summer of 2018, the Individual Defendants invited LBV to invest in and become a member of Mustang Funding I. The Individual Defendants represented to Dr. Caravella that LBV would have a twenty-five (25%) percent profit share in Mustang Funding I through a combination of a $100,000 capital contribution and Dr. Caravella's "sweat equity" in putting together the Mustang Entities' Joint Venture with LB. In reliance on Mr. Beltz's representations, LBV invested $100,000 in Mustang Funding I.

35.     Similarly, in the summer of 2018 Messrs. Beltz and Cavanaugh represented to Mr. Janish and Dr. Caravella that LB would have a twenty-five (25%) share of the Joint Venture's net

profits,[2] if any, payable twice a year on January 1 and July 1. The Mustang Entities would receive fifty (50%) of the Joint Venture's net profits, also on a semi-annual basis.

36.     In other words, the Defendants knew that there would be no business without the efforts of LB, and because of the history between the parties, Defendants should not have provided less than LB expected.

37.     During negotiations to establish the Joint Venture in the summer of 2018, Mr. Janish explained that LB needed operating capital; that is, funds to assist LB in funding day-to-day operations in addition to infusions of litigation financing by the Mustang Entities. Dr. Caravella and the Individual Defendants agreed to provide the operating capital through LBV (still operating at that time) and Mustang Funding I.

38.     During these same negotiations, moreover, the Individual Defendants formed Mustang in Delaware, and registered Mustang as a foreign limited liability company in Minnesota, in August 2018

39.     The Individual Defendants formed Mustang Funding I in Delaware and registered that entity as foreign limited liability company in New Jersey also during 2018.

**B.  LB's Reliance on the Individual Defendants' Representations**

40.     In agreeing to authorize LB to become part of the Joint Venture with the Mustang Entities, Mr. Janish and Dr. Caravella relied on the representations made to them by Mr. Beltz and Mr. Cavanaugh in the spring and summer of 2018. These representations included:

(a)  The Mustang Entities would: (i) provide substantially increased amounts of financing; (ii) not enter the litigation funding business as a broker or originator of litigation funding matters; (iii) not do business with LB's broker, attorney, and surgical provider

---

[2] Net Profits are determined by the gross profit of each case resolution, less off contract fees, and 10% cost of capital deduction for the duration holding period; but before any other corporate expenses.

relationships, whether existing prior to or after formation of the joint venture; and (iv) not originate or act as a broker for any pre-settlement, litigation, attorney, or surgical funding for their own benefit, to the exclusion of LB; and

(b) As a result of the additional financing provided by the Mustang Entities, LB would: (i) rapidly expand its network in the litigation funding industry; (ii) provide financing to additional sources in need of financing; and (iii) substantially increase revenues and profitability.

41.     Relying on these representations, Mr. Janish and Dr. Caravella agreed to form a Joint Venture between LB and the Mustang Entities, aiming to formally commence the venture in October 2018.

42.     Mr. Janish and Dr. Caravella would not have authorized LB to become member to a Joint Venture without the representations made by Mr. Beltz and Mr. Cavanaugh. These representations justifiably convinced and swayed Mr. Janish and Dr. Caravella to authorize LB to join the joint venture.

43.     More specifically, their representations that the Mustang Entities would be the financing arm on the Joint Venture, and not compete for or divert LB's litigation funding relationships for their own benefit was crucial, and material to, LB's agreement to participate in the Joint Venture. Had Mr. Beltz and Mr. Cavanaugh disclosed that the Mustang Entities would divert the Joint Venture's business relationships, all of which LB developed without the Mustang Entities' participation or assistance - and all of which were proprietary to LB – Mr. Janish and Dr. Caravella would not have caused LB to conduct business with the Mustang Entities or participate in the Joint Venture.

## C. The Joint Venture

44.     The initial members of the Joint Venture were LB, Mustang, and Mustang Funding I.  The Individual Defendants formed Mustang Funding II in Delaware during December 2019 and registered that entity as a foreign limited liability company in New Jersey during January 2020. By the agreement of the initial joint venturers, and through a course of performance within the Joint Venture, Mustang Funding II became a member of the Joint Venture upon its formation in Delaware.

45.     The terms of the Joint Venture are oral and not set forth in a writing executed on behalf of LB and the Mustang Entities.

46.     The Mustang Entities agreed to provide LB with financing to fund and grow LB's litigation funding business for the benefit of all members of the Joint Venture. The Mustang Entities agreed to supply LB with as much financing as they were able to raise from investors.

47.     The Mustang Entities agreed to provide underwriting services for LB's litigation funding originations. The Mustang Entities' employee serving as the underwriter for LB's originations is Mike Acosta, Esq., a Pennsylvania attorney with offices located in Plymouth Meeting, Pennsylvania. As the Joint Venture's underwriter, Mr. Acosta is tasked with evaluating the merits of the matters submitted for litigation funding by LB.  After evaluating the merits of a litigation funding matter, Mr. Acosta either approves the amount of the requested funding, modifies the amount to be funded by the Mustang Entities (always to a lesser sum than requested in the litigation funding application submitted by a plaintiff or plaintiff's attorney), or denies the application for funding.

48.     To further the ends of the Joint Venture, LB pays the Mustang Entities $5,000.00 a month to assist them in defraying the cost of Mr. Acosta's salary.

49.     LB is the originator of litigation funding matters through its network of broker, attorney, and surgical funding relationships. At the inception of the Joint Venture, LB had the base relationships—five (5) brokers and twenty (20) attorneys. LB developed and cultivated all of these relationships at its own expense and through the efforts of Mr. Janish, LB's CEO. The Mustang Entities did not exist before 2018, and had no broker, attorney or surgical funding contact—indeed, they had no industry relationships whatsoever.

50.     LB, by its CEO, Mr. Janish, developed - and secured litigation financing for - new broker, attorney and surgical funding relationships after the Joint Venture began operating in October 2018. The Mustang Entities and the Individual Defendants had no role in, and did not attempt to, locate or develop relationships with brokers, attorneys or surgical providers for the Joint Venture.

51.     Before the Joint Venture, LB had developed a website and internet-based platform to solicit potential litigation funding matters in addition to its broker, attorney and surgical provider relationships. This platform was staffed by two salespersons, and generated millions of dollars in annual litigation funding originations for LB. This was a thriving business.

52.     During the operation of the joint venture, Mr. Beltz pushed for Mr. Janish to pursue more brokers, shifting emphasis to a completely different business model, and destroying the internet business in the process.

53.     LB continues to solicit litigation funding matters through its website, though LB no longer has employees dedicated to serving applications submitted through its website. The revenue generated through the website is now negligible. The harm done is now irreparable.

54.    The members of the Joint Venture agreed that LB would service litigation funding contracts using its existing infrastructure, while Mustang would collect the sum due in accordance with funding contracts upon a monetary recovery in a litigation.

55.    The other members of the Joint Venture also tasked LB with managing the portfolio of litigation funding matters using a software package named Mighty. The Mighty system generates litigation funding contracts after underwriting approval.

56.    The Mighty system contains information about each matter financed by the Mustang Entities, including the funding dates, contract dates, principal and usage fees potentially to be paid in accordance with litigation funding contracts at various points in time during the pendency of a litigation, the present value of funding contracts prior to the final resolution of the underlying matters, and the status of active matters. In the event of a litigation funding matter generating a monetary recovery under a funding contract, Mighty generates a payoff letter to the attorney.

57.    Additionally, Mighty also generates payoff amounts for third parties interested in purchasing Mustang's liens—all of which are prepared by LB staff.

58.    During this process, LB's staff inputs the data into Mighty from inception to conclusion of each litigation funding matter. This portfolio management software enables LB to: (a) monitor each matter throughout the litigation and/or settlement process; (b) provide updates on litigations and surgeries to the other members of the Joint Venture; and (c) obtain status updates from attorneys whose clients have received non-recourse litigation funding, or who have obtained such funding for themselves. Mighty allows LB to close out cases, either through generating a payoff letter and noting when payment has been received, or by writing off matters in which there has been no recovery.

59.     LB, as agreed by the parties under the Joint Venture, pays a fee to use the Mighty portfolio management software each time a new matter obtains funding from the Mustang Entities. Though the specific amount varies each month, some months this fee can be more than $2,000.00.

60.     The members of the Joint Venture agreed that LB would pay commissions to brokers who referred matters ultimately financed by the Mustang Entities. The Mustang Entities agreed to reimburse LB for the commissions it fronted.

61.     The members of the Joint Venture agreed that the members would split net profits with respect to litigation funding matters in which there had been a monetary recovery twice a year on July 1 and January 1. The net profits were to be split as follows: 25% to LB and 50% to Mustang Entities. The Mustang Entities also agreed to remit 25% of the Joint Venture's net profits to LBV in consideration of its $100,000 invested in Mustang Funding I and Dr. Caravella's work in putting the Joint Venture together.

62.     LB and the Mustang Entities did not expect to incur a loss from the Joint Venture's litigation funding portfolio, though all understand that not every funded matter would result in a recovery or net profit for the Joint Venture. If the portfolio generated a gross loss on July 1 or January 1 of any calendar year, LB was to pay for its share of the loss from aggregate net profits from future funding contracts, as calculated on a semi-annual basis.

63.     As part of the Joint Venture, Mustang Funding I agreed to provide LB with a line of credit for operating expenses up to $250,000. Mustang Funding I and LBV agreed to split this amount evenly as set forth in the LOCA.

64.     The LOCA provides that LB is to repay the principal with interest at the rate of nine (9%) percent per year. LB has drawn $180,000.00 under the LOCA, $90,000.00 of which was paid

by Mustang Funding I. The LOCA does not outline when principal payments must be made. Instead, principal payments would be drawn from the Joint Venture's profit share.

65.     LB has given notice of termination of the LOCA as required under the applicable terms of the agreement.

### D.  Operation of the Joint Venture

66.     When the Joint Venture began, the Mustang Entities instructed LB to place a "Mustang Funding" sign in LB's offices. That sign has remained in a conference room in LB's offices from 2019 until today The Mustang Entities have not asked LB to remove it.  A photograph of the Mustang Funding sign in the conference room in LB's Caldwell, New Jersey office is annexed as Exhibit D.

67.     Funding contracts with plaintiffs and attorneys bare the logos for both LB and Mustang. Examples of funding contracts with both logos are attached as Exhibit E and Exhibit F.

68.     From October 2018 until present, LB has provided origination, servicing and portfolio management services for the Joint Venture. As LB and the Mustang Entities were members of the Joint Venture, LB provided the Mustang Entities with access to its electronic and hard copies files used to service the Joint Venture's litigation funding portfolio, and the information and data contained in its Mighty portfolio management system.

69.     Through the efforts of LB's CEO, Mr. Janish, LB's network of broker relationships grew from five to 30 by early 2020.

70.     From October 2018 until early 2020, LB, through Mr. Janish's work, expanded its network of attorneys referring clients for funding and seeking attorney funding from 20 to more than 50 in jurisdictions located throughout the United States.

71.     From October 2018 until December 31, 2019, Mustang and Mustang Funding I underwrote LB's originations and provided approximately $13.3 million in financing for LB's litigation funding matters.

72.     From October 2018 until January 2020, the Joint Venture grew in (a) the number of originations and financing of its litigation funding matters, and (b) the monetary value of those matters. LB was rapidly growing the number and quality of its referral sources. And the Joint Venture's gross revenues and net profits were steadily increasing throughout 2019.

73.     In 2020, however, the Mustang Entities only funded $9.2 million in LB's originations even though LB's volume of originations, both the monetary value and the number, increased over the prior year.

74.     In 2021, as a result of the Mustang Entities refusal to fund LB's originations – which were high quality and had a substantial likelihood of a recovery not only for the plaintiffs and attorneys in the litigation funding matters, but also the members of the Joint Venture – brokers and attorneys began turning originations away from LB to other funding sources.

75.     The new funding sources were, in most instances, the Mustang Entities and new funding affiliates established by the Mustang Entities co-managers, Messrs. Beltz and Cavanaugh. Mr. Beltz and Mr. Cavanaugh secretly formed these new funding vehicles without LB's knowledge or consent. These Mustang Funding affiliates include Mustang Creek Portfolio Management, LLC, Mustang Special Situations I, LLC and Mustang Special Situations II, LLC (collectively, (the "Mustang Affiliates"). The Mustang Entities diverted the Joint Venture's business opportunities for themselves and the Mustang Affiliates.

76.     For the calendar year ending December 2021, the Mustang Entities funded only $5.03 million in originations by LB, diverting most of originations belonging to the Joint Venture

to the Mustang Entities and Affiliates. As a result, LB continued to lose broker and attorney referral sources and for an obvious reason: Broker and attorney funding sources in the litigation funding industry learned that the Mustang Entities were stopping their funding of LB's originations; and by bypassing LB, brokers and attorneys could and did obtain funding directly from the Mustang Entities and Mustang Affiliates. Defendants diverted originations belonging to the Joint Venture to the Mustang Entities and Mustang Affiliates for exclusive benefit and profit of these entities.

77. The Mustang Entities provided LB with less than $1 million in funding during the first quarter of 2022.

78. The Mustang Entities have intentionally delayed reimbursing LB for payment of broker commissions, putting further financial strain on LB.

**E. Defendants' Wrongdoing and Plaintiff's Irreparable Harm**

79. Beginning in or about August 2019, Messrs. Beltz and Cavanaugh, through the Mustang Entities, as they were formed in and after 2019, established a separate litigation funding operation separate from the Joint Venture (the "Mustang Private Litigation Funding Platform"). The Individual Defendants did so in secret without LB's knowledge, authorization, or consent.

80. The purpose of Mustang Private Litigation Funding Platform was, as it still is, to misappropriate LB's network of broker, attorney and surgical providers for the sole and exclusive benefit of the Mustang Entities and the growing number of Mustang Affiliates.

81. Under the direction of Messrs. Beltz and Cavanaugh, the Mustang Entities and Affiliates actively solicit litigation funding matters from LB's exclusive of network of brokers (including sub-brokers), attorneys, and surgical providers by contacting each of them – directly, through emails and telephone calls to specific brokers, sub-brokers, attorneys and surgical providers on LB's protected list; or, indirectly through blast emails directed to these individuals

and entities – soliciting litigation funding matters belonging to the Joint Venture and directing these sources to finance their matters directly through the Mustang's Private Litigation Funding Platform.

82.     In October 2018, at the inception of the Joint Venture, LB and the Mustang Entities agreed that LB would provide the names and contact information of broker, sub-broker (collectively "brokers"), attorneys, and surgical providers in LB's network of litigation funding sources, developed by LB prior to the start of the Joint Venture.

83.     LB agreed to provide this information to: (a) account for the Joint Venture's gross revenues, net profits, and losses, if any; (b) identify productive and unproductive litigation funding relationships; (c) work on building relationships with sources of litigation funding matters that generated high quality, profitable matters; (d) diminishing or eliminating those sources that did not do so; and (e) identifying and located new funding sources with a strong potential to enhance the Joint Venture's revenue growth and profitability.

84.     The Mustang Entities' plan, at the outset of the Joint Venture and throughout its operations, has been to use these names and contact information, proprietary to LB, to surreptitiously build out Mustang Private Litigation Funding Platform by diverting litigation funding business from the Joint Venture for the sole benefit of the Mustang Entities and Affiliates. The Mustang Entities' plan has been to use LB's extensive contributions to the Joint Venture to establish a Mustang Private Litigation Funding Platform in competition with the Joint Venture, and in so doing, put the Joint Venture and LB out-of-business.

85.     The Mustang Private Litigation Funding Platform is modeled on LB's computer database the system in use to service the joint venture's portfolio, which the Defendants have also used to divert information to its new platform. The Mustang Entities, however, do not allow LB

access to their litigation funding matters, or information related to serving or management of their portfolio, wrongfully diverted from the Joint Venture.

86.     In August 2019, Mr. Acosta, the Mustang Entities Underwriter and underwriter for the Joint Venture contacted Ronald Garber, a sub-broker of Tribeca Capital Group, one of LB's broker relationships, to determine whether one of his clients, Kenyon Sibley, would accept litigation funding directly from the Mustang Entities, directly through the Mustang Private Litigation Funding Platform.

87.     The Joint Venture agreement provided in such instances that Mr. Garber, Tribeca and the Sibley action would remain as LB's brokers and origination. If Mr. Garber wanted funding for Mr. Sibley's case, he was to contact LB (or vice versa), which would submit the matter to Mr. Acosta for underwriting approval.

88.     Subsequently, Mustang represented to LB that it would not be funding the Sibley matter.

89.      LB understood that this meant that no further action would be taken related to this case.  This belief was further compounded by the fact that the Sibley matter was removed from LB's platform.

90.     Yet, weeks later, when Mr. Sibley contacted LB directly seeking more funding, LB had no idea what he was talking about until Mr. Sibley provided a copy of a funding contract to Mr. Janish. (Exhibit G).

91.     As it turned out, Mr. Acosta, in violation of the Joint Venture agreement, contacted Mr. Garber directly, solicited the Sibley matter to be funded exclusively by the Mustang Entities on the Mustang Private Litigation Funding Platform.

92.    Mr. Acosta gave underwriting approval for the Sibley matter, which the Mustang Entities funded without notifying or crediting LB. After this, the Mustang Entitles paid Tribeca and Garber their fees directly, completely cutting LB out.

93.    LB immediately protested this breach of the Joint Venture agreement to Mr. Beltz, the co-managing member of the Mustang Entities.

94.    Mr. Beltz emailed Mr. Acosta on August 14, 2019, purporting to enforce the terms of the Joint Venture Agreement. Mr. Beltz stated:

> Mike,
>
> As a matter of protocol between Mustang and Legal Bay as it relates to originating and underwriting, all cases that were initially originated through Legal Bay or its network of brokers and not funded, which may subsequently become a funding opportunity in the future, need to be forwarded back into the Legal Bay underwriting process and maintained/updated to reflect on the underwriting sheet as such. If there is any gray area, please highlight the matter to Legal Bay and Mustang and we will mutually agree upon the appropriate process for the case.
>
> Thanks,
> Jimmy

(Exhibit H).

95.    Mr. Beltz's email to Mr. Acosta, copied to Mr. Janish and Dr. Caravella, was a ruse. The Mustang Entities continued to divert litigation funding matters from the Joint Venture for their own benefit; and, unbeknownst to LB at the time, directly solicit LB's network to exclusively finance matters on the Mustang Private Litigation Funding Platform, solely benefitting the Mustang Entities.

96.    Mr. Beltz also represented to Mr. Janish, during a conversation about the issue, that the Mustang Entities were not working with brokers and did not intend to work with any brokers or sub-brokers.

97.     More than diverting LB's brokers, attorneys and surgical providers, sometime in 2019, the Mustang Entities began independently soliciting brokers to determine whether the brokers could generate high quality litigations funding matters suitable for financing. The Mustang Entities hired salespersons to cold call, investigate and do business with brokers for their benefit and profit – and the benefit and profit of the Mustang Affiliates – to the exclusion of LB and the Joint Venture.

98.     LB protested the Mustang Entities' starting a litigation funding business in competition with the Joint Venture and their diversion of business opportunities belonging to the Joint Venture. Mr. Beltz tried to explain away the Mustang Entities' wrongful conduct by saying it was a mistake and just "noise" not to be taken seriously or an economic threat to the Joint Venture.

99.     Mr. Beltz's statement was untrue, and he knew that his statement was false when he made it to Mr. Janish. By mid-2020, the Individual Defendants had caused the Mustang Entities to engage in a full-service litigation funding business for themselves, in derogation of the Joint Venture and misappropriating business opportunities belonging to the Joint Venture.

100.    On April 14, 2020, Mustang Funding's portfolio manager, Philip DeBerg, sent an email to all the broker, attorney and surgical funding relationships which LB brought to, and developed for, the Joint Venture. Mr. DeBerg invited LB's litigation funding relationships to do business with the Mustang Entities directly, stating:

> We know this is a hard time for everyone during the pandemic, and we understand there will be delays and hardship not only across the legal industry, but the industries of your clients. Please keep us in mind if any of your clients are seeking funding as they await their settlement.

> We're open, albeit remotely, and it's business as usual at Mustang Funding. We want to help bridge the financial gap so many clients are now facing as case resolutions keep getting pushed out.
>
> Best regards, and please stay safe!

(Exhibit I.)

101.    Mr. Janish informed Mr. Beltz that LB had received this email from one of its attorney relationships, and had never agreed to authorize the Mustang Entities to solicit or do business with any of LB's litigation funding relationships. (Id.). Again, Mr. Beltz responded stating that this was a mistake:

> I actually told him not to send anything out unless I ran it by you. I relayed the discussion from a few months back you were interested in us re-marketing as you guys have not had the time. But regardless, I told him to not send out anything at the moment. Obviously he did. I'll address with him.

(Id.)

102.    Again, Mr. Beltz falsely stated things to LB to make it believe that the Mustang Entities were committed to the Joint Venture, were not misappropriating LB's network and connections, and that Mr. DeBerg's email was just another mistake.

103.    In reliance on these and other similar misrepresentations by Mr. Beltz on behalf of the Mustang Entities, LB continued to uphold its responsibilities on behalf of the Joint Venture. The Mustang Entities and the Mustang Affiliates, however, continued to ramp up their separate Mustang Private Litigation Funding Platform, in competition with LB, to misappropriate LB's litigation funding relationships with brokers, attorneys, and surgical providers, and divert business opportunities from the Joint Venture.

104.    The Mustang Entities further sabotaged the Joint Venture through additional misconduct by Mr. Acosta on their behalf. From 2020 onward, Mr. Acosta would deny

underwriting approval to litigation funding matters originated by LB and submitted to the Mustang Entities for underwriting and funding without reason.

105.    Then, after initially denying funding, the Mustang Entities would contact the broker, attorney or surgical provider brought to the Joint Venture by LB and invite the individual or entity to re-submit a funding application directly to the Mustang Entities without LB's involvement.

106.    Many times the origination source would follow Mustang's direction, to the detriment of LB and fund the case upon the new submission.

107.    The Mustang Entities, through Mr. Acosta, then gave underwriting approval and funded the matter which LB had originated, but had been denied underwriting approval in the first instance by the Mustang Entities.

108.    The Mustang Entities' conduct, all of which diverted business from the Joint Venture, harming LB's good will and industry reputation within its network has been successful.

109.    By engaging in these unlawful business practices, the litigation funding industry—particularly, LB's network of brokers, attorneys, and surgical providers—now knows that the Mustang Entities will not finance LB's litigation funding matters; but, they **will** underwrite and fund them on their own Mustang Private Litigation Funding Platform, excluding LB in the process.

110.    The brokers, attorneys and surgical providers for which LB conducted due diligence and brought to the Joint Venture – and more generally, the marketplace of brokers, attorneys and surgical providers in the litigation funding industry – no longer do business with LB. LB's broker, attorney and surgical providers, whether developed by LB before or after to inception of the Joint Venture - now contact the Mustang Entities and Affiliates to finance their litigation funding matters, bypassing LB.

111.    LB's efforts to establish origination relationships with new brokers, attorneys and surgical providers have come to naught. Participants in the litigation funding industry know that the Mustang Entities no longer provide financing for LB's litigation funding matters. They also know that they can now obtain the financing they need directly from the Mustang Entities.

112.    The damage and continued harm to LB's good will and brand caused by the Mustang Entities' misappropriation of LB's broker, attorney and surgical provider relationships cannot be overstated. The Mustang Entities caused the value of LB's good will and reputation as originator of litigation funding matters to diminish to a vanishing point. LB's inability to provide financing for its originations has caused its referrals to dry up. For the last two (2) years, LB has lost money each and every quarter.

113.    In further derogation of their fiduciary obligations to LB, the Mustang Entities, through Mr. Acosta, have set up their own broker, Sunrise Financial, to divert business opportunities belonging to the Joint Venture.

114.    Similarly, the Mustang Entities now own and operate Pioneer Funding, a doppelganger of LB, claiming on their website to have funded over $50 million.  Pioneer operates in the same space as LB's litigation funding business and has misappropriated LB's funding relationships for sole benefit of Mustang Private Litigation Funding Platform.

115.    The Mustang Entities have refused to disclose the matters in their litigation funding portfolio to LB, though those matters belong to Joint Venture. LB has made repeated requests to review the portfolio. The Mustang Entities have rebuffed LB's requests.

116.    The Mustang Entities have never provided LB with its 25% share of the Joint Venture's profits, even though the net equity of the fund since inception had more than doubled in worth by December 2020, per Mustang's own valuation.

117.  The Mustang Entities refusal to pay LB's share of the Joint Venture's net profits has required LB to terminate staff, including the salespersons running LB's website portal for litigation funding originations. LB's website origination business is now dormant.

118.  Without its profit share, LB does not have the financial resources to develop new broker, attorney and surgical provider relationships. And without those relationships, LB cannot engage another financier, for example, US Claims, to fund its now *de minimis* originations.

119.  The Mustang Entities refused to remit LBV a 25% of Mustang Funding I's net profits, as promised to Dr. Caravella by the Individual Defendants in 2018. Because of the Individual Defendants' misrepresentations in this regard, Dr. Caravella caused LBV to withdraw as a member of the Joint Venture in December 2020. Mustang redeemed LBV at more than two times its original $100,000.00 investment—indicative of the Mustang Entities' acknowledgment of the value brought to the Joint Venture by LB in a short amount of time.

### (i) **Baker Street Funding**

120.  Another example of the Mustang Entities' breach of fiduciary duty in connection with the Joint Venture relates to LB's relationship with a broker of ligation funding matters, Baker Street Funding ("BSF").  LB and LBV had a contract with Baker Street Funding, with a one-year term beginning February 1, 2019, and provided LB with an option to extend the contact for an additional one-year term at the end of the initial term (the "BSF Contract"; Exhibit J). The BSF Contract provided LB with a right of first refusal ("ROFR") with respect to BSF's pre-settlement funding, surgical funding and settlement advances. BSF referred a high volume of quality pre-settlement funding opportunities to LB. In accordance with the Joint Venture agreement, LB provided these matters to the Mustang Entities for underwriting review and funding.

