KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
Phone: (212) 506-1700
Fax: (212) 506-1800

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY**

---------------------------------------------------x

|  |  |  |
|---|---|---|
| LEGAL BAY LLC, | : | |
| | : | |
| Plaintiff, | : | Case No. 2:22-cv-03941-ES-JBC |
| | : | |
| - against - | : | Removed from the Superior Court |
| | : | of the State of New Jersey, Essex |
| MUSTANG FUNDING, LLC, MUSTANG | : | County – Chancery Division, |
| SPECIALTY FUNDING I, LLC, | : | Docket No. (ESX-C-000086-22) |
| MUSTANG SPECIALTY FUNDING II, | : | |
| LLC, JAMES BELTZ, and KEVIN | : | |
| CAVANAUGH, | : | |
| | : | |
| Defendants. | : | |

---------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................1

FACTUAL ALLEGATIONS ...........................................................................4

    A.    Beltz And Cavanaugh Found The Mustang Entities In 2018 .............4

    B.    The Mustang Entities Pay Referral Fees To LB ..................................5

    C.    LB Alleges It Formed A Joint Venture With The Mustang Entities ...........................................................................................6

    D.    The Parties Execute The Line Of Credit Agreement ..........................8

    E.    LB Alleges Mustang Has Solicited Business From Its "Exclusive Network" Of Contacts ...................................................10

    F.    Mr. Janish Admits In Emails That LB and Mustang Never Entered Into A Joint Venture Agreement...........................................10

PROCEDURAL HISTORY...........................................................................11

LEGAL STANDARDS ................................................................................12

    A.    Rule 12(b)(2) .....................................................................................12

    B.    Rule 12(b)(6) .....................................................................................13

    C.    Rule 9(b) ............................................................................................14

ARGUMENT ............................................................................................14

I.    LB'S COMPLAINT MUST BE DISMISSED BECAUSE THE COURT LACKS SPECIFIC AND GENERAL JURISDICTION OVER THE DEFENDANTS.................14

II.    COUNTS I-VI MUST BE DISMISSED BECAUSE MR. JANISH ADMITS THAT MUSTANG AND LB NEVER FORMED A JOINT VENTURE NOR ENTERED INTO A JOINT VENTURE AGREEMENT ...........................................................18

III.    COUNT VI ALSO MUST BE DISMISSED BECAUSE LB FAILS TO SUFFICIENTLY PLEAD ITS FRAUDULENT INDUCEMENT CLAIM.....................23

IV.    MUSTANG HAS NOT BREACHED THE LOCA AS A MATTER OF LAW ..........26

CONCLUSION ............................................................................................................27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agbottah v. Orange Lake Country Club*,
  2012 WL 2679440 (D.N.J. July 6, 2012) .................................................................16

*Blystra v. Fiber Tech Grp., Inc.*,
  2005 WL 2807361 (D.N.J. Oct. 25, 2005) ...............................................................17

*Boyd v. Tribbett*,
  2015 WL 4199288 (D.N.J. July 10, 2015) ..........................................................23, 25

*Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*,
  137 S. Ct. 1773 (2017) .............................................................................................13

*Brumfield v. TransUnion, Inc.*,
  2020 WL 1083598 (E.D. La. Mar. 6, 2020) ............................................................15

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ...................................................................................20

*Carteret Sav. Bank, FA v. Shushan*,
  954 F.2d 141 (3d Cir. 1992) .....................................................................................12

*Chavez v. Dole Food Co.*,
  836 F.3d 205 (3d Cir. 2016) .....................................................................................16

*Daimler AG v. Bauman*,
  134 S. Ct. 746 (2014) ...............................................................................................14

*Deshpande v. Taro Pharms. U.S.A., Inc.*,
  2010 WL 1957869 (D.N.J. May 13, 2010) ..............................................................24

*Display Works, LLC v. Bartley*,
  182 F. Supp. 3d 166 (D.N.J. 2016) ..........................................................................15

*Donnelly v. Kole*,
  2010 WL 11693272 (D.N.J. July 21, 2010) .............................................................17

*Frederico v. Home Depot*,
  507 F.3d 188 (3d Cir. 2007) ........................................................................14, 23, 24

*George v. Rehiel*,
  738 F.3d 562 (3d Cir. 2013) .....................................................................................13

*Harfouche v. Wehbe*,
    950 F. Supp. 2d 766 (D.N.J. 2013) ......................................................................12

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984) ...........................................................................................13

*J.H. Reid Gen. Contractor v. Conmaco/Rector, L.P.*,
    2010 WL 398486 (D.N.J. Jan. 27, 2010) ........................................................14, 23

*Kenney v. Lofts at Sodo*,
    2019 WL 1057365 (D.N.J. Mar. 6, 2019) .............................................................15

*L-7 Designs, Inc. v. Old Navy, LLC*,
    647 F.3d 419 (2d Cir. 2011) .............................................................................21, 22

*Mayer v. Belichick*,
    605 F.3d 223 (3d Cir. 2010) .................................................................................13

*McClung v. 3M Co.*,
    2019 WL 4668053 (D.N.J. Sept. 25, 2019) ...........................................................17

*New Jersey Second Amend. Soc'y v. New Jersey Press Ass'n*,
    2021 WL 4822050 (D.N.J. Oct. 15, 2021) .............................................................21

*NN&R, Inc. v. One Beacon Ins. Grp.*,
    362 F. Supp. 2d 514 (D.N.J. 2005) .......................................................................14

*O'Connor v. Sandy Lane Hotel Co.*,
    496 F.3d 312 (3d Cir. 2007) .................................................................................13

*Quality Int'l Packaging, Ltd. v. Chamilia Inc.*,
    2015 WL 4749156 (D.N.J. Aug. 5, 2015) .............................................................17

*Siegmeister v. Benford*,
    2017 WL 2399573 (D.N.J. June 1, 2017) .........................................................16, 18