121.    Under the BSF Contract, BSF provided LB with numerous originations, under written and funded by the Mustang Entities, which provided monetary recoveries and net profits for LB and the Mustang Entities.

122.    During the initial term of the BSF Contract, BSF unknowingly submitted several cases underwritten and financed by the Mustang Entities to LB that were products of misrepresentations by the plaintiffs and/or attorneys seeking financing for these matters. Mr. Acosta failed to conduct any meaningful due diligence with respect to these specific originations. Had the Mustang Entities performed competent due diligence, they would have discovered the cases were dubious and denied funding.

123.    After the Mustang Entities substandard due diligence, Mr. Beltz badgered BSF to repay the fees received by BSF from the Mustang Entities and the funding provided to BSF's clients by the Mustang Entities.

124.    When BSF balked at doing so, and thereafter refused to do business with LB as a result of Mr. Beltz's demands, LB, in accordance with instructions from Mr. Beltz, retained legal counsel to draft and file a lawsuit against BSF. LB's draft pleadings sought, among other things, specific performance of the ROFR in the BSF Contract and damages.

125.    Mr. Beltz represented that the Mustang Entities would share in the costs of the BSF lawsuit, including LB's attorney's fees. But as LB's attorney was on the verge of filing the lawsuit against BSF, Mr. Beltz demanded that LB refrain from filing the summons and complaint because of potential adverse publicity to the Mustang Entities: i.e., driving away potential investors in litigation funding matters, and causing existing investors to withdraw their funds from the Mustang Entities - flowing from their substandard due diligence, which most likely would lead to a loss of capital.

126.     LB—who relied upon the Mustang Entities for financing and extensions of credit—had no alternative but to acquiesce to Mr. Beltz's demands to avoid imperiling financing its litigation funding business and access to operating capital under the LOCA. By forcing LB to abandon its lawsuit against BSF, LB (a) forfeited the right to enforce the BSF Contract including the ROFR; (b) lost the ability to recover the Mustang Entities' origination fees paid to BSF ($30,000, which LB repaid to Mustang); (c) lost the opportunity to recover the Mustang Entities' cash advances to BSF's clients; (d) paid fees to an attorney to draft pleadings (approximately $15,000, none of which was reimbursed by Mustang); and (d) wrote off $30,000 in LB's loans to BSF made in accordance with the BSF contract.

127.     Most importantly, by quashing LB's lawsuit to enforce the ROFR in the BSF Contract, Mustang ensured that BSF did not furnish further originations to LB as required by the ROFR.  In this regard, the cases for which funding should have been denied were an aberration by BSF. Had LB been allowed to enforce the BSF Contract, both LB and the Mustang Entities would have had secured additional *bona fide,* profitable litigation originations from BSF, which turned to other funding sources for financing in connection with meritorious litigation funding matters.

### (ii) Arthur Bogoraz

128.     The Mustang Entities entered into a funding agreement with a law firm in Brooklyn, New York ("Law Firm-1"), without LB's prior knowledge or consent.

129.     Though Law Firm-1 was previously a funding source, LB no longer did business with it given issues related to the legitimacy of the cases it referred to LB.

130.     Subsequently, the Mustang Entities unilaterally paid LB $18,000.00 in fees in connection with its transaction with Law Firm-1.

131. Mr. Janish once again confronted Mr. Beltz about this breach of the LOCA—i.e., soliciting LB's funding sources.

132. Additionally, after Mr. Janish reviewed the contract between the Mustang Entities and Law Firm-1, he immediately returned all fees the Mustang Entities paid LB in connection with the unauthorized transaction. Mr. Janish expressed, among other reasons for returning the fees, that the form of the arrangement might violate New York's law on fee sharing arrangements.

133. As a result of Mr. Janish's investigation and review of Law Firm-1's operations, LB had become suspicious that one of its supposed paralegals, Arthur Bogoraz, was operating a "no fault" auto accident insurance scheme to obtain funds from the New York State No Fault Trust Fund; and that it was very possible that many of Mr. Bogoraz's and Law Firm-1's "cases" were illegitimate.

134. Mr. Janish's due diligence uncovered that Mr. Bogoraz was previously convicted twice of insurance fraud related to personal injury.  Mr. Janish urged Mr. Beltz in electronic messages and phone calls to eliminate the Mustang Entities and LB's exposure to Mr. Bogoraz and Law Firm-1. Mustang, however, ignored these warnings and breached the Joint Venture agreement by contracting with Mr. Bogoraz.

135. The Mustang Entities' and Mr. Acosta's contract with a personal injury fraudster exposed LB and the Mustang Entities to potential transactional liability and severe reputational damage due to the nature of the relationship between Acosta, the Mustang Entities, Bogoraz and Law Firm-1.

136. Mr. Bogoraz was arrested again and charged with new felonies for engaging in no-fault insurance fraud by the United States Attorney's Office for the Southern District of New York in January 2022. (Exhibit K (January 12, 2022 SDNY US Attorney's Office Press Release: "*U.S.*

*Attorney Announces The Arrest Of 13 Individuals for $100 Million Healthcare Fraud, Money Laundering and Bribery Scheme*")).

### (iii) Tribeca Capital

137.     LB has a longstanding relationship with a Tribeca Capital Group, LLC ("Tribeca"), a broker of litigation funding matters. Tribeca has provided litigation funding matters for origination, underwriting and financing by LB since 2015.

138.     Mr. Beltz has known of LB's relationship with Tribeca since his employment with Gavel.  LB put Tribeca on its list of broker relationships submitted to the Mustang Entities since the beginning of the Joint Venture. LB and Tribeca first formed an origination agreement in January 2019.

139.     LB, Tribeca and Rory Donadio, Tribeca's managing member and a broker in the litigation funding industry, formed a new Strategic Relationship and Marketing Agreement, effective as of December 29, 2020 (the "SRMA"; Exhibit L). The SRMA provides LB with a right of second refusal for litigation funding matters which US Claims, which has a right of first refusal with respect to Tribeca's and Mr. Donadio's litigation funding leads, declines to provide financing. (Id. [Article IV].)

140.     LB furnished the SMRA to the Mustang Entities as soon as it was fully executed, including Tribeca's sub-broker list.

141.     Tribeca and Mr. Donadio provided LB with millions of dollars in litigation funding matters annually between 2017 and 2020.

142.     The Mustang Entities, in breach of their fiduciary obligations to LB, intentionally interfered with LB's SRMA with Tribeca and Mr. Donadio by soliciting and obtaining litigation

funding matters for financing on the Mustang Private Litigation Funding Platform beginning in or about 2019 with the Sibley matter incident.

143.    By misleading Plaintiff and continuing to behave in a manner that "kneecaps" and undercuts LB, namely that the interference with Tribeca has resulted in sub-brokers no longer flowing to Tribeca from LB has irreparably harmed Plaintiff.

**COUNT ONE**
**(Declaratory Judgment-Joint Venture)**

144.    Plaintiff repeats and realleges the allegations in foregoing paragraphs as if fully set forth herein at length.

145.    LB and the Mustang Entities entered into a Joint Venture agreement the purpose of providing financing for litigation funding matters originated by LB in and after October 2018.

146.    LB has fully performed its obligations under the parties' Joint Venture agreement.

147.    LB is entitled to receive from the Mustang Entities twenty-five (25%) percent of the Joint Venture's net profits, as agreed by LB and the Mustang Entities, from (a) litigation funding matters originated by LB; (b)  litigation funding matters and originations which the Mustang Entities misappropriated from LB's broker, attorney and surgical provider relationships; and (c) litigation funding matters which the Mustang Entities otherwise unlawfully diverted from the Joint Venture to the Mustang Private Litigation Funding Platform between 2019 and April 2022.

148.    The is a *bona fide* present, justiciable controversy which will have an immediate effect on the rights and obligations of LB, Mustang, Mustang Funding I and Mustang Funding II because the Mustang Entities and Individual defendants will doubtlessly contest LB's entitlement to its fair share.

149.    The dispute is genuine, substantial and sufficiently mature so as to require immediate judicial intervention.

150.    Plaintiff lacks an adequate remedy at law.

151.    LB is entitled to a declaratory judgment in accordance with the New Jersey Declaratory Judgment Act, N.J.S.A. 2A:16-51 *et seq.*, declaring that:

(i)     LB and the Mustang Entities entered into a Joint Venture agreement the purpose of providing financing for litigation funding matters originated by LB in and after October 2018; and

(ii)    LB is entitled to receive from the Mustang Entities twenty-five (25%) percent of the Joint Venture's net profits, as agreed by LB and the Mustang Entities, from (a) litigation funding matters originated by LB; (b) litigation funding matters and originations which the Mustang Entities misappropriated from LB's broker, attorney and surgical provider relationships; and (c) litigation funding matters which the Mustang Entities otherwise unlawfully diverted from the Joint Venture to the Mustang Private Litigation Funding Platform between 2019 and April 2022.

## COUNT TWO
### (Dissolution and Winding Up of the Joint Venture)

152.    Plaintiff repeats and realleges the allegations in foregoing paragraphs as if fully set forth herein at length.

153.    Defendants Mustang, Mustang Funding I, and Mustang Funding II have repeatedly and intentionally engaged in breaches of their fiduciary duties and duty of loyalty to LB and the Joint Venture by, among other things:

    (i)    Misappropriating LB's broker, attorney and surgical contracts for themselves, the Mustang Affiliates, Sunrise, Pioneer, and the Mustang Private Litigation Funding Platform to the exclusion of LB and the Joint Venture;

    (ii)    Intentionally and knowingly engaging in unfair competition with the Joint Venture by: (i) diverting litigation funding matters belonging to the Joint Venture to the Mustang Entities, Mustang Affiliates, Sunrise, Pioneer, and the Mustang Private Litigation Funding Platform, (ii) for their exclusive benefit and profit, (c) to deprive the Joint Venture of litigation funding matters needed to continue in business, and (d) drive LB and the Joint Venture out of business;

    (iii)    Tortiously interfering with LB's contractual and business relationships with brokers, attorneys, and surgical relationships – which LB used for the exclusive benefit of the Joint Venture in accordance with the Joint Venture agreement - by soliciting these individuals and entities to do business with the Mustang Entities and Affiliates directly: (a) for the exclusive benefit of the Mustang Private Litigation Funding Platform; (b)  to starve the Joint Venture and LB of funds to grow the Joint Venture's litigation funding business;  and (c)   make the Joint Venture obsolete;

(iv)     Refusing to remit LB's twenty-five (25%) percent share of the Joint Venture's net profits, including those generated from Defendants' diversion of the Joint Venture's business opportunities and misappropriation of LB's broker, attorney and surgical provider relationships; and using these funds to solicit and develop litigation funding matters in competition with the Joint Venture;

(v)     Failing to provide LB with access to the Mustang Entities' portfolio of litigation funding matters or account for the revenues and net profits related to the Mustang Private Litigation Funding Platform.

154.     The Mustang Entity defendants, from 2019 to the present, have intentionally engaged in actions intended to cause material injury to the Joint Venture and LB, as a member of the Joint Venture, in the conduct of the Joint Venture's business.

155.     In so doing, the Mustang Entities have unreasonably frustrated the economic purpose of the Joint Venture and have engaged in conduct relating to the Joint Venture's business which makes LB's continuation of the Joint Venture's business with the Mustang Entities, or any of them, unreasonably impractical.

156.     The Mustang Entities' tortious misconduct, breach of their fiduciary duties to the Joint Venture and LB, and breach of the Joint Venture agreement, make continuation of the Joint Venture impossible.

157.     As a result of the Mustang Entities' continuing breaches, the Joint Venture should be dissolved and wound up under the direction of a special fiscal agent.

158.     The Court, in the exercise of its equitable powers, should grant the special fiscal agent such powers as necessary to, among things, to (a) prevent the Mustang Entities, Mustang Affiliates, Sunrise, Pioneer, and Mustang Private Litigation Funding Platform from hiding assets

belonging to the Joint Venture;   and (b) require (i) the Mustang Entities, Mustang Affiliates, Sunrise, Pioneer, and  Mustang Private Litigation Funding Platform to disclose the brokers, attorneys and surgical providers that they misappropriated from LB and the Joint Venture, and (ii) disclose and account for the business opportunities which they have diverted from the Joint Venture.

159.   The Court should also grant the special fiscal agent the power to: (a) require the Mustang Entities, Mustang Affiliates, Sunrise, Pioneer, and Mustang Private Litigation Funding Platform to account for the gross revenues and net profits resulting from misconduct; and (b) pay twenty-five (25%) percent of the net profits belonging to the Joint Venture in accordance with the Joint Venture agreement. LB is also entitled to the upfront origination fees.

**COUNT THREE**
**(Accounting)**

160.   Plaintiff repeats and realleges the allegations in foregoing paragraphs as if fully set forth herein at length.

161.   By reason of the Mustang Entity defendants' breaches of their fiduciary duties to the Joint Venture, LB is entitled to an accounting from each of the Mustang Entities with respect to all funds deposited in, withdrawn from, or paid to/from their bank and investment accounts, and the bank and investment accounts of any Mustang Affiliates, Sunrise, and Pioneer from October 2018 to the present.

162.   Plaintiff holds no adequate remedy at law.

## COUNT FOUR
### (Breach of the Joint Venture Agreement)

163.     Plaintiff repeats and realleges the allegations in foregoing paragraphs as if fully set forth herein at length.

164.     LB and the Mustang Entities entered into a Joint Venture agreement for the purpose of providing financing for litigation funding matters originated by LB in and after October 2018.

165.     Under the terms of the Joint Venture agreement, the Mustang Entities agreed to pay LB twenty-five (25%) percent of the Joint Venture's net profits on January 1 and July 1 of each year that the Joint Venture was in operation.

166.     The Joint Venture has been in operation from October 2018 to the present.

167.     LB has performed all of its obligations and responsibilities under the Joint Venture Agreement.

168.     The Mustang Entities and each of them have failed and refused to pay LB's twenty-five (25%) percent share of the Joint Venture's net profits from October 2018 to the present.

169.     As a result of the foregoing, Mustang, Mustang Funding I and Mustang Funding II are jointly and severally liable to LB for twenty-five (25%) percent of the Joint Venture's net profits, including the net profits from litigation funding opportunities which the Mustang Entities unlawfully diverted from the Joint Venture.

## COUNT FIVE
### (Breach of Fiduciary Duties)

170.    Plaintiff repeats and realleges the allegations in foregoing paragraphs as if fully set forth herein at length.

171.    As members of the litigation funding Joint Venture with LB, the Mustang Entities had and continue to have fiduciary duties, including their duty of loyalty to LB, in connection with the business of the Joint Venture.

172.    These duties include: (a) the Mustang Entities devoting their efforts to act in the best interests and of the Joint Venture at all times; (b) provide bona fide underwriting support for LB's originations of litigation funding matters; (c) provide financing for litigation fund matters originated by LB; (d) not to misappropriate the broker, attorney and surgical provider relationships developed by LB before or during the Joint Venture for the sole benefit of the Mustang Entities and their Affiliates; (e) not to divert litigation funding business from the Joint Venture to a competing litigation funding business formed by the Mustang Entities; (f) not to tortiously interfere with LB's existing and prospective contracts and business relationships; and (g) disclose to LB the revenues, expenses and net profits from the Mustang Entities' litigation funding business in competition with the Joint Venture.

173.    As described in detail above, each of the Mustang Entities breached their fiduciary duties to the Joint Venture and to LB, as a member of the Joint Venture. These breaches were not accidental or negligent. From before the Joint Venture began until today, the Individual Defendants and Mustang Entities devised a plan to misappropriate LB's broker, attorney, and surgical funding contacts, and once the Joint Venture began generating substantial revenue, as it did by mid-2019,

divert the Joint Venture's business opportunities for themselves, their Affiliates and the Mustang Private Litigation Funding Platform.

174.    The Mustang Entities' plan worked better than they could have hoped for. The longer the Joint Venture still exists, as it does today, the Mustang Entities continue to breach their fiduciary duties to the Joint Venture and LB.

175.    As a result of the Mustang Entities' intentional and repeated breaches of fiduciary duties, LB has sustained irreparable harm, and continues to face that same irreparable harm, including the loss and continued loss of opportunities which the Mustang Entities diverted from the Joint Venture to themselves, their affiliates, and the Mustang Private Litigation Platform.

176.    The Mustang Entities' intentional and repeated breaches fiduciary duties to LB and the Joint Venture continues to irreparably harm LB's good will and business reputation in the litigation funding industry. LB's brokers, attorney and surgical funding relationships no longer do business with LB and for an obvious reason: The Mustang Entities' refusal to fund LB's matters, and their diversion of LB's originations to themselves, their Affiliates and the Mustang Private Litigation Funding Platform, is known throughout the litigation funding industry.  The Mustang Entities' unfair competition and breaches of fiduciary duty and duty of loyalty prevent LB from developing new broker, attorney and surgical provider relationships in the litigation funding industry.

177.    LB's goodwill, brand and reputation has been damaged to the point where LB is in danger of not being able to generate a sufficient number of originations for funding by LBC or other financing entities to keep itself in business.

178.    As a direct and proximate result of their breaches of fiduciary duty and duty of loyalty to LB and the Joint Venture, the Mustang Entities are jointly and severally liable to LB.

## COUNT SIX
### (Fraud in the Inducement -The Individual Defendants)

179.   Plaintiff repeats and re-alleges the allegations in foregoing paragraphs as if fully set forth herein at length.

180.   As set forth in detail above, the Individual Defendants fraudulently induced Mr. Janish and Dr. Caravella to cause LB to enter into the Joint Venture with the Mustang Entities to provide financing for litigation funding matters originated by LB.

181.   Mr. Beltz and Mr. Cavanaugh intentionally made material misrepresentations and omissions of material facts, in the spring and summer of 2018, which they knew at the time they made them, would not be fulfilled by the entity or entities they established. These misrepresentations included:

(i)     The Mustang Entities would: (a) provide substantially increased amounts of financing for LB's litigation funding business; (b) not enter the litigation funding business as a broker or originator of litigation funding matters; (c) not do business with LB's broker, attorney, and surgical provider relationships, either existing in the summer and fall of 2018, or to be developed during the Joint Venture; and (d) the Mustang Entities would not originate or act as a broker any pre-settlement, litigation, attorney, or surgical funding business for their own benefit and to the exclusion of LB; and

(ii)    As a result of the additional financing provided by the Mustang Entities, LB would (a) rapidly expand its network of and relationships with brokers, attorneys, and surgical providers in the litigation funding industry; (b) provide financing for additional plaintiffs' cases (pre-settlement and litigation), attorneys representing plaintiffs and plaintiffs in need of surgery due to the

event giving rise to their claims; and (c) substantially increase LB's revenues and profitability.

182.    In 2019, shortly after the Joint Venture began doing business, the Mustang Entities, at the direction of the Individual Defendants, established the Mustang Private Litigation Funding Platform to divert LB's litigation funding originations, and to solicit and do business directly with LB's broker, attorney and litigation funding relationships in secret, and without LB's knowledge or consent. The purpose was and is to steal and divert LB's litigation funding originations and referral sources for the exclusive benefit of the Mustang Entities and their Affiliates, and the Mustang Litigation Funding Platform.

183.    LB's sources for originations reported that the Mustang Entities were diverting the Joint Venture's business opportunities for themselves beginning in August in 2019, demonstrating that the Mustang Entities' diversion of the Joint Venture's business opportunities, and misappropriation of LB's broker, attorney and surgical funding relationships, had been planned by the Individual Defendants from the beginning of their discussions with Dr. Caravella and Mr. Janish in 2018. The Individual Defendants intention was to con Mr. Janish and Dr. Caravella to cause LB to join a litigation funding Joint Venture with entities and individuals having no relationships with sources of litigation funding, and once the Joint Venture was underway, misappropriate its business for themselves using LB's relationships to start and build a business to compete with the Joint Venture, eventually put the Joint Venture and LB out of business.

184.    When confronted with the Mustang Entities' diversion of the Joint Venture's business, and misappropriation of LB's broker, attorney, and surgical provider relationships, Mr. Beltz paid lip service to his and Mr. Cavanaugh's prior representations about not entering the litigation funding business as a broker or originator of litigation funding matters; not doing

business with LB's broker, attorney, and surgical provider relationships; and the Mustang Entities limiting their activities to financing litigation funding matters, and raising capital to do so. But the Mustang Entities' misappropriation of LB's funding sources continued to grow, as did their diversion of the Joint Venture's business opportunities --- in which the Mustang Entities were joined by Mustang Affiliates, and the brokers, Sunrise and Pioneer, established by the Individual Defendants and Mr. Acosta.

185.    And contrary to the Individual Defendants' representations about greatly increased funds to expand LB's origination sources, and grow LB's and the Joint Venture's revenues and net profits, the Mustang Entities' funding of the Joint Venture dried up as its misappropriation of LB's broker, attorney and surgical provider relationships – and diversion of the Joint Venture's business opportunities - escalated.

186.    All the evidence, none of which is disputed or circumstantial, establishes that the Individual Defendants knew their representations about the Joint Venture were false when they made them to Mr. Janish and Dr. Caravella in 2018.

187.    The Individual Defendants intended that Mr. Janish and Dr. Caravella would rely on their misrepresentations and caused LB to become part of the Joint Venture with the Mustang Entities, providing them with opportunity and means to misappropriate LB's relationships in the litigation funding industry and operate a litigation funding business in competition with the Joint Venture. Had Mr. Janish and Dr. Caravella knew that the Individual Defendants' representations were not truthful, they would not have caused LB to become part of the Joint Venture or do business with the Mustang Entities in any manner whatsoever.

188.    LB has sustained damages as a direct and proximate result of the Individual Defendants' fraud. These damages include the funds LB expended in with the Joint Venture,

including funds used to: develop relationships with brokers, attorneys and surgical providers on behalf of the Joint Venture; pay for attorney's fees for legal advice and anticipated litigation relating to the Joint Venture's business operations; pay underwriting fees; pay for servicing the portfolio and Mighty; and LB's overhead, e.g., IT services for LB's website, employee salaries and commissions and rent.

189.    LB's damages further include principal and interest due to Mustang Funding I under the LOCA, which LB and LBV would not have executed in the absence of the Individual Defendants' fraud.

190.    As a direct and proximate cause of the Individual Defendants' fraudulent misrepresentations, LB has been damaged.

**COUNT SEVEN**
**(Breach of the LOCA – Mustang Funding I)**

191.    Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein at length.

192.    LB, LBV and Mustang Funding I entered the LOCA as of October 1, 2019.

193.    LB terminated the LOCA on May 17, 2022.

194.    LB performed its obligations under the LOCA.

195.    The LOCA provides that upon its termination, in part, Defendants shall not solicit, employ, hire, retain, or engage the following individuals or business associations with whom Plaintiff had an existing relationship as of the Effective Date of the Agreement, including: (a) brokers providing leads or originations for LB's business; (b) law firms or attorneys providing litigation or legal services for or on behalf of LB's clients; (c) physicians, other health care providers and surgical centers providing surgical or medical services LB's client; (d) sources of

funds for LB's litigation, pre-settlement, medical and surgical funding businesses; and (e) LB's clients. (Exhibit A, ¶ 4.)

196.   In violation of the LOCA, Mustang Funding I is presently soliciting, hiring, retaining and engaging LB's brokers, attorneys, and surgical providers with whom had an existing relationship as of the LOCA effective date.

197.   As a result of Mustang Funding I's breach of the LOCA, LB has and continues to suffer irreparable harm to its business.

198.   LB is also entitled to an award of reasonable attorney's fees, costs and disbursements in connection with is claim for Mustang Funding I's breach of the LOCA pursuant to paragraph 14 of the LOCA.

**WHEREFORE**, Plaintiff, Legal Bay LLC respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants as follows:

(a)   Declaring that LB and the Mustang Entities entered into a Joint Venture agreement the purpose of providing financing for litigation funding matters originated by LB in and after October 2018; and declaring that LB is entitled to receive from the Mustang Entities twenty-five (25%) percent of the Joint Venture's net profits from matters originated by LB,  matters and originations which the Mustang Entities misappropriated from LB's broker, attorney, and surgical provider relationships, and matters which the Mustang Entities otherwise unlawfully diverted from the Joint Venture to the Mustang Private Litigation Funding Platform between 2019 and April 2022;

(b)   Ordering that the Joint Venture be dissolved and wound up, and appointing a special fiscal agent to dissolve and wind up the Joint Venture, with such authority as the Court may grant to special fiscal agent to do so;

(c)     Ordering an Accounting from each of the Mustang Entities with respect to all funds deposited in, withdrawn from or paid from their bank and investment accounts, and the bank and investment accounts of the Mustang Affiliates, Sunrise and Pioneer from October 2018 to the present;

(d)     Assessing liability against Defendants and an award of twenty-five (25%) percent of the Joint Venture's net profits to Plaintiff, or such other equitable apportionment the Court sees fit;

(e)     Awarding compensatory damages, punitive damages, attorney's fees, costs, interest, and disgorgement of wrongfully obtained monies against the Defendants; and

(f)     Awarding any further relief that the Court deems just and proper.

Dated: May 17, 2022                              **FOX ROTHSCHILD LLP**
                                                **LAW OFFICES OF TIMOTHY KEBBE**


                                                */s/ Christine F. Marks*
                                                Christine F. Marks
                                                Joseph J. DiPasquale
                                                Kieran T. Ensor

                                                -and-

                                                Timothy P. Kebbe (Pro Hac Vice Pending)

                                                Attorneys for Plaintiff, Legal Bay LLC

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that the matter in controversy is not the subject of any other action or arbitration proceeding, now or contemplated, and that no other parties should be joined in this action pursuant to R. 4:5-1.