*UBI Telecom Inc. v. KDDI Am., Inc.*,
    2014 WL 2965705 (D.N.J. June 30, 2014) ....................................................24, 25, 26

*Washington v. Specialized Loan Servicing LLC*,
    2018 WL 10900585 (D.N.J. Aug. 27, 2018) ..........................................................23

*Watterson v. Page*,
    987 F.2d 1 (1st Cir. 1993) ....................................................................................21

*Weichert Co. Realtors v. Ryan*,
    128 N.J. 427 (1992) .............................................................................................22

**Other Authorities**

Rule 9(b) ................................................................................................................14, 23, 24

Rule 12(b)(2)...........................................................................................................3, 12, 14

Rule 12(b)(6)...................................................................................................................13

## PRELIMINARY STATEMENT

This case is a fiction. In a largely incomprehensible Complaint, a failing brokerage business claims a non-existent, and wholly oral, "joint venture" agreement that is totally contradicted by the parties' correspondence referenced in the Complaint. The Court should dismiss the Complaint in its entirety not only because the Court lacks personal jurisdiction over the Defendants, but because it is not plausible that there was such an agreement.

As an initial matter, Plaintiff Legal Bay LLC ("LB") is not a "provider" of litigation funding; by its own admission, it has barely enough capital to fund itself, much less anyone else. (ECF 1-1 ¶¶ 112, 117-18.) Rather, it is a litigation-funding broker that generates revenue by introducing litigants in search of funding to capitalized funders—including Defendants Mustang Funding, LLC, Mustang Specialty Funding I, LLC, and Mustang Specialty Funding II, LLC, (collectively, "Mustang" or the "Mustang Entities")—in exchange for a referral fee if the funder executes a funding agreement with the referred litigant. Mustang has always (and only) dealt with LB in LB's capacity as a litigation-funding broker, and accordingly has paid LB millions of dollars in referral fees over the last several years.[1]

---

[1] This arrangement is not unique. Multiple litigation-funding brokers refer litigants to Mustang and are compensated accordingly.

LB, however, has run out of money and litigants to refer.  Out of options, LB and its CEO and sole member, Chris Janish, have now concocted sham allegations of a joint venture and profit share arrangement in a transparent money grab that would provide a windfall for LB and give Mustang nothing in return.  LB alleges that, on top of the referral fees it has already accepted, LB and Mustang have an *oral* joint venture agreement that entitles LB to 25% of *all* Mustang's profits on every litigation funding contract Mustang has ever executed, including funding contracts with litigants LB did not refer and Mr. Janish has never met.

Of course, that is not plausible.  LB alleges it executed the joint venture agreement with Mustang in 2018 and that Mustang started breaching it in 2019, but provides no explanation—other than being out of money—for why it waited until now to claim that it is owed millions of dollars under some joint venture agreement. As noted, Mustang has already paid LB a referral fee for every LB-referred litigant that executed a funding agreement with Mustang.  LB does not—because it cannot—dispute that.  Indeed, the falsity of LB's allegations about an *oral* joint venture agreement and gratuitous profit share is apparent from Mr. Janish's own emails—including an email LB attached to its Complaint and others that are integral to it, attached to this Motion, which can properly be considered by the Court.  Because Mustang's purported breach of the oral joint venture agreement is a necessary predicate to Counts I-VI in LB's Complaint, Mr. Janish's admission that Mustang

and LB never entered into any such agreement fatally undermines LB's first six claims.

LB's allegations about a purported breach of the Line of Credit Agreement's ("LOCA") non-solicitation provision are equally ill-fated. The LOCA makes clear that the non-solicitation provision Mustang allegedly breached is not applicable until 60 days after notice of the LOCA's termination. LB alleges in its *May 16, 2022*, Complaint that it terminated (*past tense*) the LOCA on *May 17, 2022*. So, even if that termination date made sense and were true (which is not the case[2]), Mustang could not have breached the LOCA based on the allegations in the Complaint because the non-solicitation provision it purportedly breached was not even *breach-able* until, at the earliest, five days ago.

Ultimately, however, the Court need not even address the insufficiency of LB's allegations and deficiency of its claims. It should instead dismiss the Complaint under Rule 12(b)(2) because it lacks personal jurisdiction over all five Minnesota-based Defendants in the first place.

---

[2] LB purported to terminate the LOCA in a *May 18, 2022*, email. (*See* Declaration of Christian T. Becker ("Becker Decl.") ¶ 2, Ex. 1.)

## FACTUAL ALLEGATIONS

**A.     Beltz And Cavanaugh Found The Mustang Entities
         Beginning In 2018**

Mr. Beltz and Mr. Cavanaugh (the "Founders") are Co-Founders and Managing Partners of Mustang Funding, LLC—the litigation finance firm that is the sole member of Mustang Specialty Funding I, LLC and Mustang Specialty Funding II, LLC.  (ECF 1-1 ¶¶ 7-8.)  Both Founders are permanent residents of Minnesota.  (*Id.*)  Organized under the laws of Delaware, all three Mustang Entities are headquartered in Minnesota, and all members of the three Mustang Entities (and the members of the Mustang Entities' members) are domiciled in Minnesota. (*Id.* ¶¶ 4-6; *see also* ECF 9-6, Mayer Decl. ¶¶ 4-8.)

The Founders formed each of the three Mustang Entities to facilitate Mustang's litigation-funding activities.  Those activities generally fall into three categories:  plaintiff pre-settlement funding, attorney funding, and commercial funding.  (ECF 1-1 at 70, Ex. C.)