I certify that confidential personal identifiers have been redacted from documents now submitted to the Court and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

FOX ROTHSCHILD LLP
*Attorneys for Plaintiff*

By: _____
KIERAN T. ENSOR

Dated:  May 17, 2022

# Exhibit A

## AGREEMENT TO PROVIDE A LINE OF CREDIT TO LEGAL-BAY, LLC

This Agreement to Provide a Line of Credit to Legal-Bay, LLC dated as of October 1, 2018 (the "Agreement") by, between and among: (a) Legal-Bay LLC, a New Jersey limited liability company, with an office located at 80 Pompton Avenue, Suite 4B, Verona, New Jersey 07044 ("Legal-Bay"); (b) LBV Funding, LLC, a Nevada limited liability company, with an office located at 8626 Titleist Circle, Las Vegas, Nevada 89117 ("LBV"); and (c) Mustang Specialty Funding I, LLC, a Minnesota limited liability company, with an office located at 60 South 6th Street, Minneapolis, Minnesota 55402 ("Mustang"). This Agreement shall be deemed effective and executed as of the date set forth above (the "Effective Date").

WHEREAS Legal-Bay desires to enter this Agreement to obtain a line of credit from LBV and Mustang to support its operations, including without limitation, improvements to Legal-Bay's current infrastructure, office space, marketing initiatives, and day-to-day operating expenses (collectively, "Operating Capital").

WHEREAS LBV and Mustang are agreeable to providing Legal-Bay with a line of credit for Operating Capital, and enter into this Agreement to establish the terms and conditions upon which the LBV and Mustang shall provide a line of credit for Operating Capital to Legal-Bay.

NOW THEREFORE in consideration of the premises, the mutual promises and covenants contained in this Agreement, and other good and valuable consideration, receipt of which is hereby acknowledged, Legal-Bay, LBV and Mustang agree, acknowledge, covenant, represent and warrant as follows:

1. **Recitals.** The recitals set forth above are incorporated into this paragraph "1" as if fully set forth at length.

1

2. **Operating Capital**.  Legal-Bay shall have the right and ability, but not the obligation, to obtain Operating Capital from both LBV and Mustang for a period of two (2) years following the Effective Date of this Agreement in accordance with the terms of this paragraph "2."

(a) *Total Operating Capital.* Legal-Bay may obtain a total of Two Hundred and Fifty Thousand Dollars ($250,000.00) in Operating Capital from LBV and Mustang. LBV and Mustang shall each be obligated to remit a maximum of One Hundred Twenty-Five Thousand Dollars ($125,000.00) of Operating Capital to Legal-Bay.

(b) **Equal Payments**.  Legal-Bay shall make each request for Operating Capital to both LBV and Mustang in writing in the matter set forth in paragraph "9," below. In making such requests, Legal-Bay shall briefly state the reason for the request and specify the amount of funds needed for Legal Bay's Operating Capital. LBV and Mustang shall each fund one-half (1/2) of the Operating Capital requested by Legal-Bay. For purposes of illustration only, in the event that Legal-Bay requests $10,000.00 in Operating Capital, LBV and Mustang shall each provide Legal-Bay with $5,000.00 of the requested $10,000.00 for Operating Capital.

(c) **Timing of Payments; No Objection**.  LBV and Mustang shall send their respective shares of the Operating Capital requested by Legal-Bay to Legal-Bay's operating bank account by ACH wire transfer within five (5) business days of their receipt of a request for Operating Capital by Legal-Bay. On the Effective Date of this Agreement, Legal-Bay shall furnish LBV and Mustang with ACH wire transfer instructions for Legal-Bay's Operating Account. LBV and Mustang shall not object to any request for Legal-Bay for Operating Capital, even if either LBV or Mustang disagrees with the necessity of or reason for the request.

**(d)  Frequency of Requests; Maximum Amount**. Legal-Bay shall be permitted to make no more than one request for Operating Capital during any calendar month on or after the Effective Date of this Agreement. The maximum amount of Operating Capital that Legal-Bay may request during a calendar month is $30,000.00.  Mustang and LBV shall each provide Legal-Bay with one-half (1/2) of the Operating Capital requested by Legal-Bay in a particular month.

**(e)  Interest**.  Legal-Bay shall pay interest on the Operating Capital funded by Mustang and LBV, at the rate of nine (9%) per year, on a quarterly basis beginning on March 31, 2019.

**(f)  Effect of Termination**.   The dates on which Legal-Bay (i) shall pay interest on Operating Capital advanced by LBV and Mustang, or (ii) prepay the Operating Capital advanced by LBV and Mustang, shall not be affected, impacted or modified by the termination of this Agreement as set forth in paragraph "6(a)," below.

**3.  Potential Additional Agreements**.  Legal-Bay, LBV and Mustang may negotiate and agree upon other and additional agreements relating to lines of credit and origination funding for Legal-Bay's litigation and surgical funding businesses during the term of this agreement or after termination of this agreement. Such negotiations, and any other or additional agreements shall not modify, change or amend this Agreement unless the parties to this Agreement agree to such modification, change or amendment in writing.

**4.  Non-Solicitation.** For a period of one (1) year following the termination of this Agreement for any reason, Legal-Bay, LBV and Mustang (collectively referred to as the "Parties"; and each individually referred to as a "Party")  shall not solicit, employ, hire, retain, or engage the following individuals or business associations with whom the Parties had an existing relationship

3

as of the Effective Date of this Agreement: (a) brokers providing leads or originations for a Party's litigation, pre-settlement or surgical funding business; (b)  law firms or attorneys providing litigation or legal services for or on behalf of any Party's clients, other than Michael Acosta and Acosta & Associates, LLC;  (c) physicians, other health care providers  and surgical centers providing surgical or medical services for a Party's client;  (d) sources of funds for any Party's litigation, pre-settlement, medical and surgical funding businesses; (e) the Parties' clients; (f) the Parties' underwriters; (g)  the Parties' employees; and (h) vendors providing support services for or on behalf of Legal-Bay, other than Mighty. For a period of one (1) year following the termination of this Agreement for any reason, the Parties further agree not to use, utilize or appropriate each other's software and data with the exception of Mighty.

### 6. *Termination*.

(a)   This Agreement shall terminate on the date that Legal-Bay repays the Operating Capital advanced by LBV and Mustang, together with interest due and owing thereon.

(b)   Prior to termination in accordance with the text of paragraph "6(a)," above, any party to this Agreement may terminate this Agreement, with or without cause, and for any reason or no reason, by providing the other parties to this Agreement with sixty (60) days written notice as set forth in paragraph "7," below. During the sixty (60) day pre-termination notice period the "Pre-Termination Notice Period", and prior to the end of the Pre-Termination Notice Period, Legal-Bay shall be permitted to make additional monthly requests for Operating Capital in a total sum not to exceed $60,000.00 during the Pre-Termination Notice Period. Mustang and LBV shall be obligated to fulfill Legal-Bay's requests for Operating Capital, in accordance with the terms and conditions set forth in paragraphs "2(a)" through "2(e)," above, during the Pre-Termination Notice Period.

4

Legal-Bay shall remit interest payments to LBV and Mustang after the expiration Pre-Termination Notice Period at the rate and on the dates provided in paragraph "2(e)," above.

7. **Notices and Writings**. Notices and writings sent by any party relating to this Agreement *given shall be sent by e-mail only to:* (a) Legal-Bay: Christopher Janish at chrisj@legal-bay.com.; (b) LBV: Dr. Peter Caravella at pcaravellamd@gmail.com.; (c) Mustang: James K. Beltz at customerservice@Mustangfunding.com. Notices and writings sent in accordance with this paragraph "7" shall be effective on the date that they are sent by email to the individuals at the email addresses set forth above. A party to this Agreement may change or amend the individual or email address to which notices and writings are required to be sent in email sent to the other parties to this Agreement.

8. **Merger.** Any and all prior understandings, contracts, statements, representations, stipulations and agreements (whether oral or written) between, among or made by the parties to this Agreement, or any party to this Agreement, with respect to the subject matter of this Agreement are superseded and merged into this Agreement. No party to this Agreement is relying upon any statement, representation, communication, action, conduct, course of conduct or dealing, either written or oral, express or implied, made to them by any other party to this Agreement other than as set forth in this Agreement. This Agreement constitutes the entire agreement and understanding of the parties to the Agreement with respect to the subject matter of this Agreement.

9. **Governing Law; Jurisdiction.** This Agreement shall be subject to, interpreted, construed, enforced, interpreted and governed by and in accordance with laws of the State of New York, and that any dispute arising from this Agreement shall be governed by the law of the State of New York, without giving effect to conflicts of law principles. The parties to this Agreement

5

agree that any dispute involving the interpretation of this Agreement, or in any way concerning or relating to this Agreement or its subject matter shall be commenced in a jurisdiction wherein one of the parties to this Agreement maintains its principal place of business. The parties to this Agreement agree not to assert that they are not personally subject to the jurisdiction of the court in which an action to resolve a dispute is filed or that such court is improper or inconvenient venue for such action.

10. **Severability**. Should any provision of this Agreement be declared or determined by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining portions of this Agreement shall not be affected thereby, and this Agreement shall be construed and enforced as if it did not contain the provision held to be illegal, invalid or unenforceable.

11. ***Binding Effect***. This Agreement shall be binding upon and inure to the benefit of (a) the parties to this Agreement and their respective affiliates, subsidiaries, managing members, members, boards of directors, officers, directors, employees, predecessors, successors and assigns; (b) any entity into which any party to this Agreement may merge, reorganize or consolidate; and (c) any person or entity to whom any party to this Agreement may sell, assign, pledge, transfer or encumber all or substantially all of such party's assets.

12. **Construction of Agreement**. Neither construction of this Agreement, nor any provision thereof, shall be affected in any manner by the fact that it was drafted by one party or multiple parties to the Agreement.

13. **Advice of Counsel**. The parties to this Agreement and their respective managing members, members, officers, directors, employees and managers acknowledge and agree that each of them has sought and received legal advice and counsel from their independent legal counsel regarding the text of this Agreement prior to executing this Agreement.

6

14. **Prevailing Party; Attorney's Fees**. If any party to this Agreement initiates a legal action to: (a) enforce, construe or interpret one or more provisions of this Agreement; or (b) resolve a dispute or disagreement arising from or relating to this Agreement, the prevailing party or parties in that action will be entitled to recover reasonable attorney's fees, costs and disbursements in connection with prosecuting or defending the action.

15. **Representations and Warranties**. The parties to this Agreement represent and warrant (a) that they have the power and authority to sign and enter into this Agreement, and to bind Legal-Bay, LBV and Mustang, as the case may be, to the terms of this Agreement; and (b) that they have not assigned, pledged, transferred, disposed of, hypothecated, liened or otherwise conveyed, encumbered or indebted any of their rights or obligations relating to the subject matter of this Agreement.

16. **Amendments and Waiver**. No modification or amendment of this Agreement shall be binding upon any party to this Agreement unless first agreed to in a writing signed by each of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding on any party to this Agreement unless agreed to in a writing signed by the party or parties against whom such waiver is sought to be enforced.

17. **Headings.** The headings in this Agreement are for the convenience of the parties and shall not be used in the interpretation or construction of this Agreement.

18. **Counterparts.** This Agreement may be signed in counterparts, all of which together shall constitute one and the same instrument, notwithstanding that all of the parties hereto are not a signatory to the original or the same counterpart. Signatures received by electronic means (email attachments, facsimiles and the like) shall have the same binding force and effect as original signatures.

7

LEGAL-BAY, LLC

By: _____

    Christopher Janish

    Managing Member

Dated: 10.5.18

MUSTANG SPECIALITY FUNDING I, LLC

By: _____

    James K. Beltz

    Managing Member

Dated: _____

LBV FUNDING, LLC

By: _____

    Peter Caravella

    Managing Member

Dated: 10/9/18

8

**LEGAL-BAY, LLC**

By: _____
   Christopher Janish
   Managing Member

Dated: 10.5.18

**LBV FUNDING, LLC**

By: _____
   Peter Caravella
   Managing Member

Dated: _____

**MUSTANG SPECIALITY FUNDING I, LLC**

By: _____
   James K. Beltz
   Managing Member

Dated: 10/8/14

8

# Exhibit B

 (877) 571-0405      info@legal-bay.com

**APPLY NOW**



a

# FAST PRE-SETTLEMENT FUNDING AND LAWSUIT LOANS

Apply Today, Approved Tomorrow


**APPLY IN SECONDS!**

## Excellent

Based on 164 reviews

★ Trustpilot

## WHAT WE DO

We provide the fastest pre-settlement lawsuit funding approvals in the industry. Less than 24 hours in some cases.
We provide the lowest pre settlement rates industry wide – and back that up with our Best Price Guarantee on our loans for lawsuits.

We provide the best lawsuit funding customer service experience in the legal funding industry, our team will work tirelessly to get you approved while you are waiting on a pending settlement. Don't stress on meeting your living expense while you wait on a pending lawsuit.

Legal-Bay is dedicated to our customers. Unlike other legal settlement funding companies, we have creative solutions to help get you approved for a lawsuit cash advance. This is not a lawsuit loan, or a pre-settlement loan. This is a non-recourse lawsuit settlement advance. You owe nothing if you lose your case. That's right, our lawsuit settlement loans are no risk whatsoever to you!

Translate »

# NO CREDIT CHECK OR EMPLOYMENT VERIFICATION NEEDED FOR LAWSUIT FINANCING!

All you need is a lawyer! Legal-Bay is the leading lawsuit settlement funding company providing cash advances in as little as 24 hours.



## FREE CASE EVALUATION

It costs you absolutely nothing to fill out our quick application and get the process started.



## NO PAYMENTS

There are no out of pocket or monthly payments paid by you directly throughout the entire process.



## 100% RISK FREE

Thats right, you only pay us back if you win your case!

**APPLY IN SECONDS!**

Translate »

# WHAT TYPES OF CLAIMS ARE ELIGIBLE FOR PRE-SETTLEMENT ADVANCES?

The Lawsuit Settlement Funding Co. provides creative funding solutions to various legal and/or business transactions including same day accident loans such as pre settlement loans for auto accidents. Feel free to fill out our quick application (on the upper right of this page) for a free case evaluation to your specific lawsuit settlement loan needs. It costs you nothing to inquire.



**ALL MOTOR VEHICLE**

**MEDICAL MALPRACTICE**

**EMPLOYMENT / DISCRIMINATION**

**ATTORNEY LOANS / SURGICAL FUNDING**

**ALL PERSONAL INJURY / WRONGFUL DEATHS**

**WRONGFUL IMPRISONMENT**

**PRODUCT LIABILITY**

**MARITIME / FELA**

**VIEW ALL CASE TYPES**

# HOW IT WORKS

Translate »

ESX-C-000086-22   05/16/2022   Pg 5 of 10   Trans ID: CHC2022113802



## 1. YOU APPLY

Apply online or call to speak with a
friendly agent



## 2. WE REVIEW

We work together with your Law Firm to
review your case



## 3. GET FUNDS

We send you cash directly within 24
hours of approval

**LEARN MORE**



# HEAR WHAT OUR CLIENTS HAVE TO SAY

*LSF Co. funded both my mom and I. In both cases, the agents were friendly and courteous to deal with and answered all of our questions and concerns.*

Translate »

**Candie S.**

Orlando, FL



*The funding agents were extremely professional. They walked me through the funding process and followed through on everything that was needed between my attorney and I.*

**Samuel N.**

Las Vegas, NV



*LSF Co. made me feel not only like a client, but like a friend. They bent over backwards for me by continuing to fund my case several times as the insurance company continued to drag their feet.*

**Bernadette H.**

Los Angeles, CA



AMOUNT RECEIVED
BY APPLICANTS

HAPPY
APPLICANTS

YEARS OF
EXPERIENCE

PERSON TEAM
TO ASSIST

Translate »

## CALL US TOLL-FREE AT (877) 571-0405

TO SPEAK WITH A FRIENDLY FUNDING SPECIALISTS TODAY.

**GET FUNDS TODAY**

## HOW LAWSUIT FUNDING CAN HELP YOU TODAY

Never settle for less. If the insurance company is forcing you to take an offer that is not fair value, then consider taking a pre-settlement funding with Legal-Bay. A pre settlement cash advance today can buy you the necessary time needed to pay your bills – and get a better settlement offer.

Here is a basic scenario: Insurance Company offers a plaintiff a $50,000 "low ball" offer today for their case... Plaintiff discusses with their attorney and decides to decline the offer, and obtain a $10,000 pre-settlement advance with Legal-Bay to pay bills. 5 month later, the Insurance Company offers plaintiff $100,000. The small cost to pay Legal-Bay produces an additional $50K in case value.

### AS FEATURED ON



Translate »

# START YOUR FREE CASE EVALUATION RIGHT NOW!

Our friendly sales agents are standing by right now to answer any of your funding questions. Simply hit the application button to start the process on your own and a sales agent will contact you shortly.

**APPLY NOW**

**FIRST TIME APPLICANTS CALL :**

(877) 571-0405

(THIS PHONE NUMBER IS FOR
FIRST TIME APPLICANTS ONLY)

**EXISTING CLIENTS CALL :**

(973) 857-1000

(THIS PHONE NUMBER IS FOR
EXISTING CLIENTS & EXECUTIVE OFFICES)

# APPLY TODAY – FUNDED TOMORROW

Your Application For Lawsuit Settlement Loans Starts Here! Loans For Lawsuits Are Easy To Apply For!

## YOUR INFORMATION

First Name

Last Name

Best Phone #

Translate »

ESX-C-000086-22   05/16/2022   Pg 9 of 10   Trans ID: CHC2022113802

Email Address

State

## ATTORNEY INFORMATION - FILL OUT AS MUCH AS YOU CAN

Lawyer/Law Firm

State of Law Firm

## CASE INFORMATION - FILL OUT AS MUCH AS YOU CAN

Type of Case

Amount Requested

Brief Description of Your Case

0 of 250 max characters

I'm not a robot

reCAPTCHA
Privacy - Terms

**SUBMIT APPLICATION**

## CORPORATE OFFICE ADDRESS

Legal-Bay Lawsuit Funding

60 Roseland Ave.

Suite 101

Caldwell, NJ, 07006



## CONTACT US

P: (877) 571-0405 (NEW APPLICATIONS ONLY)

P: (973) 857-1000 (Executive Offices / Existing Clients)

Translate »

F: (866) 697-8838

E: info@legal-bay.com

**FOLLOW US:**

**QUICK LINKS**

Home

About Us

How it Works

Cases We Fund

Blog

Attorneys

Contact Us

© 2021 Legal-Bay LLC. All rights reserved | Privacy Policy | Disclaimer | Sitemap

Translate »

# Exhibit C

ESX-C-000086-22   05/16/2022   Pg 2 of 7   Trans ID: CHC2022113802



# Our Strategy

Mustang Litigation Funding provides best-in-class capital solutions for law firms, plaintiffs, litigation vendors, and other legal assets. We can help you, your firm, and your clients receive the resources you need to see the case through to the end. Review our three verticals and find the solution that best fits your needs.

## Plaintiff Pre-Settlement Funding

Mustang provides non-recourse cash advances to plaintiffs with active litigation claims. This advance helps plaintiffs address immediate financial needs while they await settlement.

## Commercial Funding

Mustang provides non-recourse cash advances to businesses with active litigation claims. This advance is often used to reduce litigation-specific risk while helping fund working or expansion capital.

## Attorney Funding

Mustang partners with law firms to provide capital for expenses incurred and expected in the pursuit of a litigation claim. Mustang's capital addresses potential shortfalls a lawyer may incur in covering case cost expenses.

# Find your capital solution here.



# Find your capital solution here.

## About Us



**We've funded**

**75M+**

across our portfolio.

**We work with**

**800+**

law firms across the country.

**We've issued**

**5,000+**

checks to individuals, groups and firms.

**We financed**

**2,500+**

unique cases.

# Our Team

Our team of experts has a combined 80+ years of experience in the finance industry and 35+ years of combined experience in litigation finance.



### Jimmy Beltz
Co-Founder/Managing Partner



### Kevin Cavanaugh
Co-Founder/Managing Partner



### Patrick Shannon
Chief Operating Officer



### Mark Madeira
Chief Financial Officer



### Philip DeBerg
Portfolio Manager



### Posh Jesmer
Director of Business Development



### Bradford Morrison
Associate



### Dalton Rust
Associate



### Peter Mayer
General Counsel



### Seth Rieger
Chief Technology Officer



### Timothy M. Curran
Outside Legal Advisor

Meet The Team

Case 2:22-cv-03891-ES-JBC   Document 9-1   Filed 06/17/22   Page 73 of 151 PageID: 296

# Portfolio Investment Opportunities



### 60% Plaintiff Pre-Settlement Funding

Mustang provides non-recourse cash advances to plaintiffs with active litigation claims. This "lawsuit" advance helps plaintiffs address immediate financial needs while they await settlement. Broadly speaking, it helps level the economic playing field against deep-pocketed defendants and insurance companies. With adequate resources, both plaintiff and attorney are better equipped to pursue a claim to its full potential.

### 20% Law Firm Funding

Mustang partners with law firms that need access to capital for expenses incurred and expected in the pursuit of a litigation claim. Lawsuits are expensive and take time. Mustang's capital addresses potential shortfalls a lawyer may incur in covering case cost expenses. A well-capitalized lawyer can access the vendors and subject matter experts while also covering the significant expenses experienced during a long litigation process.

### 20% Commercial & Special Interest Funding

Mustang specializes in purchasing interests in litigation claims and providing liquidity to firms in various legal based strategies. With its in-house underwriting expertise and industry relationships, Mustang has funded and invested in several legal investments including vendor receivables, advertising programs, lead generation campaigns and secondary market transactions. Mustang believes these strategies are diversified, uncorrelated and offer excellent risk/reward opportunities.

**Investor Portal**

Username

Password

Submit



Contact us today and secure the capital you need.



Contact us today →

WHERE TO FIND US

Minnesota Office:
701 E. Lake St, E #250
Wayzata, MN 55391

Pennsylvania Office:
600 W Germantown Pike
Suite 600
Plymouth Meeting, PA 19462

WAYS TO REACH US

 844 847 3152

 info@mustangfunding.com

LinkedIn

Copyright 2022 Mustang Litigation Funding, LLC | Terms & Conditions | Privacy Policy

# Exhibit D



# Exhibit E

DocuSign Envelope ID: 114F39B3-4A5D-4974-8659-89ED93EF26C5





**FUNDING AGREEMENT**

**THIS FUNDING AGREEMENT** (hereinafter referred to as the "Agreement") is entered into **July 9, 2019**, by and between ███████ (the "Sellers") and Mustang Specialty Funding I, LLC (the "Purchaser"), with address of P.O. Box 083170, Chicago, IL 60691-0170, and any related investors.

WHEREAS, Seller has asserted the following claim to recover money damages in a lawsuit entitled:

WHEREAS, Seller is represented in the Claim by legal counsel, ███████ having an office located at: ███████

WHEREAS, Purchaser will be paid from the proceeds recovered from the Claim in the event that Seller obtains any monetary recovery (the "Recovery") from the Claim, or any related claims. The proceeds will be that portion of the Recovery set forth in the Disclosure Statement in paragraph 2 of this Agreement;

WHEREAS, Purchaser provides Seller with monies for seller's life's necessities (but not to fund Seller's Claims) by purchasing the right to receive a portion of the Recovery should there be any Recovery from the Claim by way of a verdict, judgment, settlement, award, compromise, or otherwise (called the "Proceeds"); and

WHEREAS, Seller desires to sell, and Purchaser desires to purchase, the Proceeds from the possible Recovery from the Claim (the "Share" or "Purchaser's Share").

NOW THEREFORE, for good and valuable consideration, the receipt, sufficiency and adequacy of which is hereby acknowledged, the parties hereby agree as follows:

**1. Purchase Price; Deduction of Flat Fee.** Purchaser shall pay the sum of **$3,125.00** (the "Purchase Price") to Seller, which includes a **$625.00** Processing Fee. After deduction of prior Funding Advance Payoff (if applicable) of **$0.00** payable to **N/A** on behalf of seller; Purchaser will disburse to Seller the net amount of **$2,500.00** in connection with this Agreement and the Exhibits annexed to this Agreement

2. **Purchaser's Share; Irrevocable Assignment of Proceeds; Disclosure Statement**. Seller unconditionally and irrevocably grants, assigns, transfers and conveys the Proceeds with respect to the potential Recovery from the Claim as set forth in this paragraph. **The Purchaser's Share increases at an Annualized Rate of 24.00% for the first 6 months; and 48.00% for the first 12 months. Purchaser's shares shall increase at a rate of 24.00% for each 6 month period thereafter until case is paid in full.** Purchaser's Share (that is, the Proceeds) will be paid to Purchaser in full on the date the Recovery, if any, is received by Seller or the Attorney. Purchaser's Share (that is, the Proceeds) will be withheld from any money collected as a result of the Claim and paid to Purchaser immediately upon collection without set-off or reduction of any kind. The Proceeds will be paid immediately after attorney's fees (including the expenses charged by the Seller's attorney for costs and disbursements); and after payment to any recorded lien holders that may exist prior to the date of this Agreement, or which may have priority by law. Seller will not receive any money from the Recovery from the Claim until the Proceeds have been paid in full to Purchaser.

a. **Multiple Payments**. In the event the Recovery is received in multiple payments, Purchaser's right to receive full payment of the Proceeds is prior to and senior to the Seller's rights to receive any portion of the Proceeds.