Mustang's pre-settlement funding arm provides non-recourse cash advances to plaintiffs with active litigation claims to help plaintiffs address immediate financial needs while they await settlement.  (*Id.*)  These advances account for roughly 60% of Mustang's portfolio.  (*Id.*)  Another 20% of Mustang's portfolio comprises non-recourse cash advances it provides to law firms that need access to capital for expenses incurred and expected in the course of litigation.  (*Id.*)  And the

last 20% of Mustang's portfolio comprises non-recourse cash advances to businesses with active litigation claims to help them reduce litigation-specific risk and fund litigation-related strategies.  (*Id.*)

### B.     Mustang Pays Referral Fees To LB

When the Founders set out to form the Mustang Entities and build Mustang's litigation-funding business in 2018 and 2019, they networked and corresponded with a variety of industry participants around the country.  (*Id.* ¶ 30.)  Some of these communications involved Mr. Janish and LB.  (*Id.* ¶¶ 27, 30.)

Mr. Beltz met Mr. Janish and learned about LB's litigation-funding brokerage business several years earlier while working for a private equity firm.  (*Id.* ¶¶ 25-26.)  That firm had occasionally funded litigants referred by LB and paid LB a corresponding referral fee, but had since ceased its litigation-funding operations. (*Id.*)  This left LB down a capital source to fund its referrals and pay its fees.  (*Id.*)

At the time of Mustang's founding, communications between the Founders and Mr. Janish concerned whether Mustang would fill that void in the same capacity as LB's previous capital source.  (*Id.* ¶¶ 25-27, 30.)  After an associate visited LB's office in Caldwell, New Jersey, to vet its operations (*id.* ¶ 12)—the sole New Jersey connection alleged in the Complaint—the Founders told Mr. Janish that Mustang would be willing to evaluate claims held by LB-referred litigants and, at Mustang's sole discretion, fund LB-referred litigants with promising claims and pay LB an

industry-standard referral fee for any such litigants (*id.* ¶¶ 27, 30). And that is precisely (and only) what Mustang has done, executing over 1,680 funding contracts[3] with, and disbursing over $31 million to, LB-referred litigants. (*Id.* ¶¶ 11, 24.)

Mustang has always and only ever dealt with LB in LB's capacity as a broker, (*id.* ¶¶ 11, 24-27, 30), and has compensated LB under a broker-fee structure comprising two payments: (i) an "off-contract" payment of 7-9% of the amount funded, disbursed upon execution of the funding contract; and (ii) a "carried-interest" payment of between 15% and 25% of any amount in excess of the funded principal ultimately recovered by Mustang.[4] (*Id.* ¶ 35 n.2.) Notably, LB does not allege that Mustang withheld any off-contract payment or carried-interest payment owed to LB for any of its successful referrals prior to LB's filing of the Complaint.

### C.   LB Alleges It Formed A Joint Venture With Mustang

In addition to the referral fees LB has collected from Mustang, LB alleges in its Complaint that it is essentially entitled to a carried-interest payment—*i.e.*, 25% of the profits—from every single advance Mustang has ever disbursed. (*Id.* ¶¶ 35, 61, 116, 119, 147, 151, 153, 159, 165, 168-169.) This notably includes advances to

---

[3] LB alleges that 97 of these funding contracts relate to lawsuits in New Jersey state and federal courts. (*Id.* ¶ 11.)

[4] Again, this arrangement is not unique. Mustang (and other funders in the industry) have similar compensation arrangements with other litigation-funding brokers.

litigants LB did not refer (*id.*), some of which were referred by different brokers to whom Mustang has made or must make the same broker fees described above (*id.* ¶ 97).

LB alleges that its entitlement to 25% of Mustang's profits arises out of a purported *oral* joint venture agreement entered into by LB and Mustang, which allegedly included the Founders' promise to pay LB a "twenty-five (25%) (sic) share of the [j]oint [v]enture's net profits." (*Id.* ¶ 35.) LB alleges the Founders also promised Mustang would "(i) provide substantially increased amounts of financing; (ii) not enter the litigation funding business as a broker or originator of litigation funding matters; (iii) not do business with LB's broker, attorney, and surgical provider relationships, whether existing prior to or after formation of the joint venture; and (iv) not originate or act as a broker for any pre-settlement, litigation, attorney, or surgical funding for their own benefit, to the exclusion of LB[.]" (*Id.* ¶ 40.)

According to LB, the Founders' "representations that the Mustang Entities . . . would not compete for or divert LB's litigation funding relationships for their own benefit was crucial, and material to, LB's agreement to participate in the [j]oint [v]enture." (*Id.* ¶ 43.) LB asserts that its "network of broker, attorney and surgical providers" are "exclusive," (*id.* ¶ 81), and "proprietary to LB," (*id.* ¶ 43). It contends that the Founders promised all of this because they "knew that there would

be no business without the efforts of LB." (*Id.* ¶ 36.)  But despite LB's allegations that it considered the Founders' representations so "material" to its purported joint venture with Mustang, and that it made such critical contributions to that alleged venture, LB fails to offer any remotely plausible explanation for why it waited four years from the joint venture's purported formation and three years from its alleged breach to allege the existence of such an agreement.  (*Id.* ¶¶ 10, 79.)

### D.    The Parties Execute The Line Of Credit Agreement

Separate from the alleged joint venture, Mustang Specialty Funding I, LLC ("Mustang I"), LBV Funding, LLC ("LBV"), and LB executed the LOCA on October 9, 2018.  (*Id.* ¶ 1, Ex. A at 8.)  LBV is a Nevada limited liability company located in Nevada with one member—Dr. Peter Caravella.  (*Id.*, Ex. A at 1.)  Under the LOCA, Mustang I and LBV agreed to provide LB with a line of credit up to $250,000 to help LB cover operating expenses.  (*Id.* ¶ 63.)  The LOCA stipulated that Mustang I and LBV would each provide 50% of any amount of the principal drawn by LB.  (*Id.*)  LB contends that it has drawn $180,000 under the LOCA, $90,000 of which Mustang I contributed.  (*Id.* ¶ 64.)