1 of 10

Seller's Initial ███████

DocuSign Envelope ID: 114F39B3-4A5D-4974-8659-89ED93EF26C5

**b. Limitation of Recovery.** If the Recovery is insufficient to pay the Proceeds, then the Purchaser's Share will be limited to the Recovery from the Claim. If the Seller does not receive, obtain or collect any money from the Claim, then the Seller will owe nothing to Purchaser.

**c. Repurchase Option.** Seller may repurchase the Purchaser's Share of the Recovery from the Claim at any time for an amount in cash equivalent to the Purchaser's Share in accordance with Exhibit D at the date of the repurchase and the execution and delivery of such documents as Purchaser may require.

**d. Disclosure Statement.**

| | | |
|---|---|---|
| 1. | **Total Purchase Price** (Includes $625.00 Processing Fee) | **$3,125.00** |
| 2. | **Purchaser's Buyout** (Prior Funding Advance: N/A ) | **$0.00** |
| 3. | **Net Amount to Seller** | **$2,500.00** |
| 4. | **Annual Percentage Fee – First Year** | **48.00%** |
| | a) **Minimum Number of Months** | **6** |
| 5. | **Total Amount to be Paid by Seller:** | |



**The Seller's Payment Obligation will continue to accrue at $750.00 or 24.00% (Flat Fee) of the Total Purchase Price for each 6 month period after the 36 month period. Call for final payoff. PLEASE READ #9 FOR ADDITIONAL REPRESENTATIONS AND DISCLOSURES.**

4. **Purchaser's Power of Attorney.** Seller hereby appoints the Attorney, on behalf of Purchaser or the duly authorized representative, to: (a) accept, endorse and deliver for deposit to the credit of Purchaser, any negotiable instrument making payment of the Proceeds from the Recovery; and facilitate Purchaser in negotiating the negotiable investment which conveys payment of the Recovery due to Seller under the terms of this Agreement. The power of attorney granted in this Agreement shall be exercised for the benefit of Purchaser and not for the benefit of Seller and can be utilized specifically in case of seller's untimely death to resolve final payment to buyer.

5. **Sale of Portion from Seller's Contingent Recovery.** Seller has valid reasons for selling Purchaser a portion of the Recovery as opposed to waiting until there is a verdict, judgment, award, settlement, compromise or other resolution of the Claim. The Purchase Price received by Seller from Purchaser must be used for immediate economic necessities or other purposes that Seller deems important. The Seller represents and notifies to Purchaser that the Purchase Price will not be used either directly or indirectly to pursue the Claim in any manner.

6. **Non-Recourse Sale.** This Agreement constitutes a non-recourse sale of the Purchaser's Share of a contingent Recovery and is not a loan. In entering into this Agreement, the parties acknowledge that Purchaser is in no way acquiring the Seller's right to sue; that the Seller has already initiated the Claim and the lawsuit referred to as the Claim; **and that the Claim and lawsuit belong exclusively to the Seller. Purchaser will in no way be**

Seller's Initials

DocuSign Envelope ID: 114F39B3-4A5B-4974-8659-89ED93EF26C5

involved in, control, affect, participate in, interfere with or otherwise influence the decisions that Seller and Attorney make in connection with the Claim, settlement of the Claim or the amount of the Recovery. This Agreement does not transfer, assign, or convey any right of action, cause of action, claim, claim for relief, counterclaim, cross claim or other claim which Seller may have in connection with the Claim or the lawsuit.

7. **Seller's Representations and Warranties Regarding Insolvency**. Seller hereby represents and warrants to Purchaser that: (a) Seller is not presently a party to any action or proceeding for relief under any federal or state bankruptcy, debtor protection, or insolvency law; (b) a trustee or receiver has not been appointed with respect to all or any portion of Seller's assets; and (c) Seller does not intend to file or otherwise initiate any action or proceeding seeking relief under any federal or state bankruptcy, debtor protection, insolvency law, or other proceeding seeking protection from Seller's creditors.

a. **Security Interest**. In the event Seller commences, or has commenced against Seller, any action, case, or other proceeding, pursuant to any bankruptcy, debtor protection, insolvency, or other similar law prior to receipt by Purchaser of the Proceeds, Seller will cause Purchaser's Proceeds to be described as a secured asset of Purchaser in any oral or written communications, including but not limited to, any filing, schedule, addendum, appendix, financial statement, asset schedule, balance sheet, income statement, statement of net worth, list of creditors, testimony or other document or communication, made or filed in connection with any such action, case or proceeding. In no event will Seller permit Purchaser's Proceeds to be described as a debt obligation of Seller.

b. **Disclosure**. Seller agrees to provide Purchaser with written notice if Seller commences, or has commenced against Seller, any proceeding described in paragraph 7(a), above. Such notice will contain: (a) the type of action; the relief sought by or against Seller; and (b) of the attorney, if any, representing Seller in the proceeding. Seller will also include in the notice a copy of the papers starting the proceeding against Seller.

8. **Seller's Additional Representations**. As of the date of this Agreement, Seller is: (a) of age of majority (or legal age) in the state listed as Seller's address on the first page of this Agreement; (b) mentally competent; (c) of a sound mind; and (d) has calculated and understands all costs and total percentage returns due to seller for each 6 month payback period. Seller has complied with all applicable laws and has not committed, made or engaged in any misrepresentations, omissions, frauds, inaccurate statement or deceptions with regard to the Claim, Case Evaluation Worksheet or this Agreement. Seller's injuries which give rise to the Claim were solely as a result of the incident giving rise to the Claim and Seller knows of no other prior or subsequent injury, medical history, medical treatment, medical condition, psychiatric treatment, psychiatric condition or psychiatric history which would reduce the amount of the potential Recovery other than to the extent disclosed in writing to Purchaser. Seller has never been convicted of a felony or any other crime (whether a misdemeanor or felony) involving fraud, theft, misrepresentations, omissions or other form of dishonesty other than to the extent disclosed in writing to Purchaser.

9. **Purchaser's Additional Representations and Disclosures of Rates & Fees.** Purchaser hereby represents to Seller that a **$625.00** processing fee has been charged to the Purchaser, which has been added into the Total Purchase Price as listed in the Disclosure Statement. Purchase represents and discloses that additional fees will be paid directly by Purchaser to third parties that have assisted Purchaser with effectuating this transaction. These fees include, but are not limited to: marketing & administrative costs, due diligence and underwriting costs, and origination and/or broker fees. These additional fees will not affect the sellers payback amounts listed in the disclosure statement on page 2. A list of any and all fees can be requested by seller prior to execution.

10. **No Violations**. The execution and performance of this Agreement by Seller, and the funding described in this Agreement: (a) do not conflict with, or cause a violation of, any other obligations, contract or agreement of Seller; (b) shall not cause a termination, cancellation or acceleration of any contract or agreement by which will or may affect the Seller or Seller's assets; and (c) shall not create or give any party (other than Purchaser) the right to create any lien, charge, interest, security interest, judgment or encumbrance in the Claim or Recovery other than to the Attorney. Seller represents and warrants that Seller has no notice or knowledge of any liens placed upon the Claim and/or the Recovery, except as disclosed in Exhibit B; and shall not grant a present

Seller's Initials: ▮▮▮▮

DocuSign Envelope ID: 114F39B3-4A5D-4974-8659-89ED93EF26C5

or future right to any other party to make a claim against Seller or Seller's assets, the Claim and/or the Recovery. Seller waives any defense to paying the Purchaser's Share of the Recovery to Purchaser. Seller further promises not to seek to avoid payment of the Proceeds, Purchaser's Share or any other sum of money due to Purchaser under this Agreement.

11. **No Liens or Encumbrances**. Seller represents and agrees: (a) not to create or permit any liens, encumbrances, interests, security interests or judgments against the Recovery or Proceeds from the Claim, except those that might be necessary to the prosecution of the Claim and/or any medical expenses, treatments and related equipment related to the Claim, after the date of this Agreement; (b) do anything to affect the Purchaser's Proceeds; or (c) do anything that would, or could in the future, violate any of the terms and conditions of this Agreement.

        **a. No Assignment**. Seller relinquishes any rights to sell, assign, encumber, lien or transfer any rights in or to the Recovery or Proceeds from the Claim, including but not limited, to any estate or probate court proceeding.

        **b. No Other Actions**. Other than the Claim, there is no legal action, lien, claim, encumbrance proceeding or order pending or threatened against Seller or Seller's assets which would impair, hinder or diminish Purchaser's collection of the Proceeds.

12. **Continuing Duty**. Seller agrees that Seller has a continuing duty to: (a) deliver any and all notices, instructions or communications regarding the Claim, Recovery, Proceeds or this Agreement to Purchaser; (b) cooperate with Purchaser regarding matters described in this Agreement; and (c) notify Purchaser of any judgment, verdict, award, settlement, compromise, resolution, discontinuance or ending with respect to the Claim within two (2) business days thereof and to cause the Attorney to do the same.

        a. **No Violation of Domestic Relations Obligations**. Seller represents that Seller is not in violation or breach of Seller's obligations to pay alimony, child support, child care expenses, maintenance and any other obligation related to an order, judgment, decree or settlement in a domestic relation matter, divorce, family court proceeding or matrimonial proceeding, and child custody proceeding.

        b. **No Additional Funding**. Seller represents that Seller has not and will not obtain additional or other funding with respect to the Claim from any source, except as disclosed in Exhibit B.

13. **Authorization.** Seller hereby authorizes and directs the Attorney to: (a) comply with this Agreement; (b) acknowledge receipt of this Agreement and its Exhibits; and (c) distribute the Proceeds to Purchaser in compliance with the provisions herein.

14. **Payment Authorization: Attorney Acknowledgement**. If Seller terminates the Attorney with respect to the Claim, Seller shall notify Purchaser in writing within two (2) business days thereof by certified mail, return receipt requested; and hereby authorizes the outgoing Attorney to notify Purchaser of such termination as set forth in the "Attorney Acknowledgment" attached as Exhibit B. Seller will notify Purchaser in writing within one (1) business day after retaining new attorneys to represent Seller by certified mail, return receipt requested; and state the name, address and telephone number of the new Attorneys of record. Seller will cause the new Attorneys to execute a "Payment Authorization"; and an "Attorney Acknowledgement." If Seller fails to obtain the signatures of the new Attorney on the "Payment Authorization" and "Attorney Acknowledgement," Purchaser may notify the new Attorneys of this Agreement; and may commence legal proceedings to enforce the terms of this Agreement and Purchaser's right to receive Proceeds from the Recovery.

15. **Waiver of Defenses; Indemnification.** Seller waives any defense to payment of the Proceeds and agrees not to seek to avoid payment of any money due to Purchaser under this Agreement. Seller agrees to indemnify and hold Purchaser harmless from and against, and to reimburse Purchaser for, claims, losses, liabilities, damages, judgments, causes of action, claims and related costs and expenses of any nature (including reasonable attorney's fees and expenses) sustained or paid by Purchaser, by reason of any written or oral (non-written) statement, action, omission, inaction, misstatement or breach of this Agreement (and the Exhibits to this Agreement) by Seller or Seller's Attorney (including any successor or substitute attorneys).

Seller's Initials: ███████

DocuSign Envelope ID: 114F39B3-4A5D-4974-8659-89ED93EF26C5

16. **Agreed Damages.** In the event Seller or the Attorney terminates or otherwise breaches this Agreement, Seller will pay liquidated damages to Purchaser in the amount of three (3) times the Purchase Price (the "Agreed Damages"). The Agreed Damages will include Purchaser's reasonable attorney's fees and expenses in the event that Purchaser initiates an action to recover the Agreed Damages. Seller agrees that the amount of the Agreed Damages is reasonable and is not a penalty. In this regard, the Seller wishes to limit Seller's exposure for actual damages as a result of Seller's or Attorney's breach of this Agreement (including the Disclosure Statement and Exhibits) and acknowledges that the Agreed Damages constitute a fair and reasonable amount of compensation for Purchaser's damage due to the Seller's or Attorney's breach of the Agreement. Any judgment obtained by Purchaser for the Agreed Damages (including attorney's fees and expenses), if not paid by Seller, are a lien against the Recovery.

17. **Purchaser's Assignment.** Purchaser may assign its right, title, and interest in and to this Agreement, the Recovery, the Proceeds and Purchaser's Share without notice or Seller's approval. This Agreement and the Exhibits annexed to this Agreement are binding on the Purchaser's and Seller's respective successors, heirs, executors and administrators. The Exhibits are part of this Agreement and incorporated into the Agreement by reference.

18. **Notices.** All payments, notices or other communications which are required or permitted hereunder will be sent to the person(s) at the addresses set forth below (or at such other address and/or manner as may be provided hereunder):

Seller:                                Address listed on page 1.

Purchaser (by regular mail):    **Mustang Specialty Funding I, LLC**
                                      **P.O. Box 083170**
                                      **Chicago, IL 60691-0170**
                                      **Customerservice@Mustangfunding.com**

If the Seller moves, the Seller will notify Purchaser in writing within five (5) business days thereof by certified mail, return receipt requested, stating the address and telephone number of the Seller's new residence or office.

18. **Merger; Severability.** This Agreement and the Exhibits annexed to this Agreement (collectively, the "Agreement") constitute the entire agreement between the parties and there are no agreements, contracts, understandings, representations, warranties, covenants or obligations except as set forth herein. This Agreement supersedes all prior and contemporaneous agreements, contracts, understandings, statements, representations, negotiations and discussions, written or oral, between Seller and Purchaser (and their representatives) relating or pertaining to any transaction contemplated by this Agreement. If any provision of this Agreement is deemed invalid or unenforceable, it shall not affect the validity or enforceability of any other provision hereof. It may be modified, amended or changed only in writing executed by Seller and Purchaser. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. A Signature transmitted by fax or e-mail shall be effective with the same force and effect as the original signature.

19.     **Jurisdiction and Governing Law.** Any controversy, disagreement, cause of action or claim arising from, pertaining to or relating to this Agreement, including without limitation the interpretation, validity, enforceability or breach thereof, will be brought in a federal or state court sitting Essex County, N.J. at the discretion of the Purchaser(s). The judge or jury, as the case may be, may award to the prevailing party reasonable attorney's fees and costs associated with action. Seller and Purchaser agree and admit that they are subject to personal jurisdiction in the State of New Jersey. The laws of either state, with the exception of either states rules regarding conflict of laws, govern and control this Agreement and the parties' rights and obligations under this Agreement. In the event that this funding is deemed to be a loan by any court in any jurisdiction, for any reason; then the parties mutually agree to have the usage rate automatically default to prevailing highest interest rate allowable in said jurisdiction, without any penalty to buyer.

Seller's Initials

DocuSign Envelope ID: 114F39B3-4A5D-4974-8659-89ED93EF26C5

20. **Purchaser's Profit.** Seller has been advised and understands that the cost of selling a portion of the Recovery to Purchaser is potentially expensive, should only be used as a last resort and that Purchaser may make a substantial profit from the Proceeds. Other sources of funding, including loans, may be available at more favorable rates, payment schedules, terms and conditions.

21. **Seller's Review.** Seller acknowledges that Seller has read this entire Agreement, including the Exhibits, and understands the contents of these materials. Seller has had a full and complete opportunity to consult with his or her Attorney, or other independent attorney, before signing this Agreement. This Agreement, including the Exhibits, has been fully explained to the Seller by his or her Attorney and all questions that Seller might have about this Agreement have been fully explained to Seller by his or her Attorney. Seller acknowledges that he or she has executed this Agreement voluntarily and of his or her own free will.

22. **Cancellation.** **Seller may cancel this Agreement without penalty or further obligation within five (5) business days following the Seller's receipt of funds from Purchaser, provided, however, that Seller must provide written notice of cancellation and return the Purchase Price to Purchaser simultaneously with the cancellation notice. Seller may comply with these requirements by: (a) making personal delivery to Purchaser's offices of the un-deposited (or uncashed) check that Purchaser issued to Seller; or (b) mailing a notice of cancellation to the Purchaser's office, and including in that mailing a return of the Purchase Price (in the form of the Purchaser's check, certified check, registered check, or a money order in the exact amount of the Purchase Price) by registered mail, certified mail or insured United States mail. The notice of cancellation will be deemed effective in the date that it is postmarked. In order to be effective, the letter containing the notice of cancellation and return of the purchase price must be postmarked within five (5) business days of receiving the Purchase Price from the Purchaser.**

23. **No Waiver.** No failure by Seller or Purchaser to enforce to any term of this Agreement shall be deemed to be a waiver of the right to do so or to enforce any other provision, condition or requirement under this Agreement. Nor will any failure, delay, or omission by Seller or Purchaser to exercise any right under this Agreement prevent either Seller or Purchaser from exercising that right at a later date.

24. **Obtain an Attorney's Advice Regarding this Agreement:**

**DO NOT SIGN THIS AGREEMENT BEFORE READING IT COMPLETELY OR IF IT CONTAINS ANY BLANK SPACE. BEFORE SIGNING THIS AGREEMENT, YOU SHOULD OBTAIN THE ADVICE OF YOUR ATTORNEY. YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS CONTRACT. DEPENDING ON YOUR CIRCUMSTANCES, YOU MAY WANT TO CONSULT A TAX BENEFIT PLANNING FINANCIAL PROFESSIONAL.**

25. **Counterparts and Electronic Signatures.** This Agreement may be signed in counterparts, all of which together shall constitute one and the same instrument. Signatures received by electronic means (email attachments, facsimiles and the like) shall have the same binding force and effect as original signatures. This Agreement may be executed by the use of electronic signatures. An electronic signature shall be binding on each Party to this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement.

**Purchaser:** _____   **Date:** _____
**By:**            **Authorized Person**
                   ~~Muntang Specialty Funding LLLG~~

**Seller:** [redacted]                               **<= SIGN AND DATE HERE**

6 of 10                                    Seller's Initial [redacted]

DocuSign Envelope ID: 114F39B3-4A5D-4974-8659-89ED93EF26C5

## EXHIBIT A

### PAYMENT AUTHORIZATION

Pursuant to the Funding Agreement dated on page 1 by and between Seller and Purchaser, the terms and conditions of which are incorporated herein by reference (collectively, the "Agreement"), Seller and Seller's Attorney are bound by this Payment Authorization, and other documents related to the Agreement. Seller authorizes his/her/their Attorneys, as identified in the Agreement and any co-counsel, substituted, successor attorney to: (a) pay the Proceeds to Purchaser as set forth in the Disclosure Statement in paragraph 3.d of the Agreement at the time of distribution the Seller's monetary recovery, if any; and (b) notify Purchaser in writing of any final resolution with respect to the Claim within two (2) business days of receiving notice thereof. Such amount, if any, will be paid directly to Purchaser to satisfy Seller's obligations to Purchaser under the terms of the Agreement.

Seller will provide a copy to this Payment Authorization, the Agreement, and the Exhibits annexed to the Agreement to any successor attorney or legal representative representing Seller in connection with the Claim. Seller will notify and provide a copy of this Payment Authorization, the Agreement, and the Exhibits annexed to the Agreement, to such successor attorney or legal representative within five (5) days after retaining such successor attorney or legal representative.

Seller directs his/her attorney and his/her estate upon seller's untimely death, or incompetence, to pay the amount due in the disclosure statement upon final resolution of the claim; to be deemed as a binding obligation of seller's estate secured by the proceeds of seller's claim. Seller expressly authorize Mustang/Legal-Bay, its agents, or designees to: Endorse on my behalf any and all settlement checks payable to me regarding the Litigation, as may be necessary for the consummation of the transaction contemplated herein. This authorization shall survive my death or disability.

The Purchaser's Proceeds will be adjusted to include any cost or expenses incurred by Purchaser as set forth in the Agreement, including but not limited to, any amount (including attorney's fees, costs, expenses and disbursements) incurred by Purchaser to enforce its rights under the Agreement and related documents.

In the event that the amount of Seller's Recovery is less than the Proceeds due Purchaser, Purchaser will be entitled to one hundred percent (100%) Seller's Recovery.

This Authorization, the Agreement and related documents are irrevocable, binding and may only be amended, modified or changed by the written agreement of Purchaser and Seller.

Capitalized terms in this Payment Authorization have the same meaning in the Agreement.

**Seller:** ███████████████████    **<= SIGN AND DATE HERE**

7 of 10                                    Seller's Initials ███████

DocuSign Envelope ID: 114F39B3-4A5D-4974-8659-89ED93EF26C5

## EXHIBIT B

### ATTORNEY ACKNOWLEDGMENT AND LIEN

Attorney represents that the Attorney and his or her law firm (collectively the "Attorney") are attorneys of record for Seller regarding Claim. Attorney further acknowledges that he or she has (a) received and reviewed the Agreement between Seller and Purchaser in its entirety; and (b) explained the terms of the Agreement and Exhibits to the Agreement to the Seller. (Capitalized terms have the meaning ascribed to them in the Funding Agreement annexed hereto and incorporated herein by reference.)

Attorney: (a) has notice of the terms of the Agreement and the Exhibits annexed to the Agreement; (b) has received the "Payment Authorization" and "Funding Instructions" (both annexed as Exhibit C to the Agreement); and (c) agrees to withhold any Proceeds owed to Seller out of any Recovery received from the Claim until such time as Purchaser has been paid in full.

Attorney has reviewed and explained the Agreement, Exhibits and Disclosure Statement to Seller, including the compound interest rate applied to calculate the Purchaser's Proceeds with respect to the Claim.

Attorney represents that any settlement funds will be distributed through the law firm and not directly to the client. In the event that client is to receive settlement funds directly, attorney will acknowledge this funding lien be paid through the law firm, and not directly to client under any circumstances whatsoever. Attorney agrees to pay the Proceeds to Purchaser as set forth in the Disclosure Statement, subject to adjustments as set forth in the Agreement. Such payment shall be made directly to Purchaser prior to any distribution to Seller without any further authorization from Seller unless proof of payment of all, or a portion, of the amount due to Purchaser has been executed by the Purchaser acknowledging such partial payment, in which case the Attorney will pay only the remaining balance then due and owing to Purchaser.

Attorney agrees to place a copy of the Agreement, Exhibits and Attorney Acknowledgment and Lien in its files related to the Claim, inform Purchaser of the status of the Claim while it is pending in response to Purchaser's reasonable inquiries, notify Purchaser if and when there is a resolution of the Claim or any portion thereof, and notify Purchaser within two (2) business days of being terminated as Seller's Attorney. Attorney will furnish Purchaser with the Proceeds, within five (5) business days after the Attorney receives funds from the Recovery. The Attorney agrees to provide notices to Purchaser at the following address: Mustang Specialty Funding I, LLC (the "Purchaser"), with address of P.O. Box 083170, Chicago, IL 60691-0170, and any related investors.

Attorney agrees to disclose to Purchaser any insurance policy, insurance coverage, insurance policy (and policy number) and insurance binder to Purchaser upon receipt or learning of same in connection with the Claim.

Attorney discloses to Purchaser that: (a) liability and damages are contested with respect to the Claim; (b) there are no assurances that Seller will prevail in connection with the Claim; and (c) there is substantial uncertainty as to the amount, if any, that may be recovered in the form of money damages (the Recovery) from the Claim. Attorney represents that the Claim is pending in active status and there are no dispositive motions pending, including but not limited to, motions to dismiss or for summary judgment. In the event that the Attorney is terminated as the Seller's legal representative with respect to the Claim, Attorney will give Purchaser written notice thereof by certified mail, return receipt requested within two (2) business days of termination, and provide Purchaser with the name, address and telephone number of Seller's new Attorney. Attorney also agrees to provide a copy and properly notify new attorney of the Funding Agreement.

Attorney's Signature: 

Name: 

**SIGN AND DATE HERE**

8 of 10

Seller's Initials:

DocuSign Envelope ID: 114F39B3-4A5D-4974-8659-89ED93EF26C5

## ATTORNEY ACKNOWLEDGMENT AND LIEN - CONTINUED

In the event that Attorney is aware of, has knowledge of, is aware of or is otherwise in notice of liens, assignments, transfers, obligations, orders, judgments or settlements as set forth above, Attorney sets for these items as follows: **PLEASE LIST ALL KNOWN OBLIGATIONS OF THE SELLER, INCLUDING (WITHOUT LIMITATION) PRIOR FUNDING ADVANCES AND CHILD SUPPORT OBLIGATIONS BELOW. IF NONE, please indicate "NONE".**

| NAME AND ADDRESS OF OBLIGEE | AMOUNT | DATE |
|---|---|---|
| | | |
| | | |
| | | |

*(Use extra pages if necessary)*

**Attorney represents and warrants that the Attorney knows of no liens other that as set forth above. Attorney will not authorize or permit Seller to place any additional liens on the Proceeds or the Recovery, unless purchaser is repaid in full. Attorney represents and warrants to Purchaser that Attorney does not have any knowledge or notice of any liens upon and/or assignments, transfers or conveyances of any portion of the Proceeds, Recovery or Claim, except as set forth herein. Attorney further represents and warrants to Purchaser that Seller is not in violation, or to the best of Attorney's knowledge, is not in violation of any obligation to pay alimony, child support or expenses, maintenance or any other monetary obligation in connection with an order, judgment, or settlement of a matrimonial, domestic relations, child custody or family court proceeding. Attorney represents and warrants that Seller is not presently a debtor in a bankruptcy proceeding and that Seller has no intention of seeking protection from creditors in a bankruptcy or other similar proceeding.**

Attorney's Signature: ████████████████████████  **SIGN AND DATE HERE**
         Name: ████████████████████████

### NOTARY ACKNOWLEDGEMENT

On _____,2019, before me appeared, **Jeffery C. Bogert, Esq.,** and provided satisfactory evidence that she/he is the Attorney whose name is subscribed to in this Acknowledgement and Lien, and acknowledged to me that she/he executed both pages of the same, and that by her/his signature, executed the Acknowledgement and Lien.
Witness my hand and official seal

_____
Notary Public

Seller's Initials ████████

DocuSign Envelope ID: 114F39B3-4A5D-4974-8659-89ED93EF26C5

**EXHIBIT C**

**FUNDING INSTRUCTIONS**

Attached please find the Agreement I have signed selling a portion of the contingent recovery of my claim for a Purchase Price of **$3,125.00** to Mustang Specialty Funding I, LLC.