The LOCA contains a non-solicitation provision.  (*Id.* at 51-52, Ex. A, § 4.) That non-solicitation provision purports to prohibit a wide range of business activity, specifically providing that all parties to the LOCA "shall not solicit employ, hire, retain, or engage the following individuals or business associations with whom the

Parties had an existing relationship as of the Effective Date of this Agreement . . . ." (*Id.*)   Importantly, the non-solicitation provision is effective "[f]or a period of one (1) year *following the termination of this Agreement* for any reason[.]" (*Id.* (emphasis added); *see also id.* ¶ 195 ("The LOCA provides that *upon its termination*, in part, Defendants shall not solicit . . . individuals or business associations with whom Plaintiff had an existing relationship as of the Effective Date of the Agreement[.]" (emphasis added)).)   The LOCA can be terminated only upon either LB repaying the total amount it borrowed, or "sixty (60) days written notice" of termination by any party to the agreement.   (*See id.* at 52-53, Ex. A, § 6.)   LB has not repaid the total amount it has borrowed from Mustang I.[5]   (*Id.* ¶ 64.)   But on May 18, 2022, Mr. Janish sent an email to Mr. Beltz and Dr. Caravella providing 60-days' notice of LB's purported termination of the LOCA.   (*See* Becker Decl. ¶ 2, Ex. 1 ("LB notifies LBV Funding, LLC and Mustang Specialty Funding I, LLC that LB shall terminate the Agreement Sixty (60) days after the date that this notice is sent to each of you by email.").)   Sixty days from May 18, 2022 was July 17, 2022. Even if LB's notice was sufficient to terminate the LOCA, that termination did not occur until five days ago.

---

[5] According to LB, "[t]he LOCA does not outline when principal payments must be made," and instead suggests that, "principal payments would be drawn from the [j]oint [v]enture's profit share."   (*Id.*)

### E.   LB Alleges Mustang Has Solicited Business From Its "Exclusive Network" Of Contacts

All of LB's claims arise out of its allegations that Mustang has "misappropriate[d] LB's litigation funding relationships with brokers, attorneys, and surgical providers, and divert[ed] business opportunities from the [j]oint [v]enture." (ECF 1-1 ¶ 103; *see also id.* ¶¶ 1, 12-13, 53, 80-81, 91, 95, 97, 101, 112, 114, 131, 142, 147, 151, 153, 158, 169, 172-173, 176, 182-185, 187, 195-196.)  LB asserts that "[u]nder the direction of Messrs. Beltz and Cavanaugh, the Mustang Entities and Affiliates actively solicit litigation funding matters from LB's exclusive of (sic) network of brokers (including sub-brokers), attorneys, and surgical providers by contacting each of them – directly, through emails and telephone calls . . . or, indirectly through blast emails . . . ."  (*Id.* ¶ 81.)  LB contends that, in doing so, Mustang is "soliciting litigation funding matters belonging to the [j]oint [v]enture and directing these sources to finance their matters directly through [Mustang]." (*Id.*)

### F.   Mr. Janish Admits In Emails That LB And Mustang Never Entered Into A Joint Venture Agreement

In his capacity as LB's CEO, Mr. Janish has sent emails to the Founders conceding that Mustang never entered into any joint venture agreement, written or oral, nor agreed to form a joint venture of any sort, with LB.  In a January 30, 2020, email from Mr. Janish to Mr. Beltz, Mr. Janish admits that LB never had "an

understandable agreement" with Mustang, and that Mustang "never finalized" any agreement with LB, stating: "Since last summer Legal-Bay has tried to get an understandable agreement that protects all parties. Mustang never finalized that understanding after numerous rounds of changes with lawyers." (Becker Decl. ¶ 3, Ex. 2.)  In an April 15, 2020, email from Mr. Janish to Mr. Beltz, attached to LB's Complaint as Exhibit H, Mr. Janish first objected to Mustang's purported solicitation of LB's contacts, but then conceded that while he is "not opposed to . . . a plan to generate more business together off [LB's] law firm contacts[,] . . . a formal arrangement was never progressed by you," *i.e.*, Mustang.  (ECF 1-1 at 121, Ex. I.)

## PROCEDURAL HISTORY

On May 16, 2022, LB filed its Complaint in the Superior Court of New Jersey, Essex County – Chancery Division.   LB's seven-count Complaint against Defendants Mustang Funding, LLC, Mustang Specialty Funding I, LLC, Mustang Specialty Funding II, LLC, James Beltz, and Kevin Cavanaugh alleges putative claims for: (i) declaratory judgment that the Mustang Entities formed a joint venture with LB; (ii) dissolution and winding up of the alleged joint venture; (iii) accounting; (iv) breach of the purported oral joint venture agreement against the Mustang Entities; (v) breach of fiduciary duties against the Mustang Entities; (vi) fraudulent inducement against Mr. Beltz and Mr. Cavanaugh; and (vii) breach of the LOCA against Mustang Specialty Funding I, LLC.  LB served a copy of the Summons and

Complaint on Mustang Funding, LLC and both Founders on May 18, 2022, and served a copy of the Summons and Complaint on Mustang Specialty Funding I, LLC and Mustang Specialty Funding II, LLC on May 19, 2022.  Defendant Mustang Funding, LLC—with the consent of all other Defendants—timely removed the state court action to this Court on June 15, 2022.  On June 22, 2022, Defendants filed an agreed request for a 30-day extension of time to answer, move, or otherwise respond to the Complaint.  On June 23, 2022, the Court granted Defendants' agreed request for an extension, which extended Defendants deadline to answer, move, or otherwise respond to the Complaint to July 22, 2022.