Kindly distribute on my behalf the net amount of **$2,500.00**, in the following manner: **(please check one)**

| | | |
|---|---|---|
| o | Pick Up at Purchaser's Office | No Fee |
| o | Check via Overnight Delivery to : | Fee of $60.00 added on final payback |
| o | Wire Transfer (same day funds) | Fee of $60.00 added on final payback |

## In the space below, please let us know how this cash advance from Mustang/Legal-Bay has helped you! (REQUIRED FOR FUNDING)

Hospital Bill's from my procedure.

**WIRE TRANSFER:**

| |
|---|
| Name of Bank and Branch Address: |
| Bank Number or ABA Routing Number: |
| Name and address on Account: |
| Account Number: |
| Type of Account: Checking vs. Savings  (Circle One) |

10 of 10

Seller's Initials

# Exhibit F




## ACCOUNT RECEIVABLE SALE AND REPURCHASE AGREEMENT

**THIS ACCOUNT RECEIVABLE SALE AND REPURCHASE AGREEMENT** ("Agreement"), made this **30** day of December, 2019 (the "Effective Date"), is by and between **Mustang Specialty Funding I, LLC**, a Delaware limited liability company, whose address is 120 Broadway Ave. S, Suite 50, Wayzata, MN 55391 (referred to herein as "Buyer") and ████████ ██████████████████████, a Texas professional limited liability company, whose address is 10077 Grogan's Mill Road, Suite 325, The Woodlands, Texas 77380 (the "Seller"). Buyer and Seller are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

**RECITALS:**

A. Seller has been engaged to represent the following "Plaintiffs" in the following lawsuit (the "Case"):

████████████████████████████████████████████████████████████████████████████████

    Case: Plaintiff was driving and had a blowout to his tire that caused the vehicle to roll. The structural integrity of the roof was compromised causing serious permanent injuries to the Plaintiffs.

    Injuries: ████████████████████████████████

    Insurance: ████

    Medical/other Liens: ████████████████████████████

    Value: $5,000,000. There is a mediation scheduled for next month.

    Referring Attorney Lien: 40% of Attorneys' Fees

    Local Attorney Lien: 10% of Attorneys' Fees

B. **SELLER AFFIRMS THAT THE INFORMATION PROVIDED TO BUYER BY WAY OF E-MAIL AND/OR SUPPORTING DOCUMENTATION IS AUTHENTIC AND ACKNOWLEDGES AND AGREES THAT BUYER HAS RELIED UPON SAME TO PURCHASE THE ACCOUNT RECEIVABLE (DEFINED BELOW). SELLER FURTHER AFFIRMS AND REPRESENTS THAT THERE ARE NO DISPOSITIVE MOTIONS PENDING AND THAT NO MATERIAL INFORMATION HAS BEEN WITHHELD WHICH WOULD REASONABLY CAUSE BUYER TO DECLINE PURCHASING THE ACCOUNT RECEIVABLE.**

1

Initials ████ Buyer




C. Following Seller's receipt of a monetary recovery from any settlement (regardless of whether the Case is settled before, as of, or after the Effective Date of this Agreement), verdict, judgment, mediation, award, or other resolution in connection with the Case (the "Monetary Recovery"), and after payment of the Attorney's Fees owed to the Referring Attorney and Local Attorney described in Recital "A" above, Seller shall receive the remaining portion of the Attorney's Fees and reimbursement of certain costs and expenses incurred by Seller in connection with the Case from the Monetary Recovery (hereinafter referred to as, the "Account Receivable") prior to its obligation to fund the Plaintiff's portion of the Monetary Recovery pursuant to its fee agreement with Plaintiff.

D. Seller desires to sell the Account Receivable to Buyer, and Buyer desires to purchase the Account Receivable from Seller, for the Purchase Price (defined below), subject to the terms and conditions set forth in this Agreement.

E. Seller, within 30 calendar days of receiving the Account Receivable, shall use the Account Receivable received by Seller to pay Buyer the Repurchase Price (defined below) and repurchase the full amount of the Account Receivable, less the amount of the Repurchase Price.

**NOW, THEREFORE**, in consideration of the recitals, representations, warranties, and agreements contained in this Agreement, the Parties hereby agree as follows:

## SECTION 1.  SALE; PURCHASE PRICE; AND REPURCHASE

1.0.   Recitals. The recitals above are incorporated by reference into this Agreement as if fully set forth herein at length.

1.1.   Sale.  For the Purchase Price and subject to the terms and conditions in this Agreement, Seller irrevocably sells, assigns, transfers, and conveys to Buyer, as absolute owner, subject to the Seller's repurchase obligation set forth in Section 1.3 below, all of Seller's rights, titles, and interests in and to the Account Receivable, free and clear of all liens, claims, interests, or encumbrances of any kind whatsoever (collectively, the "Adverse Interests").

1.2.   Purchase Price.  In full consideration for the sale to Buyer of the Account Receivable, and subject to the repurchase obligation of Seller set forth in Section 1.3, below, Buyer shall pay to Seller the sum of **One Hundred and Ten Thousand Dollars ($110,000.00)** (the "Purchase Price"), as follows: (a) First, the sum of $10,000.00 shall be paid to Legal-Bay, LLC,

2 |

Initials  /_____
Seller/Buyer





a New Jersey limited liability company, located at 60 Roseland Avenue, Suite 101, Caldwell, New Jersey 07006, for itself and on behalf of Tribeca Capital Group, LLC, a California limited liability company, located at 8214 Hollywood Blvd, Los Angeles, CA 90069, for due diligence and processing work provided on behalf of Buyer, and (b) Second, the sum of $100,000.00 shall be paid to Seller within 2 business days following the full execution and delivery of this Agreement to Buyer.

1.3.  <u>Repurchase Price</u>.  Seller, within 30 days of receiving the Account Receivable, shall use the Account Receivable to pay the Repurchase Price (defined below) to Buyer and repurchase the full amount of the Account Receivable, less the amount of the Repurchase Price.  The Repurchase Price as such term is used herein shall mean an amount equal to the Purchase Price plus the following fee: a 17.5% Flat Pricing Fee for every 6-month period following the Effective Date as outlined in the schedule below (which includes a $60 delivery fee) (collectively, the "<u>Repurchase Price</u>"):



**The Flat Pricing Fee shall continue to accrue at 17.5% for each 6-month period after 36 months, or $19,250 every 6 months, until paid in full.**

1.4  <u>Repurchase</u>.  Upon Buyer's receipt of the Repurchase Price from Seller, Buyer shall be deemed to have irrevocably sold, assigned, transferred, and conveyed to Seller, as absolute owner, all rights, titles, and interests in and to the full amount of the Account Receivable, less the amount of the Repurchase Price, without the necessity of the execution and delivery of any further instruments to effect such sale, assignment, transfer, and conveyance of same to Seller. However, upon written request by the Seller, Buyer shall promptly execute such additional

**3**

Initials

S      Buyer




documents and take such further actions as Seller may deem necessary or desirable to effect Seller's absolute ownership interest in the Account Receivable, less the amount of the Repurchase Price, or to allow or authorize Seller to recover the Account Receivable, less the amount of the Repurchase Price.

1.5   Repurchase – Shortfall.  In the event Seller has delivered the Account Receivable to Buyer and the amount of such Account Receivable is insufficient to pay the Repurchase Price, Buyer shall accept the Account Receivable received from Seller as payment in full of the Repurchase Price and shall not look to or seek payment from Seller or its members, attorneys, officers, employees, successors, or assigns (collectively, the "Seller Parties") for payment of any difference between the Account Receivable and the Repurchase Price. The Parties intend and agree that this transaction shall be non-recourse to Seller and the Seller Parties for all intents and purposes.

1.6   Tax Consequences.  The Parties also acknowledge and agree that any unpaid portion of the Repurchase Price, in the event that the Account Receivable is insufficient to pay the entire Repurchase Price, shall not be deemed or considered by the Parties to be a taxable event to Seller.  The Parties make no representation or warranty as to whether such amount would be considered a taxable event by any local, state, or federal taxing authority.

1.7   NON-RECOURSE.  NOTWITHSTANDING ANY OTHER TERMS OR PROVISIONS IN THIS AGREEMENT TO THE CONTRARY, BUYER HEREBY ACKNOWLEDGES, UNDERSTANDS, AND AGREES THAT NEITHER SELLER NOR THE SELLER PARTIES SHALL HAVE ANY LIABILITY WHATSOEVER TO PAY THE REPURCHASE PRICE OR ANY OTHER FEES, CHARGES, EXPENSES, COSTS, OR LIABILITIES IN CONNECTION WITH THIS AGREEMENT THAT IS BEYOND OR ABOVE THE AMOUNT OF THE ACCOUNT RECEIVABLE RECEIVED BY SELLER IN CONNECTION WITH THE CASE. IT IS THE INTENT OF THE PARTIES THAT BUYER SHALL LOOK SOLELY TO THE ACCOUNT RECEIVABLE RECEIVED BY SELLER IN CONNECTION WITH THE CASE TO PAY THE REPURCHASE PRICE OR ANY OTHER FEES, CHARGES, EXPENSES, COSTS, OR LIABILITIES IN CONNECTION WITH THIS AGREEMENT OR THE CASE.  IN THE EVENT THE ACCOUNT RECEIVABLE IS INSUFFICIENT OR NONEXISTENT, BUYER AGREES TO FOREGO COLLECTING THE REPURCHASE PRICE, OR ANY PORTION THEREOF LEFT REMAINING FROM SELLER OR SELLER PARTIES, AND SHALL NOT LOOK TO ANY OTHER ASSET OF SELLER OR SELLER PARTIES TO COLLECT SAME, IT BEING EXPRESSLY ACKNOWLEDGED, UNDERSTOOD, AND AGREED BY BUYER THAT SELLER AND SELLER PARTIES SHALL HAVE NO PERSONAL LIABILITY IN ANY RESPECT BEYOND THE ACCOUNT RECEIVABLE RECEIVED BY SELLER.  Seller

4

Initials 
S____Buyer

  

acknowledges and agrees that the Repurchase Price agreed upon herein is fair, reasonable, and justified based on Buyer's participation in assisting Seller in effectively prosecuting the Case.

1.8   <u>Settlement</u>.  In the event that the Seller represents and warrants that the Case is settled before or as of the Effective Date of this Agreement, the Seller's representations and warranties regarding settlement shall be and are a material inducement for Buyer to enter into this Agreement.

## SECTION 2. SELLER'S REPRESENTATIONS AND WARRANTIES

Seller hereby represents and warrants to Buyer as follows:

2.1.   <u>Repuchase Price; Senior Lien</u>. Seller and the Referring Attorney and Local Attorney described in Recital A above are the sole attorneys for the Plaintiff.  Seller intends to litigate the Case to a judgment, verdict, or award, or negotiate a settlement for Plaintiff in the Case. No portion of the Account Receivable is subject to a claim or referral fee by any other attorney or law firm, except as set forth in Recital "A" above, and Buyer's interest in the Account Receivable is for attorney fees, costs, and expenses from the Monetary Recovery in the Case. Seller represents and warrants that its interest in the Account Receivable is senior to any and all other liens, meaning that Buyer shall be paid the Repurchase Price first and to the extent the Account Receivable is sufficient to pay same, before any other party.

2.2.   <u>Buyer's Lien; Good Title</u>. Seller has all rights, titles, and interests in the Account Receivable on account of Attorneys' Fees earned and the disbursements made as a result of Seller's representation of Plaintiff in the Case, free and clear of any Adverse Interests. Seller represents and warrants that Buyer has valid, binding, and enforceable lien upon the Account Receivable for the Attorneys' Fees, costs, and expenses incurred by Seller in the Case. Seller represents and warrants that Seller has the unrestricted right to sell the Account Receivable to the Buyer. Upon payment of the Purchase Price, Buyer shall own good title to the Account Receivable, free and clear of any Adverse Interests, except as set forth in Recital "A" above.

2.3.   <u>No Bankrupcty, Insolvency, or Adverse Interest</u>. Seller represents and warrants that there are no bankruptcy or insolvency proceedings in progress or in prospect affecting Seller, the Account Receivable, or any of Seller's other property. The Account Receivable has not been and is not in jeopardy of being subject to a levy or any type of Adverse Interest.

5 |



Initials
S____ Buyer





2.4.  <u>Buyer's Reliance</u>. Seller understands, acknowledges, and agrees that Buyer has relied on and will continue to rely on the information, records, documents, files, communications, court-filed pleadings, and papers provided by Seller in connection with Buyer's: (a) decision and determination to pay the Purchase Price; and (b) collect the Account Receivable to pay the Repurchase Price. At Buyer's request, from time to time, Seller shall provide the status of the Case in writing and non-compliance with any such request shall be a material breach of this Agreement allowing Buyer to begin any legal proceedings for default.

2.5.  <u>No Liens or Judgments</u>. There are no liens or judgments against Seller or the Account Receivable to any government entity, except:

**List all liens**: None

## SECTION 3.  SELLER'S COVENANTS

3.1.  <u>Additional Documents</u>.   Seller shall promptly, upon written request by the Buyer, execute such additional documents and take such further actions as Buyer may deem necessary or desirable to perfect Buyer's security interest and/or lien in the Account Receivable or to allow or authorize Buyer to recover the Account Receivable.

3.2   <u>Changes to terms of Monetary Recovery</u>.  Seller agrees to notify Buyer in writing within 5 business days of any change in the terms of any agreed upon Monetary Recovery in the Case, that will affect Buyer's interest in the Account Receivable, including, without limitation, the amount or payment terms of any Monetary Recovery in connection with the Case.

3.3.  <u>No Adverse Interest</u>. Seller agrees that it will not grant or permit there to be any Adverse Interest upon the Account Receivable in favor of or for the benefit of any person other than Buyer, and shall provide written notice to Buyer within 5 business days upon obtaining knowledge of any involuntary Adverse Interest upon the Account Receivable.

3.4   <u>Commerical Use and Business Purposes</u>. Seller acknowledges that the purpose of each advance made by Buyer towards the Purchase Price for the Account Receivable is for commercial use and business purposes; specifically, with assistance of prosecuting the Case. Any ancillary personal, family, or household purpose that may exist or hereafter arise with regard to any advance or this Agreement may not be considered as Seller's primary purpose. As such, Seller further acknowledges that each transaction contained in or represented by this

6 |

Initials

Buyer




Agreement is not a consumer transaction but the sale of a business account receivable with a right of redemption.

## SECTION 4.  REMEDIES FOR BREACH

If Seller (a) breaches any of Seller's representations, warranties, agreements, inducements, or covenants in this Agreement, (b) breaches any other term of this Agreement, or (c) fails to use any portion of the Account Receivable received by Seller to repurchase the Account Receivable upon the successful resolution of the Case (whether such resolution occurs before, as of, or after the Effective Date of this Agreement), Buyer shall be entitled to recover from Seller:

      (a)    the Account Receivable received by Seller; and

      (b)    Buyer's reasonable attorney's fees, expenses, costs, and disbursements in connection with Buyer's efforts to collect, and collection of, the Account Receivable received by Seller.

## SECTION 5.  OTHER PROVISIONS

5.1.   <u>Governing Law; Forum</u>. This Agreement shall be governed by, construed, and enforced according to the procedural and substantive laws of the State of Texas, the domicile of Seller, without regard to its conflict of law or choice of law rules. Any controversy or claim arising out of or relating to this Agreement shall be brought in the State or Federal courts of Texas. All Parties agree and acknowledge that they are subject to personal jurisdiction in Texas and waive any defenses to personal jurisdiction or forum nonconviens in Texas.

5.2.   <u>Assignment</u>. Seller shall have no right to, and shall not, assign this Agreement or any of the rights, interests, or obligations hereunder.  Buyer shall have the right to assign all or any portion of its rights, interests, or obligations hereunder.  Buyer shall also have the right to pledge or grant a security interest in this Agreement.  This Agreement shall be binding on the successors, affiliates, agents, employees, attorneys, heirs, and permitted assigns of the Parties hereto.

5.3.   <u>No Jury Trial</u>. EACH OF BUYER AND SELLER HEREBY KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT THAT SUCH PARTY MAY HAVE TO REQUEST A TRIAL BY JURY IN CONNECTION WITH ANY PROCEEDING RELATING TO THIS AGREEMENT. ANY TRIAL WILL BE

7

Initials    
Seller   Buyer

 

A BENCH TRIAL WITHOUT A JURY.

5.4.    Notices. Any notices under this Agreement shall be made in writing via email or facsimile to the following addresses, followed by a copy of such notice via registered or certified mail, postage prepaid, or via overnight delivery, which notice shall be addressed as follows:

If to Buyer:

**Authorized Person**
**Mustang Specialty Funding I, LLC**
**P.O. Box 083170**
**Chicago, IL 60691-0170**

**Telephone: 973.857.1000**
**Facsimile: 866.697.8838**
**E-Mail: customerservice@Mustangfunding.com**

If to Seller:



5.5.    Entire Agreement; Merger. This Agreement is the entire agreement, contract, and understanding between the Parties hereto; and supersedes all prior and other understandings, agreements, contracts, negotiations, statements, representations, and discussions between or among the Parties to this Agreement, all of which are merged into and replaced by this Agreement.

5.6.    Amendment. This Agreement may not be amended, changed, modified, cancelled, or superseded except in a writing executed by all Parties hereto.

8 |

Initials 
Seller  Buyer

 

5.7.    <u>Signatures</u>. An electronic or typewritten signature, or a signature received by other electronic means (e.g., facsimile, email, PDF file, etc.) will be deemed an original signature for all purposes. This Agreement may be entered in multiple counterparts, all of which will be considered a single document.

5.8.    <u>Modification by Court</u>. If any provision in this Agreement is determined by a court of competent jurisdiction in be unenforceable under applicable law, such provision may be modified or amended by the court to render it enforceable to the maximum extent permitted by the law.

5.9.    <u>Severabiltiy</u>. If any provision in this Agreement shall be found to be unenforceable by a court of competent jurisdiction, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby, and the Agreement shall be fully enforceable without the provision found to be unenforceable.

5.10.   <u>Headings</u>. Headings are for the convenience of the Parties and shall not be used in the construction or interpretation of this Agreement.

[SIGNATURE PAGE TO FOLLOW]

9 |

Initials 
Seller/Buyer





The Parties hereto have executed and delivered this Agreement to be effective as of the Effective Date for all intents and purposes.

BUYER:

Mustang Specialty Funding I, LLC,
a Delaware limited liability company

By:_____
Name: _____
Title: _____

10

Initials _____
Seller/Buyer

# Exhibit G



# MUSTANG
## FUNDING

| To: | Patrick Dolan, Esq. | From: | Mustang Specialty Funding I, LLC |
|---|---|---|---|
| Fax: | | Pages: | 15 |
| Firm: | Siegel & Dolan | Date: | 07/16/2019 |
| Re: | Kenya Sibley | CC: | |

**INSTRUCTIONS:**

*Your CLIENT is the **SELLER**.
*Please have your CLIENT initial each page and date and sign the Purchase Agreement where indicated [p. 9, 12 and 15].
**Your CLIENT's signature must be notarized [p. 10].**
*Your signature is required on Exhibit C of the document [p. 13].
*Your signature is required on Exhibit D of the document [p. 14].
*Be sure that your CLIENT completes the Funding Instruction Sheet [p. 15].
*If the Funding Instruction Sheet is left blank we shall forward the check via regular mail to your office.


**Please include a copy of Kenya Sibley's state issued photo identification with executed contract to:**
**customerservice@mustangfunding.com**

Seller's Initials: 



# PURCHASE AGREEMENT

This is a Purchase Agreement (hereinafter referred to as "Agreement"). The date of this Agreement is 07/16/2019. My name is Kenya Sibley. My social security number is ██████. My date of birth is ████████ My address is ████████████ Under this Agreement, I am the Seller (hereinafter referred to as "Seller" or "I") and Mustang Specialty Funding I, LLC ("MUSTANG"), whose address is P.O. Box 083170 Chicago, IL 60691-0170, is the Buyer (hereinafter referred to as the "Buyer" or "MUSTANG").

### Disclosure Statement

| | | |
|---|---|---|
| 1. | Total Amount to be advanced to Seller (the "Purchase Price") | $76,350.32 |
| 2. | Itemized Fees: | |
| | a. Application | $0.00 |
| | b. Processing | $9,000.00 |
| | c. Other | $32,350.32 |
| 3. | Net Amount to Seller | $35,000.00 |
| 4. | Annualized Percentage Fee – First Year | 35.00% |
| | a. Minimum Number of Months | 6 |
| 5. | Total Amounts to be repaid by Seller to Mustang Specialty Funding I, LLC ("Purchaser's Share") | |

| If at 6 Months | 1/16/2020 | $89,711.63 |
|---|---|---|
| If at 12 Months | 7/16/2020 | $103,072.93 |
| If at 18 Months | 1/16/2021 | $116,434.24 |
| If at 24 Months | 7/16/2021 | $129,795.54 |
| If at 30 Months | 1/16/2022 | $143,156.85 |
| If at 36 Months | 7/16/2022 | $156,518.16 |

| | | |
|---|---|---|
| 6. | Minimum Required Payment Amount | $90,093.38 |

The Purchaser's Share will continue to accrue $13,361.31 or 17.50% (Flat Fee) of Purchase Price for each 6-month period after the 36-month period.

* Please see Exhibit "A" for the exact Purchaser's Share on dates other than those shown above. Purchaser's Share continues to increase until paid in full. Please contact Purchaser for an extended schedule.

Seller's Initials: 



# MUSTANG
### FUNDING

## BACKGROUND

A.       I have a Wrongful Termination claim which occurred on or before 03/03/2019 (hereinafter referred to as "Claim") against or involving Trustmark Recovery Services and Medical Office Business.  I have retained Patrick Dolan, Esq. of Siegel & Dolan ("my Attorney"), whose address is 150 N. Wacker Dr., Suite 3000, Chicago, Illinois 60606 to represent me individually, and on behalf of his firm.

B.       I anticipate that my Claim will result in proceeds from a verdict, award or settlement of my Claim in the future.  The entire amount of the final verdict, award or settlement, less legal fees, superior liens existing as of the date of this Agreement, costs and disbursements payable to my Attorney under the existing fee agreement between me and my Attorney are called the "Proceeds".

C.       I desire to sell and assign to MUSTANG an Interest in the Proceeds from my Claim/Lawsuit and MUSTANG desires to purchase an Interest in the Proceeds, on the terms and under the conditions set forth in this Agreement.

MUSTANG AND I AGREE AS FOLLOWS:

## 1.     PURCHASE OF INTEREST

Purchaser shall pay the sum of $76,350.32 (the "Purchase Price") to Seller. Seller understands, agrees and directs that the following amounts shall be withheld and disbursed from the Purchase Price on the Seller's behalf, as follows:

a.       **Net Amount**: Purchaser shall disburse to Seller the net amount of $35,000.00 per the Seller Funding Instructions,
b.       **Application Fee**: $0.00 shall be disbursed to Mustang Specialty Funding I, LLC on behalf of Seller for services rendered in connection with origination, and
c.       **Processing Fee**: $9,000.00 shall be disbursed to Mustang Specialty Funding I, LLC for administration and underwriting services in connection with this transaction.
d.       **Other Fee**:  $32,350.32 shall be disbursed to Global Financial to satisfy their prior funding advance.