## LEGAL STANDARDS

### A.    Rule 12(b)(2)

Federal courts in the District of New Jersey may exercise personal jurisdiction over nonresident defendants to the limits of due process under the Fourteenth Amendment.  *See Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 144-45 (3d Cir. 1992).  "Once the defendant raises the question of personal jurisdiction, the plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction."  *Id.* at 146; *see also Harfouche v. Wehbe*, 950 F. Supp. 2d 766, 769 (D.N.J. 2013) ("[The plaintiff] must present actual facts, not mere allegations, and cannot rely on the pleadings alone.").  To carry its burden, the plaintiff must show either that its claims arise out of the defendant's activities in the

forum state ("specific jurisdiction") or that the defendant has "continuous and systematic" contacts with the forum state ("general jurisdiction"). *See*, *e.g.*, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 416 (1984); *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 137 S. Ct. 1773, 1785 (2017). Due process requires that defendants have sufficient minimum contacts with New Jersey such that maintaining the suit "does not offend traditional notions of fair play and substantial justice." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007) (citation and quotation omitted).

### B.     Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual allegations so as to state a facially plausible claim for relief." *Mayer v. Belichick*, 605 F.3d 223, 229-30 (3d Cir. 2010) (holding that allegations must "raise a right to relief above the speculative level"). Although the court must "accept plaintiff's allegations as true and draw all inferences in plaintiff's favor," that "tenet . . . is inapplicable to legal conclusions." *George v. Rehiel*, 738 F.3d 562, 581 (3d Cir. 2013) (citation omitted). Complaints that rely on "naked assertions," "labels and conclusions," or "formulaic recitation[s] of the elements" must be dismissed. *Id.* (citation omitted).

13

### C.    Rule 9(b)

Rule 9(b) requires plaintiffs to "allege[] fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *J.H. Reid Gen. Contractor v. Conmaco/Rector, L.P.*, 2010 WL 398486, at *6 (D.N.J. Jan. 27, 2010) (quoting *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir. 2007)). Under this "heightened standard," the plaintiff must state "the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into [its] fraud allegation." *Id.* (citation omitted).  It also must identify "who made the purported misrepresentations and what specific misrepresentations were made." *Id.*; *see also NN&R, Inc. v. One Beacon Ins. Grp.*, 362 F. Supp. 2d 514, 518 (D.N.J. 2005).

## ARGUMENT

## I.    LB'S COMPLAINT MUST BE DISMISSED BECAUSE THE COURT LACKS SPECIFIC AND GENERAL JURISDICTION OVER THE DEFENDANTS

The Court must dismiss LB's Complaint under Rule 12(b)(2) because it has neither general nor specific personal jurisdiction over any of the Defendants.

LB cannot establish general personal jurisdiction because none of the Defendants are "at home" in New Jersey. *See, e.g.*, *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile"; for "a corporation, the place of incorporation and principal place of business are paradigm bases for general

jurisdiction").  LB concedes that Mr. Beltz and Mr. Cavanaugh reside in Minnesota. (ECF 1-1 ¶¶ 7-8.)  Their purported associate's single visit to New Jersey, which was on behalf of an unrelated hedge fund that Mr. Cavanaugh managed at the time and occurred before the alleged joint venture supposedly was formed, does not establish *any* contacts between the Founders and the forum, much less "continuous and systematic" ones.  Furthermore, all members of the three Mustang Entities (and the members of the Mustang Entities' members) are residents of Minnesota, and each of the three Mustang Entities has its principal place of business in Minnesota.  (*See* ECF 9-6, Mayer Decl. ¶¶ 4-8.)

As for the alleged "ninety-seven (97) funding contracts" LB and Mustang purportedly executed "in connection with [cases] in New Jersey state and federal courts," (ECF 1-1 ¶ 11), "the Supreme Court has held that even regularly occurring sales to a forum state cannot subject a nonresident defendant to general jurisdiction." *Kenney v. Lofts at Sodo*, 2019 WL 1057365, at *3 (D.N.J. Mar. 6, 2019); *see also Brumfield v. TransUnion, Inc.*, 2020 WL 1083598, at *3 (E.D. La. Mar. 6, 2020) (holding that the nonresident lender was not subject to general jurisdiction despite servicing fund advances to customers within the forum state).  Nor is general jurisdiction established by LB's allegations that Mustang Specialty Funding I, LLC and Mustang Specialty Funding II, LLC are registered to do business in New Jersey. (ECF 1-1 ¶¶ 5-6); *see Display Works, LLC v. Bartley*, 182 F. Supp. 3d 166, 175

(D.N.J. 2016) ("[T]he New Jersey statutory scheme does not permit jurisdiction by consent by virtue of registration to do business here or actually doing business here."); *Agbottah v. Orange Lake Country Club*, 2012 WL 2679440, at *3 (D.N.J. July 6, 2012) ("[N]either a certificate to do business in New Jersey nor mere solicitation of business is sufficient to confer general jurisdiction.").   Accordingly, the Court lacks general jurisdiction over all Defendants.   *See Siegmeister v. Benford*, 2017 WL 2399573, at *3 (D.N.J. June 1, 2017) (no general jurisdiction where "[the individual Defendants] are not New Jersey residents and [the business-venture Defendant] is neither incorporated in New Jersey nor does it have its principal place of business there"); *see also Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016) (holding that it is "incredibly difficult to establish general jurisdiction over a corporation in a forum other than the place of incorporation or principal place of business." (citation omitted)).

Nor can LB establish specific jurisdiction over Defendants because it pleads no facts showing that its claims arise out of Defendants' contacts with New Jersey. To be sure, LB nakedly asserts that Defendants "misappropriate[ed] and unlawful[ly] diver[ted] . . . LB's business relationships with New Jersey attorneys and brokers."  (ECF 1-1 ¶ 13.)  But LB fails to specifically identify a single New

Jersey business[6] or individual that Defendants allegedly "misappropriated."  *See*

*Donnelly v. Kole*, 2010 WL 11693272, at *2 (D.N.J. July 21, 2010) (no personal

jurisdiction where plaintiff "offer[ed] only the conclusory remark that Defendants

have sufficient business contacts in New Jersey" (citation omitted)); *McClung v. 3M*

*Co.*, 2019 WL 4668053, at *5 (D.N.J. Sept. 25, 2019) (requiring "citations to sworn

affidavits or other competent evidence, *i.e.*, actual proof, that show the necessary

minimum contacts with reasonable particularity" (citation omitted)).  LB's failure to

connect its "misappropriation" allegations—the sole basis of its entire Complaint—

to Defendants' forum contacts forecloses a finding of specific jurisdiction for all of

its claims.  *See Blystra v. Fiber Tech Grp., Inc.*, 2005 WL 2807361, at *4 (D.N.J.