I understand that the amount of Purchaser's Share, or, in other words, the amount to be paid to MUSTANG from the Proceeds will be as described with Exhibit "A", Schedule of Purchaser's Share, attached hereto.

e.       MUSTANG's Interest will be paid by my Attorney directly to MUSTANG out of the Proceeds from my Claims/Lawsuits.  MUSTANG's Interest will be deducted directly from the Proceeds of our Claims/Lawsuits and will be paid to MUSTANG prior to any payment to me from the Proceeds.  If the Proceeds of my Claims are not enough to pay the full amount due to MUSTANG, then MUSTANG shall be entitled to receive 100% of the Proceeds of our Claims/Lawsuits that are due and payable to me.  I have directed my Attorneys (and will direct any future attorneys representing me) to, among other things, (i) place an assignment, consensual lien and security interest in favor of MUSTANG against any and all Proceeds due us from our Claims/Lawsuits (after payment of any and all legal fees) and to protect and satisfy the assignment, consensual lien and security interest in favor of MUSTANG up to the full amount of MUSTANG's Interest; (ii) notify MUSTANG of any verdict, award, settlement, discontinuance or ending with respect to my Claims/Lawsuits; (iii) make payment directly to MUSTANG from the Proceeds of the proper amount due to MUSTANG of their Interest in the Proceeds as set forth in the Distribution Table; (iv) payment of MUSTANG's Interest shall be made from the Proceeds

Seller's Initials: K S



**MUSTANG**

FUNDING

prior to any payment to me from the proceeds with respect to my Claims/Lawsuits; (v) respond to requests for information from MUSTANG; and (vi) call MUSTANG prior to any disbursement of funds to verify the amount of MUSTANG's Interest in the Proceeds. I have provided MUSTANG with an executed Authorization For Attorney To Pay Mustang Specialty Funding I, LLC Interest From Proceeds of Claim/Acknowledgement of Authorization, attached as Exhibit "B" and incorporated into this Agreement by reference thereto. My Attorneys have executed the Acknowledgement of Authorization, attached as Exhibit "C" and incorporated into this Agreement by reference thereto.

      f.     The amount MUSTANG is entitled to may be more than the amount listed in the Disclosure Statement if we do not honor our obligations in this Agreement. I will also be liable to pay MUSTANG their Interest even if I have misled MUSTANG or my Attorney concerning my Claims/Lawsuits. I will also be liable for MUSTANG's attorney's fees or collection costs, as permitted by law.

      g.     At any time prior to final verdict, award or settlement of our Claims/ Lawsuits, I may pay MUSTANG money to reduce the amount of MUSTANG's Interest in the Proceeds of our Claims/Lawsuits. If I do, MUSTANG will prepare an amended Disclosure Statement, which MUSTANG and I will sign, which will reduce the amount of MUSTANG 's Interest. Also, if I want to sell an additional Interest in my cases/lawsuits, and MUSTANG agrees to purchase an additional Interest, I will sign an amended Exhibit "A" Schedule of Purchaser's Share. I understand that MUSTANG is not required to purchase any additional Interest in my Claims/Lawsuits.

      h.     In the event that my Claim is the subject of more than one lawsuit, claim or cause arising out of more than one incident/accident/transaction, then the amount due MUSTANG pursuant to this Agreement shall be paid from the Proceeds of the first lawsuit, claim and/or case, including but not limited to, Uninsured Motorist claims, Underinsured Motorist claims, Bad Faith claims, and malpractice claims arising out of the Claim, which results in a monetary recovery. If insufficient funds are available from the first lawsuit, claim and/or case resulting in a monetary recovery to pay the full amount due MUSTANG pursuant to this Agreement, MUSTANG shall be paid from such Proceeds according to the procedures set forth in Paragraph 1 (c) of this agreement and any remaining balance(s) due MUSTANG shall be paid from the Proceeds of the lawsuit(s), claim(s) and/or cause(s) until such time as MUSTANG has been paid the full value of its Interest.

      i.     The amount due MUSTANG shall be withheld from any money collected as a result of my Claim and shall immediately be paid to MUSTANG (after first deducting our Attorney's fees and costs, and any prior liens which exist as of the date of this Agreement and disclosed in the attached Exhibit "D" AND incorporated into this Agreement by reference thereto). I agree that all Proceeds received in connection with my Claims/Lawsuits, shall be held IN TRUST for MUSTANG until MUSTANG has been fully paid the value of its Interest. **I understand that I will not receive any money or payment from the Proceeds of my Claims/Lawsuits until MUSTANG has been paid its Interest in full.** This shall also apply to any structured settlements. If I receive payments from several sources, I will pay MUSTANG all monies received from each source until MUSTANG is paid in full its Interest in the Proceeds of our Claims/Lawsuits. I acknowledge that my receipt or use of any Proceeds from my Claims/Lawsuits prior to the full payment to MUSTANG of its Interest in the Proceeds of my Claim.

## 2.    GRANT OF SECURITY INTEREST IN PROCEEDS

      By signing this Agreement, I grant to MUSTANG a security interest and a lien in the Proceeds of my Claims/Lawsuits. MUSTANG shall have all rights and remedies of a secured

                           Seller's Initials:



**MUSTANG**

FUNDING

party under the Uniform Commercial Code of **Delaware**. I authorize MUSTANG to file one or more UCC financing statements regarding their security interest and lien in the Proceeds of my Claims/Lawsuits.

**3.    NO TRANSFER OF CLAIM**

MUSTANG has no right or obligation to take any legal action for me in connection with my Claims/Lawsuits.  MUSTANG has no right or obligation to advise, direct or instruct me or my Attorneys in how to go forward with my Claims/Lawsuits.  MUSTANG will not be involved in the negotiation of any settlement of my Claims/Lawsuits.  MUSTANG has no obligations or duties concerning my Claims/Lawsuits, or the collection of any settlement, award or verdict from my Claims/Lawsuits.

**4.    MY REPRESENTATIONS AND WARRANTIES**

I represent and warrant to MUSTANG that:

a.      I understand that this is not a credit agreement and any transaction resulting from this contract is not a loan.  I understand that I have a property interest in the Proceeds of our Claims, regardless of whether the value of those Proceeds can be determined at this time, and that I am selling a portion of my interest to MUSTANG.  I further understand that, because this is a sale rather than a credit transaction, **if my Claim does not result in an award, judgment or settlement I will not owe MUSTANG any money.**

b.      I understand that the value of MUSTANG 's Interest in any Proceeds resulting from my Claims shall exceed the amount paid to me by MUSTANG.  I acknowledge that this is fair and reasonable given the high level of risk to MUSTANG that the Proceeds from my Claim, if any, may be less than the value if MUSTANG's Interest.

c.      I am using the funds received from the Purchase Price for our immediate economic necessities.  I have been advised that I should not sell any portion of the Proceeds of my Claim if I have any other alternative to meet my immediate economic needs.  Because MUSTANG is taking a high risk in purchasing a portion of the Proceeds of my Claims/Lawsuits, I understand MUSTANG may make a large profit.

d.      I acknowledge that I have been advised to seek the counsel of tax, accounting and/or financial advisors as well as my Attorneys in deciding whether to accept the funding from MUSTANG and in the negotiation and signing of this Agreement.  I have either received such counsel prior to signing this Agreement or expressly waive such counsel.

e.      I are not currently in bankruptcy, there are no pending tax claims or criminal allegations against us, and we have complied with all laws in connection with the Claims.  We further represent that we are not in violation of any obligations concerning child-care, alimony or support, and we have not been convicted of a felony or other crime involving dishonesty. Other than the Claims itself, there is no claim, legal action, lien or any proceeding or order pending or in effect or threatened, against us or our properties, assets or business, or which would in any manner affect or impair MUSTANG's Interest or MUSTANG's rights under this Agreement.

f.      I have been truthful in all aspects of the Claims and have provided all information to my Attorneys in a complete and honest fashion.  I also confirm that all documents submitted in connection with the investigation and MUSTANG's evaluation of my Claims/Lawsuits are true, whether submitted by my Attorney or I.  I understand that MUSTANG is relying upon these statements in determining whether to enter into this Agreement.

Seller's Initials: K S



**MUSTANG**

FUNDING

5. **MY PROMISES TO MUSTANG**

I promise that:

a.    I will not change the fee agreement between me and my Attorneys in any way that would reduce the value of MUSTANG's Interest in the Proceeds of my Claims/Lawsuits. I further promise to notify MUSTANG in writing within 72 hours if I terminate the services of my Attorneys, or if my Attorneys determine not to proceed with my Claims/Lawsuits. If new attorneys are retained to represent me in these Claims/Lawsuits, I will notify MUSTANG within 72 hours of the new attorneys being retained, and will direct my new attorneys to comply with the terms of this Agreement by me and my Attorneys executing a new Authorization, Exhibit "B" and Acknowledgement, Exhibit "C" within 14 days after accepting my representation. I will also notify MUSTANG in writing within 72 hours if I move from the address listed above.

b.    I will not knowingly create any additional liens, charges, security interests, encumbrances, agreements of any kind or other rights of third parties against the Proceeds of our Claims/Lawsuits without the prior written consent of MUSTANG. **I specifically promise not to sell any additional portion of my Claims/Lawsuits, and the Proceeds of my Claims after the date of this Agreement, unless MUSTANG's interest has been paid in full or has given me prior written permission.** I also confirm that neither my Claims/Lawsuits nor the Proceeds from said Claims/Lawsuits are subject to any liens, charges, security interests, encumbrances, agreements of any kind or nature (other than this Agreement) or other rights of third parties except as set forth in Exhibit "D". I understand that MUSTANG is relying upon my statements in going forward with this Agreement and that if these statements are not true, I may be committing fraud.

c.    I will use our best efforts to prosecute my Claims/Lawsuits and to bring my Claims/Lawsuits to a good faith settlement and final payment. I will keep MUSTANG informed about important developments in my Claims/Lawsuits, and to instruct my attorneys to also keep MUSTANG informed about my Claims/Lawsuits. I also promise to cooperate with MUSTANG in enforcing its rights under this Agreement. I will promptly respond to all inquiries from MUSTANG as to the status of my Claims/Lawsuits, and will also direct my Attorney to do so.

d.    I understand that if the outcomes of my lawsuits are unsuccessful and I do not receive any Proceeds from a settlement/verdict, I have no obligation to pay MUSTANG the Purchase Price paid to me for their Interest in my Cases/Lawsuits.

6. **EVENTS OF DEFAULT**

The occurrence of any one or more of the following events shall be an event of default by me under this Agreement (each, an "Event of Default"):

a.    The failure by me or my Attorney to pay MUSTANG's Interest in the Proceeds within thirty (30) days after (i) there is a verdict, award or other settlement with respect to my Claims and (ii) Proceeds are received by me or my Attorney; or

b.    My failure to perform or comply with any of the agreements, conditions, provisions or promises contained in this Agreement, including but not limited to if MUSTANG does not receive a timely response to a request for information from me or my Attorney or if MUSTANG does not receive a new Authorization and Acknowledgement by me and my new Attorney within 14 days after accepting representation, and such failure to perform or comply continues unremedied for a period of 10 days after written notice from MUSTANG to us, unless

Seller's Initials: K S



**MUSTANG**

FUNDING

such default, in MUSTANG's reasonable discretion, is not curable, in which event there shall be no grace period; or

    c.    If MUSTANG discovers any material misrepresentation or inaccuracy in any representation or warranty made by me to MUSTANG in this Agreement.

Upon an Event of Default by me under this Agreement, I agree that MUSTANG may contact any insurance company, claims adjuster or attorney then handling the Claims/Lawsuits on behalf of any responsible party and advise such insurance company, claims adjuster or attorney about MUSTANG's Interest in my Claims/Lawsuits, the existence of a lien on my Claims/Lawsuits and to direct that MUSTANG be included as a payee on any settlement checks. If MUSTANG does anything stated in this paragraph, MUSTANG shall not be liable to me for any damages which we may suffer resulting from MUSTANG's actions as described above.

## 7.    APPLICABLE LAW

This Agreement shall be governed, construed and enforced in accordance with the internal laws of the State of Delaware, without regard to the conflict of law rules of Delaware or any other jurisdiction.

**ALL DISPUTES, CLAIMS, OR CONTROVERSIES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIPS THAT RESULT FROM THIS AGREEMENT ("DISPUTES") SHALL BE RESOLVED THROUGH ARBITRATION UNDER THE COMMERCIAL ARBITRATION RULES ("RULES") OF THE AMERICAN ARBITRATION ASSOCIATION ("AAA"). THE ARBITRATION SHALL TAKE PLACE BEFORE A SINGLE ARBITRATOR TO BE CHOSEN BY AGREEMENT OF THE PARTIES, OR FAILING SUCH, IN ACCORDANCE WITH AAA RULES. THE ARBITRATION SHALL TAKE PLACE IN DOVER, DELAWARE, UNLESS THE PARTIES AGREE TO A DIFFERENT LOCATION. THE PARTIES AGREE THAT THIS ARBITRATION AGREEMENT IS MADE PURSUANT TO A TRANSACTION IN INTERSTATE COMMERCE, AND SHALL BE GOVERNED BY THE FEDERAL ARBITRATION ACT, 9 U.S.C. §1. JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT HAVING JURISDICTION. THE PARTIES ALSO AGREE THAT THE AAA OPTIONAL RULES FOR EMERGENCY MEASURES OF PROTECTION SHALL APPLY TO THE PROCEEDINGS.**

**THE PARTY WHO INITIATES ARBITRATION SHALL PAY THE INITIAL FILING FEE AND DEPOSIT REQUIRED BY THE AAA. IF SELLER INITIATES AN ARBITRATION AND BELIEVES IN GOOD FAITH THAT IT IS FINANCIALLY UNABLE TO PAY SUCH FILING FEES, FEES OF THE ARBITRATOR, AND OTHER ARBITRATION FEES, SELLER MAY ASK THE AAA TO DEFER OR REDUCE SUCH FEES, PURSUANT TO AAA RULES. IF THE AAA DOES NOT DEFER OR REDUCE SUCH FEES SO THAT SELLER CAN AFFORD THEM, PURCHASER MAY, UPON SELLER'S WRITTEN REQUEST, PAY THE FEES AND ANY OTHER COSTS OF ARBITRATION THAT SELLER DEMONSTRATES IT IS UNABLE TO PAY AND THAT ARE OVER AND ABOVE THE AMOUNT OF FEES AND COSTS THAT SELLER WOULD HAVE PAID IN AN LEGAL CLAIM IN A FEDERAL DISTRICT COURT IN THE SAME JURISDICTION AS THE PLACE OF ARBITRATION. PAYMENT OF SUCH FEES AND COSTS BY PURCHASER IS SUBJECT TO ANY LATER ALLOCATION OF THE FEES AND COSTS BETWEEN SELLER AND PURCHASER BY THE ARBITRATOR AS PROVIDED BELOW.**

Seller's Initials:

# MUSTANG
FUNDING

**THE PARTIES TO THIS AGREEMENT CHOOSE ARBITRATION AS A WAY TO EXPEDITIOUSLY RESOLVE ANY DISPUTES. THE PARTIES HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL ON ANY DISPUTES.**

**THE PREVAILING PARTY IN ANY DISPUTE SHALL BE ENTITLED TO ALL REASONABLE ATTORNEYS' FEES AND COSTS, EXPENSES AND DISBURSEMENTS WITH RESPECT TO SUCH DISPUTE.**

8.    **WAIVER OF JURY TRIAL**

MUSTANG AND I, AFTER CONSULTATION WITH OUR RESPECTIVE ATTORNEYS, EACH HEREBY WAIVE ANY RIGHT WHICH I MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY LEGAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER COMMENCED BY OR AGAINST ME IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR WITH ANY DOCUMENT EXECUTED IN CONNECTION WITH THIS AGREEMENT.

9.    **WAIVER OF CLASS ACTION RELIEF**

**MUSTANG AND I, AFTER CONSULTATION WITH OUR RESPECTIVE ATTORNEYS, EACH HEREBY WAIVE ANY RIGHT TO CONSOLIDATE OR TO HAVE HANDLED AS A CLASS ACTION ANY PROCEEDING ON ANY DISPUTES WITH ANY PROCEEDING ON DISPUTES, CLAIMS, OR CONTROVERSIES INVOLVING ANY PERSON OR ENTITY NOT A PARTY TO THIS AGREEMENT.**

10.    **RECLASSIFICATION OF TRANSACTION**

This Agreement represents an investment by MUSTANG, and not a loan to me. However, should a court of law determine that the transaction set out in this Agreement is a loan of money; I agree that interest shall be calculated and shall accrue at the maximum rate permitted by law. I agree that any fees or expenses paid by MUSTANG in connection with my Claims/Lawsuits will not be included as interest. This includes any attorney's fees and costs MUSTANG has expended to enforce its rights under this Agreement. I agree that these will be considered as a reimbursement to MUSTANG, rather than as interest.

11.    **MISCELLANEOUS**

a.    If any part of this Agreement is deemed invalid or unenforceable, it shall not affect the validity or enforceability of any other part, and the Agreement shall be modified to the extent legally possible to legally carry out the intent of this Agreement. This Agreement and its Exhibits, "A" "B" "C" and "D", make up the entire and only agreement or understanding between MUSTANG and me. It may not be changed unless signed in writing by MUSTANG and me. This Agreement takes precedence over all prior agreements, brochures, negotiations, commitments and representations, whether oral or written, about my Claims/Lawsuits and MUSTANG's purchase of its Interest.

b.    I shall pay our own costs and expenses in connection with the carrying out and signing of this Agreement. However, should MUSTANG retain the services of an attorney to enforce the terms of this Agreement, client will be responsible for any costs or expenses (including reasonable legal fees and expenses) in enforcing MUSTANG's rights under this Agreement and the amount of MUSTANG's Interest shall be increased in an amount equal to MUSTANG's costs and expenses.

Seller's Initials:

# MUSTANG
FUNDING

      c.      This Agreement may be signed in separate counterparts. A facsimile or electronic signature shall be deemed to be an original signature.

**12.**    **RIGHT TO CANCEL**

**I HAVE THE RIGHT TO CANCEL THIS AGREEMENT AT ANY TIME PRIOR TO MIDNIGHT OF THE FIFTH (5TH) BUSINESS DAY FROM THE DATE I SIGN THIS AGREEMENT.**

In order for the cancellation to be effective, we must either:

    (i)      return the full amount of disbursed funds by MUSTANG to MUSTANG, by delivering the MUSTANG uncashed check to the MUSTANG office in person, within 5 business days of the date I sign this Agreement; or

    (ii)     mail a notice of cancellation and include in that mailing a return of the full amount of disbursed funds (in the form of the MUSTANG check, a registered, cashiers' or certified check, or a money order), by insured, registered or certified United States mail, postmarked within five business days of the date I sign this Agreement from MUSTANG, to the address specified below:

               Mustang Specialty Funding I, LLC
               P.O. Box 083170
               Chicago, IL 60691-0170

**DO NOT SIGN THIS AGREEMENT BEFORE YOU READ IT COMPLETELY OR IF IT CONTAINS ANY BLANK SPACE. I ACKNOWLEDGE THAT I HAVE HAD AN OPPORTUNITY TO REVIEW THIS AGREEMENT WITH AN ATTORNEY AND I HAVE DONE SO PRIOR TO OUR EXECUTION OF THIS AGREEMENT. YOU ARE ENTITLED TO A COMPLETELY FILLED IN COPY OF THIS AGREEMENT.**

SELLER: Kenya Sibley

By: _Kenya Sibley_

761A3...Kenya Sibley

Date: 7/17/2019

BUYER: Mustang Specialty Funding I, LLC

By: _____

           Authorized Signatory

Date: _____

Seller's Initials: K S

**MUSTANG**
FUNDING

STATE of
COUNTY of

On _____, 20___, before me, the undersigned notary public, personally appeared
Kenya Sibley and in due form of law acknowledged the foregoing instrument to be that person's
act and deed and desired the same to be recorded as such.

Witness my hand and Notarial seal the day and year aforesaid.

_____
Notary Public

My Commission Expires: _____

Notarial Seal:

Seller's Initials:



**MUSTANG**

F U N D I N G

## EXHIBIT "A"

### Schedule of Purchaser's Share

| On or before: 8/16/2019 | Month 1 | $89,711.63 |
| On or before: 9/16/2019 | Month 2 | $89,711.63 |
| On or before: 10/16/2019 | Month 3 | $89,711.63 |
| On or before: 11/16/2019 | Month 4 | $89,711.63 |
| On or before: 12/16/2019 | Month 5 | $89,711.63 |
| On or before: 1/16/2020 | Month 6 | $89,711.63 |
| On or before: 2/16/2020 | Month 7 | $103,072.93 |
| On or before: 3/16/2020 | Month 8 | $103,072.93 |
| On or before: 4/16/2020 | Month 9 | $103,072.93 |
| On or before: 5/16/2020 | Month 10 | $103,072.93 |
| On or before: 6/16/2020 | Month 11 | $103,072.93 |
| On or before: 7/16/2020 | Month 12 | $103,072.93 |
| On or before: 8/16/2020 | Month 13 | $116,434.24 |
| On or before: 9/16/2020 | Month 14 | $116,434.24 |
| On or before: 10/16/2020 | Month 15 | $116,434.24 |
| On or before: 11/16/2020 | Month 16 | $116,434.24 |
| On or before: 12/16/2020 | Month 17 | $116,434.24 |
| On or before: 1/16/2021 | Month 18 | $116,434.24 |
| On or before: 2/16/2021 | Month 19 | $129,795.54 |
| On or before: 3/16/2021 | Month 20 | $129,795.54 |
| On or before: 4/16/2021 | Month 21 | $129,795.54 |
| On or before: 5/16/2021 | Month 22 | $129,795.54 |
| On or before: 6/16/2021 | Month 23 | $129,795.54 |
| On or before: 7/16/2021 | Month 24 | $129,795.54 |

Seller's Initials:



# EXHIBIT "B"

## AUTHORIZATION FOR ATTORNEY TO PAY MUSTANG SPECIALTY FUNDING I, LLC
## FROM PROCEEDS OF CLAIM/ACKNOWLEDGEMENT OF AUTHORIZATION

### AUTHORIZATION

Pursuant to that certain Purchase Agreement dated 07/16/2019 between Kenya Sibley and Mustang Specialty Funding I, LLC ("MUSTANG") (the "Agreement"), I, Kenya Sibley, Individually, hereby irrevocably authorize and direct my Attorney (and any future Attorney representing me in connection with my Claim/Lawsuit) to, among other things, (i) acknowledge an assignment, consensual lien and security interest in favor of MUSTANG against any and all of the Proceeds due to me from my case/lawsuit against Trustmark Recovery Services and Medical Office Business after payment of any and all legal fees, reimbursable costs, and liens MUSTANG has been advised of that are in existence prior to the date of the Agreement and itemized in the attached Exhibit "D" and to protect and satisfy the assignment, consensual lien and security interest in favor of MUSTANG up to the full amount of MUSTANG's Interest, (ii) pay MUSTANG from the Proceeds received from the settlement of my Case/Lawsuit the amount due to MUSTANG representing their Interest in the Proceeds of my Claim/Lawsuit at the time of distribution of the Proceeds prior to any payment to me with respect to my Claim/Lawsuit, (iii) notify MUSTANG of any verdict, award, settlement, discontinuance or ending with respect to my Claim/Lawsuit, (iv) respond to requests for information from MUSTANG and (v) call MUSTANG prior to any disbursements of funds to verify the amount of MUSTANG's Interest. Such amounts shall be paid directly to MUSTANG to satisfy our obligations to MUSTANG under the Purchase Agreement prior to any distribution of Proceeds to me from the settlement of my Case/Lawsuit.

The amount of MUSTANG's Interest will increase to reflect the date MUSTANG is paid its Interest in the Proceeds as set forth in the Disclosure Statement. As reflected in the Disclosure Statement, we understand that MUSTANG's Interest shall be amended and increased in accordance with said Disclosure Statement.

This Authorization is irrevocable and binding and may only be amended by the mutual written agreement of me and MUSTANG.

Date: 7/17/2019

Seller: _Kenya Sibley_
761A379575E Kenya Sibley

Seller's Initials: KS



# MUSTANG
### FUNDING

## EXHIBIT "C"

## ACKNOWLEDGEMENT OF AUTHORIZATION

I, Patrick Dolan, Esq. of Siegel & Dolan [Individually and on behalf of Firm], hereby acknowledge that I represent Kenya Sibley ("Plaintiff"), as his or her attorney, in connection with the Claims/Lawsuits described in the Purchase Agreement dated 07/16/2019, entered into by my client Kenya Sibley, and Mustang Specialty Funding I, LLC ("MUSTANG").

I acknowledge that my client Kenya Sibley, has irrevocably instructed me, (Individually and on behalf of Firm) to comply with the terms of the Purchase Agreement and the Authorization set forth in Exhibit "B" (the "Authorization") as executed by Plaintiff. I will honor Plaintiff's Authorization and the assignment, consensual lien and security interest in favor of MUSTANG, subordinate only to my fees, reimbursable costs, and liens MUSTANG has been advised of that are in existence prior to the date of the Agreement and disclosed in Exhibit "D". In particular, we agree to pay MUSTANG its Interest from Plaintiff's Proceeds of his/her Claim/Lawsuit in accordance with the Disclosure Statement. As reflected in the Disclosure Statement, MUSTANG's Interest shall be amended and increased in accordance with said Disclosure Statement. I further agree not to distribute any Proceeds received from my client, Kenya Sibley, Claim/Lawsuit to Plaintiff until MUSTANG has been paid its Interest in full. In the event of a dispute, I and my Firm agree that only disbursements for attorney's fees, reimbursable costs, and liens that MUSTANG has been advised of that are in existence prior to the date of the Purchases Agreement and disclosed on Exhibit "D" will be made, and that all funds due Plaintiff shall be held by us until such dispute with MUSTANG is resolved. I also agree to honor any amended Exhibit "A" signed by Plaintiff and MUSTANG.

All disbursements of funds, including Plaintiff's share of the Proceeds, will be through my attorney trust account, and Plaintiff will not receive a settlement check directly from any defendant or insurance company. I also agree to call MUSTANG prior to any disbursement of funds to verify the amount of MUSTANG's Interest.

I have no knowledge of my client Kenya Sibley having previously sold, transferred or assigned any interest in his/her Claim/Lawsuit or in the Proceeds of his/her Claim/Lawsuit, to any other person or entity, except for MUSTANG, and understand that Plaintiff may not further sell, transfer or assign any additional Interest without MUSTANG's written permission unless MUSTANG's interest has been paid in full.

Date: 7/17/2019

Attorney: *Patrick Dolan*
DocuSigned by:
664DBC3C... Patrick Dolan, Esq.

Seller's Initials: K S



# EXHIBIT "D"

## PRIOR SALES, TRANSFERS, ASSIGNMENTS OR CONVEYANCES OF ANY INTEREST IN THE CLAIM

Please list all previous liens, if any:

Date:  7/17/2019

Attorney: *Patrick Dolan*
                 Patrick Dolan, Esq.

Seller's Initials: K S



# MUSTANG SPECIALTY FUNDING I, LLC
## FUNDING INSTRUCTION SHEET

**I, KENYA SIBLEY, SHALL NOT SELL ANY PORTION OF THE PROCEEDS OF MY CLAIM TO ANY OTHER FUNDING OR LENDING ENTITY.**

**Total Amount Advanced Under this Agreement:** $76,350.32
**Net Amount to Client:** $35,000.00

**OPTION 1:**     **CHECK**

☐     Route to the Attorney

☐     Route to the Client's address as shown on page 1 of the Agreement.