Oct. 25, 2005) ("[W]here, as here, most of the claims arise out of the same set of

---

[6] LB does allege that the Mustang Entities solicited business from Baker Street Funding, LLC ("BSF") and Tribeca Capital Group, LLC ("Tribeca"), and attached to its Complaint a contract that refers to BSF as a "New Jersey Corporation" (ECF 1-1 at 125, Ex. J), and a contract that refers to Tribeca as a "New Jersey limited liability company," (*id.* at 139, Ex. L).  Both of those representations appear to be inaccurate, though.  Neither BSF nor Tribeca is registered with the New Jersey Department of the Treasury, Division of Revenue and Enterprise Services, (*see* Becker Decl. ¶¶ 4-5, Exs. 3-4), and *both are* registered with the Delaware Department of State as Delaware limited liability companies, (*see id.* ¶¶ 6-7, Exs. 5-6).  Furthermore, BSF's website lists only two addresses for the company—one in Florida and another in New York.  (*See id.* ¶ 8, Ex. 7.)  And Tribeca's website states that it is "headquartered in Los Angeles, California."  (*See id.* ¶ 9, Ex. 8); *see, e.g.*, *Quality Int'l Packaging, Ltd. v. Chamilia Inc.*, 2015 WL 4749156, at *2 (D.N.J. Aug. 5, 2015) ("[O]nce [jurisdictional] allegations are contradicted by an opposing affidavit or other evidence, a plaintiff must "respond with actual proofs, not mere allegations.").

facts and are tightly interwoven, an individualized discussion of each claim is unnecessary, as the jurisdictional analysis is the same"); *accord Siegmeister*, 2017 WL 2399573, at *4 (lack of personal jurisdiction for breach of contract claim necessarily foreclosed personal jurisdiction for fraudulent inducement claim premised on the same factual allegations).

Because LB's allegations do not support a finding of either general or specific jurisdiction, this Court must dismiss LB's Complaint.

## II. COUNTS I-VI MUST BE DISMISSED BECAUSE MR. JANISH ADMITS THAT MUSTANG AND LB NEVER FORMED A JOINT VENTURE NOR ENTERED INTO A JOINT VENTURE AGREEMENT

The Court must dismiss LB's first six claims because the Complaint does not plausibly plead that Mustang formed a joint venture or entered into any joint venture agreement with LB. Mr. Janish admits as much in multiple emails to the Founders, including his April 15, 2020, email to Mr. Beltz, (*see* ECF 1-1 at 121, Ex. I), and his January 30, 2020, email to both Founders, which, as explained below, is integral to the Complaint and properly attached to this Motion (*see* Becker Decl. ¶ 3, Ex. 2). LB premised its first six claims on Mustang's purported breach of the oral joint venture agreement, so Mr. Janish's admissions that Mustang never entered into any such agreement with LB, much less breached it, are the death knell for Counts I-VI.[7]

---

[7] If Mr. Janish's admissions somehow are not fatal to Counts I-VI, then LB's breach of fiduciary duty claim (Count V) still must be dismissed under the economic loss theory as duplicative of LB's breach of contract claim (Count IV). *See State Capital*

First, LB attached to its own Complaint Mr. Janish's April 15, 2020, email to Mr. Beltz in which he admits—indeed, laments—that LB and Mustang have neither formed a joint venture nor entered into a joint venture agreement.  In the email, Mr. Janish first objects to the Mustang Entities sending marketing emails to LB's purportedly proprietary "law firm contacts," but never once does he mention any joint venture agreement between the parties (or any agreement for that matter). (*See* ECF 1-1 at 121, Ex. I.)  To the contrary, Mr. Janish states that while he is "not opposed to . . . a plan to generate more business together off [LB's] law firm contacts[,] . . . a *formal arrangement was never progressed* by you," *i.e.*, Mustang. (*Id.* (emphasis added).)   Mr. Janish's admission that Mustang never progressed "a formal arrangement" with LB squarely contradicts the allegations that, *e.g.*, (i) "LB and the Mustang Entities entered into a [j]oint [v]enture agreement," (*id.* ¶ 164); (ii) that LB and Mustang "formally commence[d] the venture in October 2018," (*id.* ¶ 41); and (iii) that "the Mustang Entities agreed to pay LB twenty-five (25%) percent of the [j]oint [v]enture's net profits,"[8] (*id.* ¶ 165).  That admission, on its own, warrants dismissal of LB's Complaint.

---

*Title & Abstract Co.*, 646 F. Supp. 2d 668, 678 (D.N.J. 2009) (finding that the economic loss doctrine barred plaintiff's breach of fiduciary duty claim based on allegations intrinsic to the agreement underlying its breach of contract claim).

[8] Not only is the allegation that Mustang agreed to pay LB 25% of the net profits directly contradicted by Mr. Janish's own words, it just doesn't make sense.  If Mustang agreed to pay LB 25% of the joint venture's net profits (including profits

Second, Mr. Janish further admits in a January 30, 2020, email to both Founders that Mustang has never entered into a joint venture agreement nor formed a joint venture with LB.  (*See* Becker Decl. ¶ 3, Ex. 2.)  As an initial matter, the Court may—and should—consider the January 30, 2020, email exchange in deciding this Motion because the email exchange is integral to and relied upon in LB's Complaint.  *See, e.g.*, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (holding that a Court ruling on a 12(b)(6) motion may consider a "document integral to or explicitly relied upon in the complaint . . . without converting the motion [to dismiss] into one for summary judgment" (citation omitted).  Mr. Janish's January 30, 2020, email to Mr. Beltz is integral to LB's Complaint because LB references and even quotes the contents of the email in Paragraphs 97-99; those paragraphs in turn reference the contents of Mr. Janish's