☐     U.S. Mail          Allow 2-7 Days          $0
☐     Next Business Day Delivery     Federal Express       $60.00
                                *Business Days Only*

**OPTION 2:**     **WIRE TRANSFER (To Your Bank Account Only)**

☒     Checking Account          $60.00
☐     Savings Account           $60.00

| | |
|---|---|
| **1. Name on Account:** | Yes U Can Foundation NFP - Kenya Sibley |
| **2. Address/City/State:** | |
| **3. Routing Number:** | |
| **4. Account Number** | |
| **5. Name of Bank:** | |
| **6. Bank Address/City/State** | |
| **7. Bank Telephone** | |

Seller: *Kenya Sibley*
761A379575E94C4...
Date: 7/17/2019

\* Seller agrees to pay any additional costs for delivery of funds by Wire Transfer or Federal Express from the original purchase price. Said costs shall be directly deducted from the payment to Seller of the purchase price.

\*\* You must call your bank for the proper incoming routing number. Most banks use a separate routing number for wires. The account must be in your name.

\*\*\* If delivery of funds by Wire Transfer are returned back to Mustang Specialty Funding I, LLC due to incorrect banking information provided by the Seller, an extra fee may be directly deducted from the payment to the Seller of the purchase price.

                                    Seller's Initials: *KS*

# Exhibit H

**From:** Jimmy Beltz <jimmy@mustangfunding.com>
**Sent:** Wednesday, August 14, 2019 5:25 PM
**To:** Mike Michael Acosta <acostaandassociatesllc@gmail.com>
**Cc:** Chris Janish <chrisj@legal-bay.com>; 'caravellap@yahoo.com' <caravellap@yahoo.com>
**Subject:** Legal Bay/Mustang Protocol

Mike,

As a matter of protocol between Mustang and Legal Bay as it relates to originating and underwriting, all cases that were initially originated through Legal Bay or its network of brokers and not funded, which may subsequently become a funding opportunity in the future, need to be forwarded back into the Legal Bay underwriting process and maintained/updated to reflect on the underwriting sheet as such. If there is any gray area, please highlight the matter to Legal Bay and Mustang and we will mutually agree upon the appropriate process for the case.

Thanks,
Jimmy

**James (Jimmy) Beltz**
Partner
Mustang Funding, LLC
120 Broadway Ave. South
Wayzata, MN 55391
www.mustangfunding.com
**Direct:** 612.286.1756  **Cell:** 612.501.9502

# Exhibit I

From: Jimmy Beltz <jimmy@mustangfunding.com<mailto:jimmy@mustangfunding.com>>
Sent: Wednesday, April 15, 2020 2:13 PM
To: Chris Janish <chrisj@legal-bay.com<mailto:chrisj@legal-bay.com>>
Cc: 'Peter Caravella ███████████████████████
<caravellap@yahoo.com███████████████████████
Subject: RE: Mustang Funding is here for you.

I actually told him not to send anything out unless I ran it by you. I relayed the discussion from a few months back
you were interested in us re-marketing as you guys have not had the time. But regardless, I told him to not send out
anything at the moment. Obviously he did. I'll address with him.

From: Chris Janish <chrisj@legal-bay.com<mailto:chrisj@legal-bay.com>>
Sent: Wednesday, April 15, 2020 1:05 PM
To: Jimmy Beltz <jimmy@mustangfunding.com<mailto:jimmy@mustangfunding.com>>
█████████████████████████████████████████████
Subject: FW: Mustang Funding is here for you.

Jimmy, I don't know if you and Pete ever spoke regarding partnership issues?  However, a law firm client sent this
email below over to me and it needs to be understood what Mustang's plan is with soliciting to our law firms
directly (if they are at all).  At this point, direct soliciting our law firms is not something we have agreed to in any
form.

As I've mentioned, I am not opposed to working with Flip to align a plan to generate more business together off our
law firm contacts; however a formal arrangement was never progressed by you.  I'll wait til you and Pete speak, but
I need to understand what Mustang's intent is here. Thanks,

[cid:image001.png@01D61328.18800130]
CONFIDENTIALITY NOTICE: This message is intended only for the use of the individual or entity named above,
and may contain information that is privileged, confidential and/or exempt from disclosure under applicable law,
including but not limited to the Electronic Communications Privacy Act, 18 USC 2510-2521. If the reader of this
message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this
communication is strictly prohibited. If you receive this communication in error, please notify me immediately by
electronic-mail reply and delete this original message. Thank you.

---------- Forwarded message ---------
From: Philip Deberg <philip@mustangfunding.com<mailto:philip@mustangfunding.com>>
Date: Tue, Apr 14, 2020 at 4:50 PM
Subject: Mustang Funding is here for you.
To:

We know this is a hard time for everyone during the pandemic, and we understand there will be delays and hardship
not only across the legal industry, but the industries of your clients. Please keep us in mind if any of your clients are
seeking funding as they await their settlement.

We're open, albeit remotely, and it's business as usual at Mustang Funding. We want to help bridge the financial gap so many clients are now facing as case resolutions keep getting pushed out.

Best regards, and please stay safe!


Philip DeBerg
Mustang Funding, LLC
120 Broadway Ave. South <https://protect-us.mimecast.com/s/pmRQCpYRkMFWARkAFPY7m7?domain=google.com>
Wayzata, MN 55391<https://protect-us.mimecast.com/s/pmRQCpYRkMFWARkAFPY7m7?domain=google.com>
https://protect-us.mimecast.com/s/FLI3CqxVlNI3XMBXIXILQT?domain=mustangfunding.com<https://protect-us.mimecast.com/s/TCZgCrkEmOHY2BM2h4Xrxu?domain=mustangfunding.com>
████████████████████████████


--
This email has been checked for viruses by AVG.
https://protect-us.mimecast.com/s/PLBjCv2Y8Vu5Ak1AcA0yA9?domain=avg.com

# Exhibit J

# Marketing Advance Agreement & Term Sheet

This agreement between Baker Street Funding, LLC (BSF) and Legal Bay / LBV Funding (LB), both New Jersey Corporations, dated February 8, 2019 shall outline a 1 year hybrid loan that will be in full force and effect Feb. 1, 2019 until Jan. 31, 2020 (termination date); or until LB is paid in full if extends past the termination date. LB will have the first right of refusal to extend this note for another twelve (12) months from its termination date consistent with the same terms outlined in this document, including advance amounts due to BSF, subject to any offsets of funds due to LB. BSF and LB will have the discretion to amend or cancel this term sheet at any time with dual party consent. The parties agree to work together to work out any matters amicably, and re-evaluate the terms of the agreement at the first anniversary to ensure equitable for all parties.

## *Borrower's and Lender's Rights*

### *Use of Funds*
Funds will be primarily used for Pay Per Click (PPC) advertising on Google, as well as other similar marketing campaigns that BSF deems viable. (Copies of BSF's PPC dashboard on Google are available upon request.)

### *First Right of Refusal/Duties*
BSF will guarantee LB right of first refusal (ROFR) for any and all clients for, pre-settlement, settlement advances and surgery funding; as well as attorney (case cost) funding or special situation contracts that LB has expressed interest in. The ROFR will remain intact for any subsequent funding requests by a particular client already funded.

LB shall have a duty to quickly evaluate cases for BSF under industry guidelines of 48 hours from when all documents are received and a law firm representative has spoken with an LB underwriter. In the event that LB is not interested in a particular case or funding; or denies a case that has been submitted by BSF, LB will provide prompt notice to BSF, and BSF shall have full discretion to remarket said case to another funding source.

### *Loan Repayment*
BSF will be required to repay this marketing advance *only if* the terms outlined below for loan forgiveness **are not met.** The repayment schedule will be as follows unless a supplementary mutually agreed upon repayment schedule is signed off on by both parties. The monthly repayment schedule will start exactly twelve (12) months after the initial advance date and will consist of 6 payments of $5,000 per month either deducted directly from commission that LB owes BSF or payable by wire transfer from BSF to LB. In the event that the amount due is only $15,000 then the repayment amounts will be $2500 over same 6 month period.

### *Termination Clause*
Either party can terminate the contract for cause, if either party were to breach for any reason. Clear reasons of breach would be if BSF did not fulfill its ROFR to LB; or if LB failed to timely underwrite and/or fund cases within an industry standard time frame.

Either party can also terminate without cause with 60 days prior notice so the other party can transition its business accordingly. In order for BSF to terminate without cause, it must repay the entire advance in full, and BSF shall provide 60 days of service to LB from that point on. LB to terminate for cause it must adhere to all terms in the agreement for 60 days from their termination notice to BSF, and accept the repayment terms outlined above.

Int. BSF

Int. LB

## *Loan Forgiveness*

If BSF produces net pre-settlement origination funding of $2MM (before any fees) from 2.1.19 until 1.31.20, then the entire advance amount of $30,000 will be forgiven. If BSF produces net pre-settlement origination funding of $1.2MM then 50% of the loan shall be forgiven or $15,000.

## *Personal Guarantee*

This agreement, while made between two corporate entities (BSF and LB) will be personally guaranteed by Daniel DiGiaimo. Any repayment that is triggered is personally guaranteed by Daniel DiGiaimo and he will be responsible for any and all repayments in the case of a default by BSF.

## *Loan Payout Terms*

LB agrees to provide a marketing advance of **$30,000** to BSF under this agreement, with 3 installments of $15,000, $10,000, and $5,000 to be paid by LB on 2.15.19; 3.15.19; and 4.15.19, respectfully.

The signing below by both parties shall make this agreement binding on the date listed above.

Agreed:                                          Agreed:

Daniel A. DiGiaimo
CEO
Baker Street Funding

Chris Janish
CEO
Legal-Bay, LLC

# Exhibit K

U.S. Attorney Announces The A... ESX-C-000086-22   05/16/2022   Pg 2 of 9   Trans ID: CHC2022113802 torney-announces-arrest-13-in...

Case 2:22-cv-03941-ES-JBC   Document 9-1   Filed 06/17/22   Page 129 of 151 PageID: 352





THE UNITED STATES ATTORNEY'S OFFICE

SOUTHERN DISTRICT *of* NEW YORK

Search

**SEARCH**

**HOME**     **ABOUT**     **PRIORITIES**     **NEWS**     **RESOURCES**     **PROGRAMS**     **EMPLOYMENT**

**CONTACT**

U.S. Attorneys » Southern District of New York » News » Press Releases

**Department of Justice**

U.S. Attorney's Office

Southern District of New York

FOR IMMEDIATE RELEASE                                     Wednesday, January 12, 2022

# U.S. Attorney Announces The Arrest Of 13 Individuals For $100 Million Healthcare Fraud, Money Laundering, And Bribery Scheme

### Two Indictments Charge the Defendants, Including an NYPD Police Officer, Doctors, an Attorney, and Others, With Healthcare Fraud, Money Laundering, Bribery, and Other Offenses in One of the Largest No-Fault Automobile Insurance Fraud Takedowns in History

Damian Williams, the United States Attorney for the Southern District of New York,  Michael J. Driscoll, Assistant Director-in-Charge of the New York Office of the Federal Bureau of Investigation ("FBI"), Miriam E. Rocah, the Westchester County District Attorney, Kevin P. Bruen, Superintendent of the New York State Police ("NYSP"), and Keechant Sewell, Commissioner of the New York City Police Department ("NYPD"), announced the unsealing of two indictments charging 13 individuals – including an NYPD police officer, licensed physicians, an attorney, and others – in connection with a $100 million automobile insurance fraud scheme.

Of the 13 defendants, eight are charged in an indictment detailing conspiracies to commit healthcare fraud, money laundering, bribery, and obstruction, making false statements to federal authorities, and aggravated identity theft.  The charges are set forth in *United States v. Alexander Gulkarov*, et al., 22 Cr. 20 (the "*Gulkarov* Indictment"), which has been assigned to U.S. District Judge Failla.  Five additional defendants are separately charged in *United States v. Bradley Pierre*, et al., 22 Cr. 19 (the "*Pierre* Indictment"), which has been assigned to U.S. District Judge Torres.

Of those defendants, ten were arrested this morning in New York and New Jersey and are scheduled to appear before U.S. Magistrate Barbara Moses in Manhattan federal court later today.  An eleventh defendant, Alexander Gulkarov, was arrested in Miami, Florida, and is scheduled to appear before a U.S. Magistrate Judge in the Southern District of Florida later today.

U.S. Attorney Damian Williams said: "The thirteen defendants charged in today's indictments are alleged to have collectively perpetrated one of the largest no-fault insurance frauds in history.  In carrying out their massive scheme, among other methods, they allegedly bribed 911 operators, hospital employees, and others for confidential motor vehicle accident victim information. With this information, they then endangered victims by subjecting them to unnecessary and often painful medical procedures, in order to fraudulently overbill insurance companies. Schemes exploiting no-fault insurance laws – which ironically exist to make insurance more affordable – also result in higher costs, and unfairly burden all consumers in the auto insurance market."

FBI Assistant Director Michael J. Driscoll said: "No-fault accident schemes, like the one alleged today, can cost insurance companies millions of dollars in payouts to doctors and clinics who provide phony or unnecessary services to unwitting accident victims. This cost is almost always passed to consumers of private insurance or subsidized programs established to help those in need. This is a dangerous game in which the penalties include federal criminal charges."

Westchester County District Attorney Miriam E. Rocah said:  "This case is a perfect example of federal, state and local law enforcement working in partnership to investigate and take down two criminal organizations that allegedly defrauded insurance companies and exploited vulnerable individuals by subjecting them to unnecessary, harmful, and sometimes painful, medical treatments for the sake of greed and profit. We will continue to work with our law enforcement partners to hold accountable those who manipulate the insurance system on which so many people depend, especially when the alleged perpetrators are professionals who allegedly violated the oaths they took to serve and protect."

State Police Superintendent Kevin P. Bruen said: "These indictments are the result of years of investigative work and could not have succeeded without the collaboration between federal, state and local law enforcement.  Our investigation uncovered a large-scale, complex scheme that resulted in millions of dollars of fraudulent insurance claims. This type of fraud impacts the entire system and results in higher costs for companies and policyholders. I commend our members and our law enforcement partners for their work on this case, and we are sending a clear message that we will not tolerate fraud on any level."

NYPD Commissioner Keechant Sewell said: "Today's indictments reflect schemes to profit by exploiting victims' through fraud. I commend the NYPD detectives, FBI agents and prosecutors of the United States Attorney's Office in the Southern District of New York for their long-term efforts and cooperation in this investigation into alleged healthcare fraud, money laundering and bribery. Together, we will continue to be relentless in fighting crime that impacts the people we serve wherever, and however, it occurs."

According to allegations contained in the Indictments[1] unsealed today in Manhattan federal court:

<u>Background of the Investigation</u>

Since 2017, the U.S. Attorney's Office for the Southern District of New York, the FBI, and the Westchester County District Attorney's Office have been investigating several criminal organizations involved in a widespread healthcare fraud and bribery scheme that utilized the New York and New Jersey no-fault automobile insurance regime to earn millions of dollars in illegal profits.

New York and New Jersey no-fault insurance laws require a driver's automobile insurance company to pay automobile insurance claims automatically for certain types of motor vehicle accidents, provided that the claim is legitimate, and is below a particular monetary threshold (the "No-Fault Laws").  Pursuant to these requirements, insurance companies will often pay medical service providers directly for the treatment they provide to automobile accident victims, without the need to bill the victims themselves.

U.S. Attorney Announces The ...   ESX-C-000086-22   05/16/2022   Pg 4 of 9   Trans ID: CHC2022113802   torney-announces-arrest-13-in...

Case 2:22-cv-03941-ES-JBC   Document 9-1   Filed 06/17/22   Page 131 of 151 PageID: 354

This process resolves automobile claims without apportioning blame or fault for the accident, thereby avoiding protracted disputes, and the costs associated with an extended investigation of the accident.

The <em>Gulkarov</em> Indictment

The *Gulkarov* Indictment charges eight individuals (the "Gulkarov Conspirators") with participating in a scheme to exploit the No-Fault Laws.  As part of the scheme, the Gulkarov Conspirators fraudulently owned and controlled more than a dozen medical professional corporations – including medical, acupuncture, and chiropractic practices – by paying licensed medical professionals to use their licenses to incorporate the professional corporations (collectively, the "Gulkarov Clinics").  The Gulkarov Conspirators further defrauded automobile insurance companies by billing insurance companies for unnecessary, harmful, and excessive medical treatments and lying under oath to insurance company representatives.

The Gulkarov Conspirators promoted the scheme through bribery.  The Gulkarov Conspirators paid hundreds of thousands of dollars to co-conspirators (the "Runners"), who used this money to bribe 911 operators, hospital employees, and others for confidential motor vehicle accident victim information.  The Runners then used this information to contact automobile accident victims, lie to them, and induce them to seek medical treatment at, among other places, the Gulkarov Clinics.

The Gulkarov Conspirators laundered the proceeds of the fraud scheme through law firms, check-cashing entities, and shell companies, and used the money to pay for luxury cars, watches, and vacations.  Then, when certain members of the conspiracy learned that they were under federal criminal investigation, they obstructed justice by fabricating documents, lying to law enforcement, and committing perjury before a federal grand jury.

As alleged, the leaders of the Gulkarov Conspirators are non-physicians, including ALEXANDER GULKAROV, a/k/a "Little Alex," ROMAN ISRAILOV, a/k/a "Roman Matatov," PETER KHAIMOV, a/k/a "Peter Khaim," and ANTHONY DIPIETRO.  ROLANDO CHUMACEIRO, a/k/a "Chuma," and MARCELO QUIROGA are licensed medical practitioners who incorporated medical practices as part of the scheme, prescribed unnecessary and excessive medical treatments, and overbilled insurance companies under the No-Fault Laws.

The *Gulkarov* Indictment also includes charges against an attorney, ROBERT WISNICKI, Esq., who is the founding partner of two New York-based law firms.  As alleged, WISNICKI laundered hundreds of thousands of dollars of illicit proceeds for the leaders of the Gulkarov Conspiracy and concealed these transfers by fabricating retainer agreements, lying to law enforcement, and committing perjury before a federal grand jury.

Finally, the *Gulkarov* Indictment includes a charge against an NYPD police officer, ALBERT ARONOV.  As alleged, as part of the scheme, ARONOV logged into NYPD computers during off-hours and searched for confidential motor vehicle accident reports on the NYPD's servers.  ARONOV then took photos of the reports using a pre-paid "burner" phone and transmitted the photos to the leaders of the Gulkarov Conspiracy using an encrypted messaging application.  The leaders then used the confidential information contained in these reports to contact the motor vehicle accident victims, lie to them, and steer them to the Gulkarov Clinics for medical treatment.  When later questioned by federal agents, ARONOV lied about his involvement in accessing and disseminating the confidential motor vehicle accident reports.

All told, the Gulkarov Conspirators billed insurance companies for more than $30 million in fraudulent

U.S. Attorney Announces The A... ESX-C-000086-22   05/16/2022   Pg 5 of 9   Trans ID: CHC2022113802 torney-announces-arrest-13-in...

Case 2:22-cv-03941-ES-JBC   Document 9-1   Filed 06/17/22   Page 132 of 151 PageID: 355

medical treatments.

The *Pierre* Indictment

The *Pierre* Indictment separately charges five additional individuals (the "Pierre Conspirators") with participating in a second criminal scheme to exploit the No-Fault Laws.  The Pierre Conspirators fraudulently owned and controlled five medical services corporations – including medical clinics and a magnetic resonance imaging ("MRI") center – by paying licensed medical professionals to use their licenses to incorporate the professional corporations (collectively, the "Pierre Clinics").  The Pierre Conspirators further defrauded automobile insurance companies by billing insurance companies for unnecessary, harmful, and excessive medical treatments, falsifying clinical injuries in reports, and lying under oath to insurance company representatives.

The Pierre Conspirators promoted the scheme through bribery.  Like the Gulkarov Conspirators, the Pierre Conspirators also paid hundreds of thousands of dollars to the Runners, who used this money to pay bribes for confidential motor vehicle accident victim information.  The Runners then used this information to induce victims to seek medical treatment at, among other places, the Pierre Clinics.

The Pierre Conspirators laundered the proceeds of the fraud scheme through phony loan arrangements and shell companies.

As alleged, the leader of the Pierre Conspiracy is BRADLEY PIERRE, who is not a physician.  PIERRE conducted much of the No-Fault Scheme from his physical office located in a law firm owned by a family member ("Law Firm-2"), where, among other things, he monitored the Pierre Clinics using closed circuit TV cameras, communicated with co-conspirators using Law Firm-2's email domain, and met with doctors in Law Firm-2's offices.   PIERRE further openly communicated with Law Firm-2 about the scheme, for instance telling his family member, "I'm going to make sure you ALWAYS make your quota."  Law Firm-2 paid PIERRE over $4 million in connection with the No-Fault Scheme – typically from Law Firm-2's Interest on Lawyers Trust Accounts ("IOLA Accounts") – while maintaining no documentation or ledgers identifying the purpose of these payments.

The *Pierre* Indictment further charges two licensed medical practitioners with participating in the scheme.  MARVIN MOY is a medical doctor who incorporated a medical practice as part of the scheme and agreed with PIERRE to conduct unnecessary and painful electrodiagnostic testing on patients.  WILLIAM WEINER is a doctor of osteopathic medicine who incorporated a medical imaging facility as part of the scheme and agreed with PIERRE to falsify findings of clinical injuries in MRIs in order to boost patient referrals.

Finally, the *Pierre* Indictment charges two individuals for conspiring with PIERRE to pay bribes in order to facilitate the scheme.  ARTHUR BOGORAZ is a paralegal and manager at a New York-based personal injury law firm ("Law Firm-1").  Among other things, BOGORAZ and PIERRE agreed to jointly pay bribes for patient and client referrals to the Pierre Clinics and Law Firm-1.  ANDREW PRIME is a Runner who bribed 911 operators and operated an additional call center as part of the scheme.

All told, the Pierre Conspirators billed insurance companies for more than $70 million in fraudulent medical treatments.

*          *          *

The maximum potential sentences are prescribed by Congress and are provided here for informational purposes only, as the sentencing of the defendants will be determined by a judge.

Mr. Williams praised the work of the FBI, the New York State Police, the New York City Police Department, the New York City Department of Financial Services, the Westchester County District Attorney's Office, and the National Insurance Crime Bureau.  Mr. Williams noted that the investigation is ongoing.

This case is being handled by the Office's Complex Frauds and Cybercrime Unit, and the White Plains Division.  Assistant United States Attorneys Mathew Andrews and Louis A. Pellegrino are in charge of the prosecution.

22-007
 ###

*Gulkarov* Indictment

| Defendant | Age | Hometown | Charges (Potential Maximum Term of Imprisonment) |
|---|---|---|---|
| **ALEXANDER GULKAROV, a/k/a "Little Alex"** | | | Healthcare fraud conspiracy, money laundering conspiracy, Travel Act conspiracy, obstruction conspiracy, aggravated identity theft<br><br>(42 years) |
| **ROMAN ISRAILOV** | | | Healthcare fraud conspiracy, money laundering conspiracy, Travel Act conspiracy, aggravated identity theft<br><br>(37 years) |
| **PETER KHAIMOV, a/k/a "Peter Khaim"** | | | Healthcare fraud conspiracy, money laundering conspiracy, Travel Act conspiracy, aggravated identity theft |

U.S. Attorney Announces The A ESX-C-000086-22 05/16/2022 Pg 7 of 9 Trans ID: CHC2022113802 torney-announces-arrest-13-in...

Case 2:22-cv-03941-ES-JBC   Document 9-1   Filed 06/17/22   Page 134 of 151 PageID: 357

| | | | |
|---|---|---|---|
| | | | (37 years) |
| **ANTHONY DIPIETRO** | | | Healthcare fraud conspiracy, money laundering conspiracy, Travel Act conspiracy; obstruction conspiracy<br><br>(40 years) |
| **ROLANDO CHUMACEIRO, a/k/a "Chuma"** | | | Healthcare fraud conspiracy<br><br>(10 years) |
| **MARCELO QUIROGA** | | | Healthcare fraud conspiracy<br><br>(10 years) |
| **ROBERT WISNICKI** | | | Money laundering conspiracy, obstruction conspiracy<br><br>(25 years) |
| **ALBERT ARONOV** | | | False statements<br><br>(5 years) |

*Pierre* Indictment

U.S. Attorney Announces The A̶ ESX-C-000086-22   05/16/2022   Pg 8 of 9   Trans ID: CHC2022113802 torney-announces-arrest-13-in...

Case 2:22-cv-03941-ES-JBC   Document 9-1   Filed 06/17/22   Page 135 of 151 PageID: 358

| | | | |
|---|---|---|---|
| **BRADLEY PIERRE** | | | Healthcare fraud conspiracy, money laundering conspiracy, Travel Act conspiracy, aggravated identity theft<br><br>(37 years) |
| **MARVIN MOY** | | | Healthcare fraud conspiracy, money laundering conspiracy<br><br>(30 years) |
| **WILLIAM WEINER** | | | Healthcare fraud conspiracy, money laundering conspiracy<br><br>(30 years) |
| **ARTHUR BOGORAZ** | | | Travel Act Conspiracy<br><br>(5 years) |
| **ANDREW PRIME** | | | Travel Act Conspiracy<br><br>(5 years) |

U.S. Attorney Announces The A~~ESX-C-000086-22~~ 05/16/2022 Pg 9 of 9 Trans ID: CHC2022113802 torney-announces-arrest-13-in...

Case 2:22-cv-03941-ES-JBC Document 9-1 Filed 06/17/22 Page 136 of 151 PageID: 359

[1] As the introductory phrase signifies, the entirety of the texts of the Indictments and the descriptions of the Indictments set forth herein constitute only allegations and every fact described should be treated as an allegation.