---

from contracts LB did not originate/refer), then it would be illogical for LB to demand assurances up front that Mustang would "not enter the litigation funding business as a broker or originator of litigation funding matters" and "not do business with LB's broker, attorney, and surgical provider relationships, whether existing prior to or after formation of the joint venture." (*Id.* ¶ 40.)  To the contrary, if LB were guaranteed 25% of the purported joint venture's profits, then it should have been actively encouraging Mustang to bring in as much business as possible from any and all sources, including LB's business relationships.  In fact, LB's alleged demand that Mustang not do business with LB's "broker, attorney, and surgical provider relationships, whether existing prior to ***or after formation of the joint venture***" would be directly at odds with its fiduciary duty to act in the best interests of, and not steal opportunities from, the joint venture—*i.e.*, the same duties it claims Mustang breached.  (*Id.*)

email to allege Mustang improperly solicited and misappropriated LB's brokers and diverted LB's originations, which LB cites as the basis for all of its claims.[9]  (ECF 1-1 ¶¶ 1, 12-13, 53, 80-81, 91, 95, 97, 101, 103, 112, 114, 131, 142, 147, 151, 153, 158, 169, 172-173, 176, 182-185, 187, 195-196.)

Mr. Janish's January 30, 2020, email exposes LB's allegations as a fabrication.  After complaining about Mustang's purported solicitation of LB's broker relationship—an allegation debunked in subsequent emails—Mr. Janish recounts his failed efforts to negotiate some protection of his supposedly "proprietary" network of broker and attorney relationships and bemoans Mustang's

---

[9] Specifically, Paragraphs 97-98 allege "[Mustang] hired salespersons to **cold call, investigate and do business with brokers**" and that "Mr. Beltz tried to explain away [Mustang's] wrongful conduct by saying it was a mistake and just **'noise'** not to be taken seriously." (*Id.* ¶¶ 97-98 (emphasis added).)  Mr. Janish's January 30, 2020 email to Mr. Beltz clearly served as the basis for those allegations, which virtually plagiarize the first two sentences of his email.  (*See* Becker Decl. ¶ 3, Ex. 2 ("Mustang/Patrick **contacting our broker relationships directly** is very concerning. It is not **'noise'** as Jimmy states." (emphasis added)); *see also New Jersey Second Amend. Soc'y v. New Jersey Press Ass'n*, 2021 WL 4822050, at *5 (D.N.J. Oct. 15, 2021) (holding that an email exchange "detail[ing] the denial of the press pass," which Defendants attached to their motion to dismiss, was "integral to Plaintiffs' claims because the Amended Complaint repeatedly alleges that Defendants arbitrarily denied the Press Pass to Plaintiffs"); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) ("[E]mails—of which [plaintiff] had notice well before [defendant] attached them to its Answer (because [plaintiff] sent or received them)—were 'integral' to the negotiation exchange that [plaintiff] identified as the basis for its Complaint.").  Because LB "ha[s] actual notice . . . and relied upon [these emails] in framing the complaint," the Court can and should consider them in ruling on this Motion.  *Id.* (quoting *Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir. 1993)).

refusal to execute any agreement with LB.  (*See* Becker Decl. ¶ 3, Ex. 2.)  He states, "[s]ince last summer [LB] has tried to get an understandable agreement that protects all parties.  Mustang never finalized that understanding after numerous rounds of changes with lawyers."[10]  (*Id.*)  In yet another acknowledgment that Mustang and LB never entered a joint venture agreement, Mr. Janish suggests that Mustang's supposed solicitation of LB's broker contacts "goes against the [LOCA]"—*not* the supposedly ironclad joint venture agreement with the litany of protections Mustang allegedly promised back in 2018.  (*Id.*)  Mr. Janish's admissions that LB and Mustang have no "understandable agreement" and that Mustang "never finalized" any agreement with LB, and telling failure to cite any supposed joint venture agreement, would make little sense if the allegations in LB's Complaint had an ounce of credibility.  There is, however, nothing credible nor plausible about LB's allegation that it is entitled to 25% of Mustang's profits for providing no additional value beyond the referrals for which it has already been paid.

---

[10] Even if this email did not evidence the absence of the purported joint venture agreement between LB and Mustang—and it does—Mr. Janish's admission that the parties never executed an "*understandable* agreement," (*id.* (emphasis added)), at minimum reflects a lack of definiteness that renders the purported joint venture agreement unenforceable.  *See, e.g.*, *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992) ("A contract . . . must be sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty." (citation omitted)).

### III.   COUNT VI ALSO MUST BE DISMISSED BECAUSE LB FAILS TO SUFFICIENTLY PLEAD ITS FRAUDULENT INDUCEMENT CLAIM

LB's fraudulent inducement claim against the Founders also fails because LB's allegations do not satisfy the applicable pleading standard in two respects. First, LB does not plead specific details about the Founders' purported misrepresentations that are necessary to satisfy Rule 9(b)'s heightened pleading standard.   Second, LB pleads no non-conclusory allegations to show fraudulent intent and therefore fails to establish that element under any pleading standard.