---

**Attachment(s):**
Download
r_u.s._v._alexander_gulkarov_et_al_indictment_
Download
u.s._v._bradley_pierre_et_al_indictment_redacte

**Topic(s):**
Financial Fraud

**Component(s):**
USAO - New York, Southern

**Contact:**
Nicholas Biase

**Press Release Number:**
22-007

Updated January 13, 2022

# Exhibit L

## Strategic Relationship and Marketing Agreement

### Effective as of December 29, 2020

### Recitals

This Strategic Relationship and Marketing Agreement (the "Agreement"), dated as of December 29, 2020 (the "Effective Date") is made by, between and among (a) Legal-Bay, LLC, a New Jersey limited liability company ("LB"); and (b) Tribeca Capital Group, LLC a New Jersey limited liability company, and Rory J. Donadio, an individual (collectively, the "Broker"). The terms LB and Broker shall include their respective parents, subsidiaries, and affiliates and other related individuals and entities, as well as LB's and Broker's websites and domain names, the websites and domain names of their respective parents, subsidiaries, and affiliates, and other related individuals (including John G. Cavalli) and entities in any way participating in the Pre-Settlement Funding and the Legal Funding Industry (collectively, the "Legal Funding Industry").

WHEREAS, Broker provides marketing services and funding leads from Plaintiffs, Claimants, Lawyers, other Brokers, Medical Providers, and other sources in connection with the business of the Legal Funding Industry;

WHEREAS, LB is engaged as a processing center for Brokers and a direct in-house National call center for leads in connection with purchasing Plaintiffs, Claimants, Lawyers, and Medical Providers monetary interests in potential proceeds deriving from litigation claims and related pre-settlement funding (collectively, "Litigation Funding"), pursuant to a "Contingent Proceeds Funding Agreement (the "Funding Agreement").

WHEREAS, LB and Broker entered into a Marketing Advance Agreement in or about December 2018; and LB and Broker intend and shall, by this Agreement, supersede, replace, and substitute this Agreement for the Marketing Advance Agreement, which shall have no further force or effect, and shall terminate in all respects as of the Effective Date of this Agreement.

NOW, THEREFORE, in consideration of the premises, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, LB and Broker, intending to be legally bound hereby, agree, represent and warrant as follows:

### ARTICLE I – DEFINITIONS

"**Aggregate Marketing Advance Balance**" means the sum of the monthly marketing advances, commissions, and any bonuses paid by LB and which LB has not previously recouped.

"**Net Revenue**" means, with respect to each Funding Agreement all collections received by LB less the amount of the advance, any and all on contract fees and off contract fees or bonuses specifically paid to Broker for each case, and any cost of capital from the time of the advance until delivery of funds at an agreed upon interest rate of twelve (12%) per annum.

1

"**On Contract Fees**" shall mean broker fees paid to Broker that are set forth in the Funding Agreement.

"**Off Contract Fees**" shall mean broker fees or bonuses paid to Broker that are not contained in the Funding Contract, but are detailed in separate commission reports.

"**Profit-Sharing Bonus**" shall mean Broker profit share to be paid to Broker based on net revenue of LB's collections.

"**Volume Bonus**" shall mean monthly bonuses paid to Broker in the event that Broker obtains, and LB funds a minimum of $500,000.00 in Litigation Funding (exclusive of fees) for a particular calendar month, such funds to be provided by (a) LB or (b) Mustang or a TBD Funding Partner (collectively, a "<u>Funding Partner</u>"). To qualify for a Volume Bonus, LB, Mustang or the TBD Funding Partner must separately provide at least $500,000.00 in Litigation Funding during a calendar month. The funds provided by LB or a Funding Partner during a calendar month shall not be aggregated to reach the minimum $500,000.00 in Litigation Funding to qualifying Broker for a Volume Bonus. Cases with 17.5% flat pricing during the first six (6) months (exclusive of current Mustang terms), and attorney funding cases do not qualify for the Volume Bonus.

## Article II – INTRODUCING BROKER MARKETING SERVICE AND FEES

**Section 2.01. Scope of Services.** During the Term of this Agreement, including any Renewal Terms, Broker shall provide marketing services and leads, including identification of seller of any claim.

**Section 2.02. Marketing Fees, Salary Reimbursement, and Bonuses Due to Broker.** During the Term and any Renewal Terms, LB shall pay Broker the following fees and bonuses for funded agreements that are sourced by Broker and are not cancelled or rescinded:

(a) **On Contract Fees.** LB shall pay Broker on Contract Fees to be determined on each funding agreement (not to be more than fifteen (15%) percent on any given contract.)

(b) **Off contract Fees/Bonus.** LB shall pay Broker an Off Contract Fee or Bonus to be negotiated and determined on each Funding Agreement's pricing (not more than five (5% ) percent on any given contract.)

(c) **Profit-Sharing Bonus.** LB shall pay Broker a ten (10%) profit share of all net revenue received on Funding Agreements that have settled within the calendar year. Realized profits and losses will be aggregated, and a reserve shall be established for cases that are deemed to be "high risk", but not formally written off as a loss yet.

(d) **Volume Bonus.** LB shall pay a monthly volume bonus of two (2%) percent of NET funded amount of all Litigation Funding each month to broker from either LB or a Funding Partner each month Broker funds a minimum of $500,000.00 in net Funding Agreement (exclusive of fees). Unless otherwise agreed in writing by LB and the

2




Broker, the funds provided by LB or a Funding Partner during a calendar month shall not be aggregated to reach the minimum $500,000.00 in Litigation Funding to qualifying Broker for a Volume Bonus. The Volume Bonus shall not be included as a Marketing Advance, but is included in deductions of net revenue calculations in order to determine Profit-Sharing Bonus.

**Section 2.03. Marketing Advances and Repayment Terms.** During the Term of this Agreement and any Renewal Terms, LB shall pay Broker the following advances unless the Agreement is sooner terminated as provided for in this Agreement.

(a) During the Term and any Renewal Term, and so long Broker is providing *bona fide* marketing leads services, LB shall make monthly marketing advances to broker in the amount of Ten Thousand Dollars ($10,000.00) for the first 12 months from the Effective Date of this Agreement; and the first twelve months of any Renewal Terms. (The total advances shall total no more than $120,000.00 during: (a) the original Term and (b) each Renewal Term. Repayment of advances shall be deducted from Profit-Sharing of net revenue after each calendar year (LB shall provide Broker with a full spread-sheet calculation of all profit-sharing within sixty (60) days of closing of calendar year).

**(b)** A Thirty-Thousand "zero interest" Loan ($30,000.00) shall be provided to Broker by LB upon the Effective Date of this Agreement, and upon the effective date of each Renewal Term of this Agreement. The Loan(s) shall be repaid within the first 6-months after the Effective Date of this Agreement; and within the first six (6) months of any Renewal Term. The Loan shall be repaid in six (6) equal installments of $5,000.00 per month; or as agreed upon by LB and the Broker. Under no circumstances shall the Loan be repaid later than July 15, 2021; or July 15 of the first year of a Renewal Term. Additionally, under no circumstances shall the Loan(s) be forgiven or written off in connection with a breach of the Agreement by LB or Broker.

## ARTICLE III – LEGAL-BAY'S RIGHTS

**Section 3.01. Ownership of Receivables.** LB and Broker expressly acknowledge and agree that LB and/or its designees or Funding Partners shall have exclusive ownership of any and all receivables; and each of them shall have discretion to resolve or sell them to third parties at any price they deem reasonable without objection or interference from Broker.

**Section 3.02. LB Right to Reject.** Broker expressly acknowledges and agrees that LB and its Funding Partners have the right to deny or reject any funding for any reason or no reason in their sole and absolute discretion.

3



**Section 3.03.  No Restriction of LB.**  Broker expressly acknowledges and agrees that this Agreement does not limit LB to engage in its own business directly with potential sellers of Litigation Funding claims, or other separate brokers or sources of leads for Litigation Funding claims.

**Section 3.04.  Broker Rights Limited to Fees.**  Broker shall have no claim to any funds under this Agreement with the sole exception of its fees and bonuses as set forth in this Agreement.

**Section 3.05.  LB Processing/Miscellaneous Fees.**  LB and Broker have a long standing processing and funding relationship with a well-established fee schedule that LB charges on each Funding Agreement for various services, including but not limited to: Administrative, Processing, Underwriting, Portfolio Management and Delivery charges Fee which LB has a right to, and shall, continue to charge. An Addendum relating to fees and operational issues is attached to this Agreement and incorporated into this Agreement by reference. LB and Broker may make reasonable adjustments to the Addendum on a case by case basis or on changing market conditions that are in the best interest of LB and Broker, provided such adjustment is set forth in writing and agreed to by both parties.

## ARTICLE IV – EXCLUSIVITY

**Section 4.01.  Exclusivity/Inducement**.  Broker represents, warrants and agrees that during the Term of this Agreement and any Renewal Term, Broker shall refer any and all Litigation Funding leads or cases from any and all of its sources on a Right of Second Refusal basis after its fully disclosed exclusive agreement with US Claims (with whom Broker has agreed to provide Right of First Refusal for Litigation Funding leads and claims).   LB and its Funding Partners shall have exclusivity with respect to Litigation Funding leads or cases that are denied by US Claims or do not fit into US Claims agreement with Broker.   The Right of Second Refusal exclusivity provision in this section 4.01 is intended to include all forms of referrals, whether direct or indirect, as well as through third parties of any kind, including but not limited to other brokers, attorneys and law firms, medical providers, underwriters, other funding sources, and any other individual or entity in contact with the Broker or otherwise within LB's or the Broker's network of Litigation Funding leads. Broker also acknowledges and agrees that LB has agreed to pay and provide Broker substantial upfront payments, preferred fees, loans, volume bonuses and profit-sharing bonuses to induce Broker to form a strategic relationship with LB. Broker therefore represents, warrants and agrees that Broker shall refrain from doing, refuse to do, decline to do, and forgo any business directly or indirectly with LB's current funding sources: LBV Funding, Mustang Funding (including any affiliated individual or entity, successor, underwriter, or other funding source in any

4




way related to Mustang Funding) and any TBD Funding Partner for the entire Term of this Agreement and any Renewal Terms of this Agreement. Broker shall fund with LBV, Mustang Funding (sometimes referred to as "Mustang") and any TBD Affiliate by first summitting cases to LB and only to LB, and not to LBV, Mustang and any TBD Funding Partner. Failure to strictly adhere to the terms of this section by Broker and any other related individuals or entities shall: (a) constitute a breach of this Agreement; (b) interfere with LB's existing and prospective contacts and busines relationships; (c) constitute unfair competition; and (d) shall materially impair LB's goodwill and good reputation and standing in the Legal Funding Industry.

**Section 4.01(a) The Parties agree that this Agreement does not, and is not intended in any way shape or form, to interfere with the Broker's agreement with US Claims or leads and cases generated by Broker on behalf of US Claims.** LB and its Funding Partners shall have exclusivity only with respect to Litigation Funding leads or cases that are denied by US Claims or do not fit into US Claims agreement with Broker on a Right of Second Refusal Basis.

**Section 4.02. Right of First Refusal.** LB shall have a right of first refusal to receive full exclusivity on all of Broker's leads and cases in the event that the US Claims agreement with Broker is terminated by either party to the US Claims agreement in accordance with its terms.

## ARTICLE V – TERM AND TERMINATION

**Section 5.01. Term**. This Agreement shall commence on the Effective Date and shall continue for a period of two (2) years from the Effective Date, ending on the second anniversary of the Effective Date (the "Term"), unless earlier terminated pursuant to section 5.02 or section 5.03, below. LB shall have the sole and exclusive option to renew the Agreement for two (2) additional two (2) year periods after the end of the initial Term. LB shall provide Broker with notification to renew this Agreement for either or both of the two (2) year renewal periods by email notification to Broker no later than ten (10) days before the end of the initial Term and the end of the first two (2) year renewal period.

**Section 5.02**. **Termination with Notice**. LB may terminate this Agreement for any reason or no reason thirty (30) days written notice to Broker by email. Broker shall have no right to terminate this Agreement other than as provided in section 5.3., below.

**Section 5.03. Immediate Termination**. Either LB or Broker shall have the right to terminate this Agreement immediately, upon written notice to the other party by email, for any of the following:




5

(a)  The other party ceases to exist or exits and leaves the Legal Funding Industry in its entirety;

(b)  The other party breaches a material term of this Agreement and fails to cure the breach within thirty (30) days of written notice of such breach by email from the non-breaching party to the breaching party;

(c)  The other party files a voluntary bankruptcy petition or becomes insolvent;

(d)  Broker may terminate after two (2) years if LB has acknowledged in writing to the Broker that LB does not have the ability provide $500,000.00 in Litigation Funding per month on a going forward basis. Prior history shall not be a factor on ability to fund going forward after 2 years has been exhausted.

(e)  Broker may terminate at any time by repaying all Marketing Advances, loans, and bonuses of any kind, together with a break-up fee of $800,000.00 to be paid in cash on the date that Broker provides LB written notice of termination by email.

**Section 5.04.   Post-Termination or Expiration Payments.** Upon the expiration or termination of this Agreement in accordance with section 5.02 and 5.03 (d), above, only, Broker's right to compensation under this Agreement shall be limited to payment by LB of outstanding profit-sharing fees in connection with Legal Funding cases entered prior to the termination date. Broker shall not be entitled to, and shall not receive, any payment from LB in the event that LB terminates this Agreement in accordance with section 5.03, above (excluding 5.03 (d)).

If LB terminates this Agreement in accordance with section 5.02 or section 5.03, above (excluding 5.03 (d)), Broker shall be liable to LB for, and pay to LB, the then pending Marketing Advance balances, loans, and bonuses of any kind.  Payment of such amounts shall be due upon the date the termination or expiration of the Agreement is effective. This payment shall be in addition to any other right or remedy that LB has under this Agreement, at law or in equity.

If Broker terminates this Agreement under 5.03 (d) and Broker has not satisfied its payment of Marketing Advances, Broker will continue to fund with LB in good faith until Marketing Advances are satisfied in full through profitable lien resolutions.

**Section 5.05.   Indemnity**.  Broker shall indemnify, defend and hold harmless LB, its affiliates and successors, and their respective officers, employees or consultants against any damages, losses, claims, suits, liability, costs (including reasonable attorney's fees), arising out of or any way related to Broker's breach of this Agreement or other wrongful conduct set forth in section 4.01, above. LB shall indemnify, defend and hold harmless Broker, its affiliates and successors, and their respective officers, employees or consultants against any damages, losses, claims, suits, liability, costs (including




reasonable attorney's fees), arising out of or any way related to LB's breach of this Agreement.

## ARTICLE VI – MISCELLANEOUS

**Section 6.01.  Relationship of the Parties.**  The relationship of the parties shall be that of independent contractors, and neither party nor any of their affiliates shall be considered an employee or agent of the other.  The relationship between the parties shall not in any way be construed creating a fiduciary obligation of either party to the other; nor shall either LB or Broker represent that it can bind or act on behalf of either Party.

**Section 6.02.  Confidentiality.**  The LB and Broker acknowledge, agree, represent and warrant that each party's information is confidential and proprietary to such party, including but not limited to LB's intellectual property of their attorney marketing program.  Each Party shall not disclose the other party's information to any third party.

**Section 6.03.  Assignment**.  This Agreement is not assignable by Broker without written consent from LB.  LB may freely assign this Agreement or its Legal Funding liens without the prior consent of LB.

**Section  6.04.   Notices.**   Any notice required or permitted to be given under this agreement shall be in writing and shall be delivered to the below addresses and made by overnight delivery service by a nationally recognized delivery company or by email.

**If to LB:**

Legal-Bay LLC
Attn: Chris Janish, CEO
60 Roseland Ave., Suite 101
Caldwell, NJ, 07006
Email: ChrisJ@Legal-Bay.com

**If to Broker and Rory J. Donadio:**

Tribeca Capital Group, LLC
Attn: Rory Donadio
8214 Hollywood Blvd.
West Hollywood, CA 90069

7



**Section 6.05.  Choice of Law.**  This Agreement shall be governed, interpreted, enforced and construed in accordance with the substantive and procedural laws of the State of New Jersey without  regard the New Jersey's or any  federal court's choice of law and  conflict of laws  principles or  rules which  would  cause the  procedural  or substantive law of a jurisdiction other than the State of New Jersey to apply to this Agreement and the rights, duties and obligations of the Parties under  this   Agreement. The substantive and procedural laws of the New Jersey shall control and govern     the rights and obligations of the Parties arising out of and in accordance with the terms of this Agreement. Any dispute pertaining to, arising from, relating to, or otherwise relating to this Agreement shall be governed by and resolved solely accordance with the substantive and procedural laws of New Jersey, and no other jurisdiction.

**Section 6.06.  Dispute Resolution and Venue.**  Each party represents, warrants and agrees that any and all disputes involving the interpretation of this Agreement, a breach or violation of  the  Agreement,  Termination  of  this  Agreement  or  arising  from, pertaining to or relating to the Agreement, shall be  resolved by a single arbitrator appointed  by  the  Judicial  Arbitration  and  Mediation  Service  ("JAMS").  Each  Party agrees that the JAMS arbitration shall take place at the JAMS office located in New York, New York, and irrevocably submits to personal jurisdiction in New York state. Each party represents, warrants and agrees not to seek to transfer or dismiss any arbitration  on  the  grounds  of:  (a)  lack  of  personal  jurisdiction;  (b)  forum  non conveniens, or (c) any other claim that a JAMS office other than the JAMS office  located in New York, New York is a  more convenient or appropriate to hear and   determine     a dispute between the parties that in any way   relates to or arises from this Agreement. The parties agree to split the costs for the arbitration, including among other things, JAMS forum  fees, hearing fees, other JAMS costs, arbitrator and mediator compensation on an equal (50/50) basis. The arbitrator shall haves the power and authority to award JAMS forum fees,    hearing fees and other costs, reasonable attorney's fees and expenses to the prevailing party in other disputes related to this Agreement. This arbitration clause s hall  not  prevent  or  impair  either  party's  right  or  ability  to  seek  temporary  and preliminary injunctive relief in aid of arbitration in a court of competent jurisdiction.

**Section 6.07.  Entire Agreement**; Merger.  This Agreement constitutes the entire understanding and agreement of the parties with respect to subject matter of this Agreement.  Any and prior understandings, agreement, negotiations, contracts, statements, representations, warranties, courses of dealing or performance, written or oral written or oral are hereby superseded by and merged into this Agreement, and are of no force or effect.

**Section 6.08.  Amendments.**  This Agreement may not be amended or modified, except by written execution by both parties.

**Section 6.09.  No Waivers**.   The failure by either party to enforce at any time one or more of the terms in this Agreement shall not be a waiver of any such terms by that Party or the right of that Party to thereafter enforce each term in strict accordance therewith.



**Section 6.10.  Changes in Law and Severability.**  This Agreement shall conform to any change in applicable law.  In the event that any provision in or obligation under this Agreement shall be declared or found invalid, illegal or unenforceable by the JAMS arbitrator, the validity, legality and enforceability of the remaining provisions or obligations shall not in any way be affected or impaired thereby.

**Section 6.11. Recitals.** The recitals set forth on page 1, above, are incorporated into this Agreement by reference as if fully set forth herein at length.

IN WITNESS WHEREOF, the signing below by the parties have caused this agreement to a binding Agreement in full force and effect on the effective date listed above.

**Legal-Bay, LLC**

By: _____
    Chris Janish, CEO

**Tribeca Capital Group, LLC**

By: _____
    Rory J. Donadio, Managing
    Member

**Rory J. Donadio, Individually**

By: _____
Rory J. Donadio

**Witness**

By: _____
    James Alamia   12/29/20

9



## ADDENDUM TO STRATEGIC RELATIONSHIP AND MARKETING AGREEMENT

This Addendum to the Strategic Relationship and Marketing Agreement (the "Agreement") between LB and Broker shall clarify operational items between the parties. The Addendum is incorporated into Agreement by reference.

**Loan Balance:** The parties represent, warrant and agree that a $5,000.00 balance is due to LB from previous marketing advances provided to Broker by LB, subject to off-set from Mustang and/or LB Profit-Sharing.

**Underwriting:** The parties represent, warrant and agree that Hugh Brammer and/or Damon Stevens will be lead underwriter for LB that will handle the majority of Broker's initial submissions for Litigation Funding via the LBV Fund. Broker shall have direct access to underwriting, once a definitive underwriting flow has been established. Broker and LB will work together in obtaining additional underwriters as they deem necessary. LB makes no representation or warranty of underwriting for Mustang. LB, however, agrees to work with whichever underwriter that Mustang deems fit for Broker submissions in connection with funding provided by Mustang (including but not limited to Michael Acosta).

**Broker Fees:** Broker can charge up to 15% on contract fees in most cases, and will receive "off contract fees or bonuses" on the following: (a) 3% on flat pricing deals of 35 to 38% per annum; (b) 4% on flat pricing deals of 40 to 48%; and (c) 5% pricing on deals above 48% per annum. Compounded pricing contracts, if applicable, will be negotiated on a case-by-case basis. Nothing shall prevent the parties from negotiating separate pricing on a case-by-case basis or altering pricing, when reasonable to do so, based on market conditions.

**On Contract Fees for LB**: LB shall be entitled to the same on contract fees for various processing services that it has provided to Broker in the past, and consistent with its current funding contracts with LBV and Mustang. In addition, LB shall charge an upfront delivery and/or wire fee of $100 on each contract. Nothing shall prevent the parties from negotiating separate pricing on a case-by-case basis or alter pricing, when reasonable, based on market conditions.



**Mustang Relationship/Available Capital:** The parties acknowledge and agree that LB is in a strategic funding and line of credit relationship with Mustang, and that Broker has been funding through LB with Mustang for last two (2) years. The parties wish to continue to utilize Mustang under the current scenario, which will not affect or implicate this Agreement and Addendum at all. However, if Mustang or LB terminates their relationship for any reason, then access to capital for LB (and LBV) will be limited. LB discloses that it does not have sufficient capital at this time to fund Broker on a full-scale level without Mustang. Broker understands and agrees to accept any risks associated with LB and LB's losing funding from Mustang, most notably that it might be harder for Broker to make its 2% monthly volume bonus. Nevertheless, Broker has agreed to proceed with the Agreement and Addendum with full understanding of the risks posed by the loss of funding from Mustang. The loss of funding from Mustang shall not be a basis for Broker to terminate this Agreement; or be deemed a breach of the Agreement or Addendum by LB. The parties agree to work together over the next two (2) years in order to raise substantial capital to ensure that LB can fulfill Broker's need for $500,000.00 per month in Litigation Funding. The parties acknowledge and agree that there are no assurances that this level of capital will be met. In the event that LB is unable to commit to a certain funding amount or case, it will promptly notify Broker prior to full submission and underwriting of a case to allow Broker the ability to move case along efficiently.

**Marketing Advances after Year One:** The Parties acknowledge that the Marketing Advances in this Agreement are to cover a 2-year period; however, the Parties will re-evaluate the Agreement after year one to determine if additional Marketing Advances are warranted based performance and market conditions. LB has no obligation to provide any other Marketing Advances then what are already covered in the Agreement.

**Re-Marketing to Broker Attorneys:** LB has agreed to assist Broker with re-marketing to its attorney's. LB will build-out for Broker a proprietary system exclusively for Broker, of which is considered intellectual property of LB (and under confidentiality clause). Broker agrees to pay LB out of pocket expenses to outside vendors to effectuate this, if Broker desires to proceed. Broker acknowledges the substantial value in doing this, and is a factor in the value of signing the Agreement at this time.

**Agreement Inures to Benefit of Both:** The Parties mutually agree that the Agreement is fair and reasonable to both Parties and inures equally to the benefit of both.

The signing below shall constitute an understanding of the above items between the Parties.



Agreed:

Chris Janish, CEO Legal-Bay, LLC

Agreed:

Rory J. Donadio on behalf of Tribeca
Capital Group and Individually

By: _____
Rory J. Donadio, Individually

**Witness**

By: _____
James Alemia
12/28/20

12





# FUNDING APPLICATION

## LEAD INFORMATION

| | | | |
|---|---|---|---|
| **First:** | Andrew | **Last:** | Keaveny |
| **Phone:** | 845-750-5009 | **Email:** | andrew.keaveny@yahoo.com |
| **City:** | | **State:** | New York |

**Notes:**

8-8-97

## LAW FIRM INFORMATION

| | | | |
|---|---|---|---|
| **Law Firm Name / State:** | Richard Fogel Law | Islip | New York |
| **Lawyer Name / Email:** | Richard Fogel | rfogel@rfogellaw.com | |
| **Case Manager Name / Email:** | | | |

**Notes:**

Law Offices Of Richard A. Fogel 389 Cedar Ave. Islip, NY 11751

## CASE INFORMATION

| | | | |
|---|---|---|---|
| **Date of Accident/Incident:** | 11-25-19 | **Location** | New York |
| **Case Type:** | Personal Injury | **Amount Requested:** | $20K |
| **Description of Accident:** | Client was at a bar in Long Island. Client was walking outside and was tackled by bouncer for puffing on a vape and client landed on a brick wall. 3 witnesses which were all deposed. | | |
| **Description of Injuries:** | Client sustained torn Labrum Had surgery 2-5-2020. Muscle spasms in neck. | | |
| | Offered 21% flat rates 21% every 6 months. $1500 processing fee $250 UW Fee | | |

## PRIOR FUNDING

| | | | |
|---|---|---|---|
| **Have you received any money against your lawsuit?** | No | **If so, how much?** | |
| **Prior Funding Law Firm:** | Approved for $15K from Sunrise. Offered 20% flat rates every 6 months. | | |

**Notes:**

Settlement offer for $75K  Demand is $300K

Phone number that client received client received phone call & text. 610-462-3332 (Mike's Cell)

| | | | |
|---|---|---|---|
| **Intake Rep:** | Frank | **Date:** | 12-21-20 |