LB fails to plead necessary "detail as to the who, what, where, and when of the[] alleged [mis]representations." *Boyd v. Tribbett*, 2015 WL 4199288, at \*6 (D.N.J. July 10, 2015) (citation omitted).  It provides only generic and sweeping descriptions—not quotes—of supposed misrepresentations.  (ECF 1-1 ¶¶ 181-85); *see, e.g.*, *Frederico*, 507 F.3d at 200 ("generic references" and "broad statements" do not "state with particularity the circumstances of the alleged fraud or otherwise inject the requisite precision into her allegations").  LB also fails to specify who, as between Mr. Beltz and Mr. Cavanaugh, actually made each purported misrepresentation.  (ECF 1-1 ¶¶ 181-90); *see Washington v. Specialized Loan Servicing LLC*, 2018 WL 10900585, at \*5 (D.N.J. Aug. 27, 2018) (Rule 9(b) not satisfied where "each allegation sounding in fraud is vaguely alleged against all 'Defendants'"); *J.H. Reid*, 2010 WL 398486, at \*7 (plaintiff failed "to satisfy the heightened standard of Rule 9(b)" where it "d[id] not specify who made the alleged

misrepresentation").  And it does not identify the date, time, or place of each alleged misrepresentation, or offer any other measure of substantiation, stating only that they were made "in the spring and summer of 2018."  (ECF 1-1 ¶ 181); *see, e.g.*, *Frederico*, 507 F.3d at 200 ("[P]laintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation."); *Deshpande v. Taro Pharms. U.S.A., Inc.*, 2010 WL 1957869, at *4 (D.N.J. May 13, 2010) (Rule 9(b) not satisfied where plaintiff "fail[ed] to specify . . . the identity of the persons who made the statements or the time or place of any of the alleged representations").  LB's failure to allege these required details renders its allegations insufficiently particular to provide the Founders with adequate notice of their purportedly fraudulent conduct, as required under Rule 9(b).

LB also fails to plead sufficient non-conclusory facts to establish the element of fraudulent intent under any pleading standard.  "Intention may be derived from circumstantial evidence such as . . . implausibility of the statement in light of subsequent acts and events . . . or evidence showing at the time of the promise that the promisor could not or would not fulfill the promise."  *UBI Telecom Inc. v. KDDI Am., Inc.*, 2014 WL 2965705, at *27 (D.N.J. June 30, 2014).  LB's Complaint, however, lacks even circumstantial evidence of fraudulent intent, instead relying on a litany of clearly deficient conclusory statements, such as, "[t]he Individual

24

Defendants intended that Mr. Janish and Dr. Caravella would rely on their misrepresentations," (ECF 1-1 ¶ 187), and "[t]he Individual Defendants knew their representations about the [j]oint [v]enture were false when they made them," (*id.* ¶ 186). The only statement in the Complaint that could even tenuously support LB's contention that the Founders' purported promises—*i.e.*, that Mustang would perform its obligations under the alleged joint venture agreement—were knowingly false when made is LB's allegation that Mustang ultimately did not perform those supposed obligations. But that allegation still falls well short of the mark—courts are clear that allegations of contractual non-performance do not show that prior promises to perform under the contract were intentionally false when made. *See, e.g.*, *Boyd*, 2015 WL 4199288, at *6 ("Allegations of non-performance alone, however, are insufficient to plead a fraudulent inducement claim."); *UBI Telecom*, 2014 WL 2965705 at *27 ("Nonperformance alone is, however, not sufficient to show an intent not to perform the promise."). Thus, under any pleading standard, LB's allegations fail to establish that any of the purported misrepresentations—themselves deficiently pled—were made with fraudulent intent.

These pleading deficiencies are fatal to LB's fraudulent inducement claim. The Court therefore should dismiss Count VI of LB's Complaint.

## IV.    MUSTANG HAS NOT BREACHED THE LOCA AS A MATTER OF LAW

LB's seventh claim for breach of the LOCA's non-solicitation provision fails as a matter of law because that provision plainly was not applicable and, thus, could not be breached when the allegedly proscribed conduct occurred.

Solicitation is barred by the LOCA's non-solicitation provision *only upon* termination of the LOCA.  (*See* ECF 1-1 at 51, Ex. A § 4 (explaining that the non-solicitation provision is effective "[f]or a period of one (1) year following the termination of this Agreement for any reason[.]").)  LB even admits that point in its Complaint, stating "[t]he LOCA provides that *upon its termination*, in part, Defendants shall not solicit . . . individuals or business associations with whom Plaintiff had an existing relationship as of the Effective Date of the Agreement[.]" (*Id.* ¶ 195 (emphasis added).)

The LOCA can be terminated only upon either (i) LB repaying the total amount it borrowed (which it has not), or (ii) "sixty (60) days written notice" of termination by any party to the agreement.  (*Id.* at 52, Ex. A § 6.)   LB provided the Mustang Entities with 60-days' notice of its purported termination of the LOCA via email sent by Mr. Janish on May 18, 2022.  (*See* Becker Decl. ¶ 2, Ex. 1.)  In that email, Mr. Janish directly contradicts LB's allegation that it "terminated the LOCA on May 17, 2022," (ECF 1-1 ¶ 195), stating, "LB notifies LBV Funding, LLC and Mustang Specialty Funding I, LLC that LB shall terminate the Agreement Sixty (60)

days after the date that this notice is sent to each of you by email." (*See* Becker Decl. ¶ 2, Ex. 1.)   Accordingly, even if LB's 60-days' notice of purported termination is valid, that would make the non-solicitation provision effective only as of July 17, 2022—*i.e.*, five days ago.   Because all of the alleged conduct underlying LB's claim for breach of the LOCA's non-solicitation provision occurred months and years before that provision even became applicable, the alleged conduct cannot constitute breach of contract as a matter of law.   Therefore, Count VII of LB's Complaint must be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss LB's Complaint in its entirety with prejudice.

Dated: New York, New York
July 22, 2022

KASOWITZ BENSON TORRES LLP

By: _/s/ Christian T. Becker_____
    Christian T. Becker
    Sheron Korpus (*pro hac vice
    forthcoming*)
    Edward E. Filusch (*pro hac vice
    forthcoming*)
    David Tyler Adams (*pro hac vice
    forthcoming*)
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800

Email: cbecker@kasowitz.com
skorpus@kasowitz.com
efilusch@kasowitz.com
dadams@kasowitz.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument was served on July 22, 2022, on all counsel of record via CM/ECF, pursuant to the Federal Rules of Civil Procedure.

<em>/s/ Christian T. Becker</em>

Christian T. Becker